

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

JEREMY PINSON
PLAINTIFF

v.                          Case No. 23-cv-00442-TUC-RM

FEDERAL BUREAU OF PRISONS, et al.,
DEFENDANTS

## MOTION OF DEBRA PINSON TO INTERVENE AND FOR PERMISSIVE JOINDER OF IDENTICAL CLAIMS

COMES NOW the plaintiff Jeremy Pinson proceeding pro se, and her mother Debra Pinson also proceeding pro se (hereinafter "movant") seeking a court order granting Debra Pinson leave to intervene into this action and to join her First and Fifth Amendment claims to Plaintiff's First Amendment retaliatory transfer claims as outlined in her First Amended Complaint ("FAC")(Doc. 7) and proposed-Second Amended Complaint ("SAC")(Doc. 22), with leave to file a Third Amended Complaint if intervention and joinder are provisionally granted. This motion is premised upon Federal Rules of Civil Procedure 20(a)(1) and 24(b)(1)(B). For the following reasons, this motion should be granted.

I. RELEVANT FACTS:

On Sept. 14, 2022 Plaintiff Jeremy Pinson was attacked by prisoner Tyrone Brown while walking with several inmates in the USP Tucson dining hall with a prison-made weapon. (See Declaration of Jeremy Pinson, Ex. 1 hereto). Prison officials at USP Tucson had had ample warning that Brown posed a threat to the safety of both Pinson and the inmates she was walking with that day, but for reasons that are unclear prison officials refused to follow PREA regulations that required them to protect Pinson and the other inmates from Brown. (id.). Several individuals outside the prison, including Pinson's Mother, movant Debra Pinson, her attorneys Andrew Talai and Jim Davy, as well as one of the other inmates' family members had also attempted to intervene to prevent Brown's attack on Sept. 13, 2022 to no avail. (See, Declaration of Debra Pinson, Ex. 2 hereto). After the attack, Pinson was identified on CCTV camera footage as being present, and was escorted to the Special Housing Unit approximately 3 hours after Brown's violent attack. (Ex. 1). Once in the SHU, Pinson and her cellmate who had also been involved in the incident began to file administrative remedy complaints and federal tort claims alleging staff negligence for their injuries inflicted by Brown. (id.). Pinson also received favorable summary judgment rulings by this court in Case No. 19-cv-00401-RM and 19-cv-00422-RM that set the stage for bench trials in the two matters to occur and likely require staff and inmates to testify about conditions in USP Tucson. (id.).

Following the summary judgment rulings and the filings related to Brown's attack representatives of the news media organization The Marshall Project, and civil rights attorneys at the Washington Lawyers Committee for Civil Rights and Urban Affairs became interested in the conditions at USP Tucson as well as Pinson's being repeatedly injured at the prison and harms being inflicted upon other inmates at the facility as well. (id.). Warden Mark Gutierrez assigned SIS Lieutenant J. Christensen to investigate the September 14, 2022 attack and on October 5, 2022 met with Pinson and several other inmates in the SHU to discuss the attack. (id.). They also had an ultimatum for the inmates: drop all pending lawsuits and any anticipated lawsuits stemming from the incident with Brown, or remain in SHU and be transferred to a worse facility. (id; see also: Exhibit 3, Decl. of Ernesto Zaragosa-Solis III). When Pinson and Zaragosa-Solis declined, the Warden threatened that they would be kept in SHU and eventually transferred and ordered they be removed from a housing tier with other USP Tucson inmates and moved them to a housing tier that housed only inmates pending criminal charges for having murdered another inmate. (id.). Other prisoners seeking legal assistance from Pinson were told by officers that Pinson had been placed into an isolated area of segregation to prevent her from assisting prisoners who had been seriously injured due to staff negligence at USP Tucson for receiving assistance exhausting their administrative remedies, pursuing legal action in federal court under the FTCA, or more importantly, from discussing their injuries with the representative of the news media and Washington Lawyers Committee investigating claims of victims harmed at FCC Tucson. (See, Exhibit 4, Declaration of David L. Green).

To facilitate Pinson's transfer, SIS officials at USP Tucson fabricated two SIS Reports in what it described as two separate investigations in October 2022: Investigation No's. TCP-23-0005 and TCP-23-0021. (Pinson Decl.). In Case No. 23-0005 SIS officials claimed that allegations of Pinson being involved in illicit activities at USP Tucson would be investigated in No. 23-0021 but did recommend Pinson received disciplinary charged for "Threatening any Person With Bodily Harm" under BOP Prohibited Act Code 203 for stating to investigators that she would pursue legal action against them. (id.). The second SIS report, No. 23-0021, then falsely claimed that Investigation No. 23-0005, had uncovered the evidence of her wrongdoing, stating:

"Inmate Pinson also known as 'Grace' has been assisting {another inmate} in the sale of K2 drugs in general population, has been accepting payments to file false allegations against other inmates to have them removed from the A-1 housing unit, has been accepting payments to conduct legal work for other inmates, and has been attempting to recruit other inmates to make false allegations against BOP staff regarding treatment towards transgender inmates" and "Pinson also threatened to pursue legal action against BOP staff at USP Tucson if Pinson was not returned to general population and left alone. Pinson received an Incident Report (#3695602) for the threat against BOP staff" and "made threatening statements toward BOP staff" in a second incident where SIS claimed "Pinson received an incident report (#3679910) for Code 203 threatening any person with bodily harm" and that "it is recommended that {redacted} and Jeremy Pinson, Reg. No. 16267-064, remain in the SHU pending transfer to another facility" (Pinson Decl). On the basis of these fabricated SIS reports, Warden Gutierrez requested Pinson be transferred to "a more restrictive environment" on Dec. 2, 2022 in a Request For Transfer (known also as "409" hereinafter) which recounted the fabricated SIS reports nearly verbatim. (Pinson Decl. at Attachment B). The Bureau's Transgender Executive Council ("TEC" hereinafter) deliberated on the 409 from its Jan. 3, 2023 meeting (See Pinson Decl. at Att. C) until at a Feb. 2023 meeting it selected the Secure Administrative Unit in Allenwood, PA which was then under construction but expected to open by the end of the year. (id.).

After several months in isolation in SHU at USP Tucson where officials repeatedly tried to persuade Pinson not to proceed with her bench trials in the two civil actions (19-cv-00401 and 19-cv-00422) her cases proceeded to trial. (Pinson Decl.). Within days of her second trial ending, BOP officials finally designated her pursuant to the Dec. 2, 2022 transfer request and selected a "more restrictive environment" as Warden Gutierrez requested: the Secure Administrative Unit, an inactivated solitary confinement control unit in Allenwood, PA, where the TEC designated her on Nov. 29, 2023. (Id. at Att. D). Though Pinson verbally and in writing warned the TEC that it was effectuating a retaliatory transfer on the basis of false allegations, the TEC paid no heed to Pinson in designating her to the SAU. Gutierrez, for his part, did not tell the TEC that the incident reports wherein Pinson has been accused of threatening staff identified in the two SIS reports had been subject to acquittal when Pinson went before a Discipline Hearing Officer, nor that all the other allegations against Pinson she was also acquitted of while another inmate Jose Armendariz was found guilty of the allegations Gutierrez had levied against Pinson. (id.; See also, Ex. 5, Declaration of Jose Armendariz).

The Secure Administrative Unit "houses incarcerated individuals diagnosed with a serious mental illness (SMI) who require a secure setting and either refuse mental health programming or are awaiting bed space at a mental health treatment program. Placement in the SAU is administrative, not voluntary." (Pinson Decl, Att. A). Pinson does not fit the Bureau's own definition of seriously mentally ill, she has not refused mental health programming at any point, she is not awaiting bed space in a mental health program either. (Pinson Decl.). However, due to a dispute between the correctional officers union and the Psychology Services Branch within BOP, the Bureau's headquarters has suspended activation of the SAU and it cannot receive further inmates beyond the 4 currently housed in he SAU. (id.). Furthermore, the 4 inmates in the SAU cannot progress out of the program due to the Bureau's suspension due to the union dispute - as a result the 4 inmates are being held in the physical SAU but are receiving no credit for their time there (See, Ex. 6 Declaration of Juan Vargas; Ex. 7, Declaration of Bruce Altenbuger; Ex. 8, Declaration of Eric Temple) thus their stay in the SAU has become indefinite. (id.). None of the SAU inmates were given any due process prior to their placement in the SAU. (id.). Because they cannot make progress on being removed from the non-functioning program, their ability to transfer closer to their release residences or other programs is also completely suspended. (Pinson Decl. at Att. E-H). In turn, this prevents movant Debra Pinson from being able to visit her daughter who is being held against her will in solitary confinement in the SAU. (Ex. 2, Decl. of Debra Pinson). Moreover, she has been restricted from a contact visit with her daughter since she entered segregation on Sept. 14, 2022. (id.).

II. LEGAL STANDARDS

The Federal Rules of Civil Procedure provide a path that plaintiffs may use to join their claims into a single action if their claims "arise out of the same transaction, occurrence, or series of transactions or occurrences" and if "any question of law or fact common to all plaintiffs will arise in the action." Fed.R.Civ.P. 20(a)(1).

Moreover, Rule 24 permits a party to intervene where they can demonstrate they have a claim or defense that shares with the main action a common question of law or fact. Rule 24(b)(1)(B). When evaluating these requirements, courts are guided by

"practical and equitable considerations" and generally construe the rule to apply "broadly in favor of proposed intervenors." Wilderness Soc. v. U.S. Forest Service, 630 F.3d 1173, 1179 (9th Cir. 2011)(quoting United States v. City of Los Angeles, 288 F.3d 391, 397 (9th Cir. 2002)).

In evaluating motions to intervene courts "must take all well-pleaded, non-conclusory allegations in the motion to intervene...and declarations supporting the motion as true." SW Center for Biological Diversity v. Berg, 268 F.3d 810, 820 (9th Cir. 2001).

III. ARGUMENTS AND AUTHORITIES

A. MOVANT HAS A FIRST AND FIFTH AMENDMENT RIGHT TO VISIT WITH HER DAUGHTER THAT IS ABRIDGED BECAUSE OF THE RETALIATORY TRANSFER PLAINTIFF RECEIVED

In Tiedemann v. Blanckensee, 72 F.4th 1001 (9th Cir. 2023) the Bureau of Prisons did "not here dispute that its policy limiting incarcerated persons' phone time at least implicates the First and Fifth Amendment interests in free association with family and others." In a previous appeal, the Ninth Circuit also reaffirmed in 2019 in a case involving Tiedemann, the prisoners have a "substantive due process claim predicated on his fundamental liberty interest in a relationship with his children" and "a First Amendment freedom of association claim" relating to access to his family. See, Tiedemann v. Mitchell, 778 Fed. Appx. 461, 462 (9th Cir. 2019).

Here, movant Debra Pinson -- the mother of plaintiff Jeremy Pinson -- also alleges that she too bears constitutional rights like Tiedemann to freedom of association/substantive due process in a relationship with her daughter that has been unconstitutionally abridged by the Bureau's retaliatory transfer of her daughter from a general population facility within 500 driving miles of her, to a solitary confinement facility where she no longer has the ability to visit Plaintiff because she is in excess of 500 driving miles which is physically and economically prohibitive. (Decl. of Debra Pinson).

Congress has mandated the Bureau of Prisons "shall designate the place of the prisoners imprisonment" specifically "in a facility as close as practicable to the prisoner's primary residence and to the extent practicable, in a facility within 500 driving miles of that residence" 18 USC 3621(b). But, here because the Bureau effectuated a retaliatory transfer from a facility within 500 miles of Plaintiff's release residence in Midwest City, OK not only placed significant and unconstitutional hardship upon plaintiff, it placed an unconstitutional hardship on the movant as well, and movant alleges that the unconstitutional nature of the plaintiff's transfer makes the abridgment of her own constitutional rights to maintain a relationship with her daughter through contact visits is a violation of her First and Fifth Amendment rights which is ongoing because the Bureau of Prisons also refuses to undo its actions in effectuating an unconstitutional retaliatory transfer of plaintiff to the most isolate control unit in the entire prison system on the other side of the United States from movant.

Normally, such designation decisions would not be judicially reviewable. But the Ninth Circuit itself held in Reeb v. Thomas, 636 F.3d 1224, 1228-20 that 3621(b) designations are not exempt from judicial review where "allegation that BOP action is contrary to established federal law, violates the United States Constitution, or exceeds its statutory authority" which permits movant to challenge Plaintiff's retaliatory transfer to the Secure Administrative Unit insofar as it is an abridgement of her First and Fifth Amendment rights as well. The Eleventh Circuit Court of Appeals said much the same in another case involving a Bureau of Prisons inmate seeking injunctive relief relating to a designation decision that he alleged was in violation of his Eighth Amendment rights. "{A} plaintiff may be able to obtain injunctive relief against a federal officer acting in his official capacity when the officer acts beyond statutory or constitutional limitations." Doe v. Wooten, 376 Fed.Appx. 883, 884-85 (11th Cir. 2010)(citing Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682 (1949); Saine v. Hosp. Auth., 502 F.2d 1033 (5th Cir. 1974)).

Plaintiff is likely to prevail upon the claims she has raised in her Second Amended Complaint which is pending PLRA screening on the docket of this case since April. (Doc. 22). The Bureau violated plaintiff's due process rights in sending her to the SAU as laid out in Count II of the Second Amended Complaint (hereinafter "SAC")(Doc. 22). In Johnson v. Ryan, the Ninth Circuit Court of Appeals reversed Judge Liburdi of this court in a case involving an Arizona state prisoner who was transferred from "close custody" to maximum custody, in retaliation for his filing lawsuits against prison officials and without due process, an almost identical case to the Plaintiff's own SAC. 55 F.4th 1167 (9th Cir. 2022). The Court noted: "Inmates in close-custody have significantly greater freedom than those in maximum custody. Close-custody inmates live at different facilities from maximum-security inmates and enjoy reduced security protocols...thus it is not Johnson's removal from the SDP per se that creates an atypical and significant hardship, but the change in Johnson's underlying conditions of confinement when he was moved from

close custody and returned to the Browning unit." (id. at 1197)(citing Wolff v. McDonnell, 418 U.S. 539, 571 n. 19 (1971)(noting that the "imposition of solitary confinement requires procedural protection because it represents a major change in the conditions of confinement"). The Judge in that original Johnson case has gone on to apply the appellate decision to other similar cases to say: "The Ninth Circuit has held that a prisoner's liberty interest in avoiding maximum custody is clearly established. Here, plaintiff's transfer from close custody to maximum custody in the Browning Unit and its attendant conditions constituted a material change in his living conditions, and he was subject to an atypical and significant hardship. Accordingly, plaintiff had a liberty interest in avoiding transfer to the Browning Unit." Mendoza v. Shinn, No. CV-21-00829-PHX-MTL (D.Ariz., Feb 21, 2023)(holding that where inmate was moved to maximum custody and solitary confinement "without explanation...without any notice and without any hearing or opportunity for rebuttal...is insufficient to remedy the failure to provide any procedures at the time plaintiff was transferred. On these facts, plaintiff can establish a likelihood of success on the merits his due process claim.")(citing Johnson, 55 F.4th at 1197-99). Comparing Johnson and Mendoza to the SAC, plaintiff is likely to succeed on the merits of her due process claims because she too was moved from a general population facility to a solitary confinement unit that houses 4 inmates in the most restrictive isolation of the Bureau's entire population of 144,589 inmates in a unit that is not even operational because of a dispute between BOP's correctional officers union and its Psychology Services Branch holding those 4 inmates in complete limbo of ever leaving solitary confinement due to a dispute they are not even a party to. (See Pinson Decl, Att. K); (also see: Aitenhouses, Vargas, Temple Declarations)

Similarly, despite knowing the retaliatory nature of the requested transfer to "a more restrictive environment" on the basis of falsified government documents created by USP Tucson staff to secure Plaintiff's transfer, the BOP Central Office refused to look into plaintiff's allegations of the retaliatory nature of the transfer request and put her into solitary confinement in the SAU. The Bureau was well aware from Pinson v. U.S. Dept.. of Justice et al., No. 12-cv-01872-RC (D.D.C. 2021) that she would not fare well in solitary confinement. In 2020, BOP sought to secure the dismissal of that case which involved her previous retaliatory transfer to the ADX Florence facility. In moving to dismiss her claims for injunctive relief to prevent her ever being returned to solitary confinement in retaliation the plaintiff "claim{ed} that her constitutional rights were violated when Bureau of Prisons officials retaliated against her for exercising her First Amendment rights..." including that then-BOP Director Charles "Samuels transferred Pinson to ADX in retaliation for her First Amendment activities." (id., Order dated March 30, 2017 denying Motion to Dismiss). On January 8, 2021 the Court decided:

"There is no reasonable, more-than-speculative chance that BOP officials will again transfer Pinson to {solitary confinement} in retaliation for her exercising her First Amendment rights" 514 F.Supp.3d 232, 245-46 (D.D.C.), "Updated BOP guidance on the handling of prisoners who suffer from mental illness makes a second retaliatory transfer even more speculative...Pinson retorts that, despite new requirements for {solitary confinement} referrals depending on an inmate's care level, transfer is not prohibited. But while the policies do not prohibit the BOP from transferring Pinson back to {solitary confinement} they certainly make it harder for officials to do so" ultimately, "there is no evidence that BOP officials will again retaliate against Pinson by assigning her to {solitary confinement}. Her removal from that facility thus moots her official-capacity claim for retaliatory transfer." 514 F.Supp.3d at 246-47. Yet, by 2024, plaintiff is back in solitary confinement again and for the same reason: because prison officials retaliated against her for having the audacity to sue them in federal court, and embarrass them in the news media, and win.

These transfers are unconstitutional. As the D.C. Circuit Court of Appeals noted in Toolaprashad v. Bureau of Prisons, 286 F.3d 576, 587-88 (D.C. Cir. 2002):

"The relevant question is not whether a transfer actually interferes with a particular prisoner's ability to exercise her rights but whether the threat of a transfer would, in the first instance, inhibit an ordinary person from speaking. Crawford-El v. Britton, 93 F.3d 813, 846 (D.C. Cir. 1996). Equally irrelevant is the Bureau's long-recognized discretion to decide where to house prisoners. See, e.g. Olim v. Wakinekona, 461 U.S. 238, 245 (1983). An ordinary permissible exercise of discretion may become a constitutional deprivation if performed in retaliation for the exercise of a First Amendment right. Despite the fact that prisoners generally have no constitutionally-protected liberty interest in being held at, or remaining at, a given facility, therefore, the Bureau may not transfer an inmate to a new prison in retaliation for exercising his or her First Amendment rights." (citing Vignolo v. Miller, 120 F.3d 1075, 1077-78 (9th Cir. 1997); Pratt v. Rowland, 65 F.3d 802, 806 (9th Cir. 1995)).

The Sixth Circuit Court of Appeals reversed a district court a few years later, relying on Toolaprashad. In Hill v. Lappin, 630 F.3d 468 (6th Cir 2010) the Court also wrote:

"The district court's analysis of these two allegations was misdirected...Even though a prisoner who has no inherent constitutional right to avoid segregated housing or prison transfers, the BOP may not place the prisoner in segregated housing or transfer him to another prison as a means of retaliating against him for exercising his First Amendment rights." id. at 473 (citing Toolaprashad, 286 F.3d at 585; Thaddeus-X v. Blatter, 175 F.3d 378 (6th Cir. 1999)).

By extension, the Bureau also may not violate the movant's constitutional rights to freedom of association/substantive due process in maintaining a relationship with her daughter by conducting a retaliatory transfer that ultimately takes plaintiff out of the 500 driving miles mandated by Congress and thus creating a physical and economically prohibitive barrier to the movant maintaining visits with her daughter as she could have done in USP Tucson but for the retaliatory action of Bureau officials there in keeping her daughter in long term segregation and then transferring her to a prison on the other side of the country where she is now in solitary confinement 24 hours per day and no longer able to receive contact visits at all because she has been transferred to the most secure form of isolation the Bureau has for its entire population of more then 144,000 inmates.

CONCLUSION

WHEREFORE based upon the aforegoing and the evidence submitted herewith, movant Debra Pinson respectfully prays she be permitted to intervene into this action and to assert the aforegoing explained First and Fifth Amendment claims against the Federal Bureau of Prisons which directly extend from the plaintiff's own First and Fifth Amendment claims that the Bureau transferred her in retaliation and without due process of law. Movants claims exist only because of the claims plaintiff has asserted and she should be permitted to proceed in this action alongside her daughter.

If this motion is granted, plaintiff and movant seek 30 days to file a Third Amended Complaint consistent with the claims outlined herein being added to plaintiff's claims 1-4 in her Second Amended Complaint (Doc. 22).

Respectfully Submitted:

_/s/ Debra Pinson_
Debra Pinson
9034 Rhythm Road
Midwest City, OK, 73130
PinsonDebraL@gmail.com
(405) 706-8586
Movant - Pro Se

_/s/ Jeremy Pinson_
Jeremy Pinson #16267-064
USP Allenwood Secure Admin. Unit
PO Box 3000
White Deer, PA, 17887
Plaintiff - Pro Se

5