Exhibit 1

Declaration of Jeremy Pinson

X
X
X
X
X
X
X

DECLARATION OF JEREMY VAUGHN PINSON, REG. NO. 16267-064

I declare under penalty of perjury that the following is true and correct and is based upon my own personal knowledge and belief as set forth in the paragraphs below:

1. I am an inmate in the custody of the Federal Bureau of Prisons. On June 3, 2022 I arrived to the United States Penitentiary in Tucson, Arizona (hereinafter "USP Tucson") where I had been redesignated from the United States Penitentiary #2 in Coleman, FL.

2. After my arrival to USP Tucson I was in the Special Housing Unit (hereinafter "SHU") for approximately 10 days for a false disciplinary charge of which I was acquitted. Upon my acquittal the Warden of the prison, Damon Colbert, ordered my immediate release from SHU and I was reassigned to the A-1 housing Unit.

3. On June 26, 2022 inmate Tyrone Brown approached me to ask me if I would become a prostitute for him and that he would arrange for me to perform sex acts upon other inmates who would pay Brown in drugs and money. He also told me that he already has one transgender inmate named Jessica Gulisano who had been allowing him to "pimp" her for the previous 6 to 8 months. I told Brown I was not interested in his offer. Upon declining his offer, Brown then attempted to become menacing towards me and said that he could always "make" me become one of his prostitutes and brandished a prison-made weapon. Upon seeing his weapon, I immediately exited the cell we were in, proceeded down the stairs and directly to the office of my clinical psychologist Dr.Samantha Licata.

4. Upon entering Dr. Licata's office I explained to her what Brown had said and done to me and that I wanted to be protected from him immediately pursuant to the Prison Rape Elimination Act policies. She called Lieutenant Todd Kehl on the telephone and upon arriving to the unit after several hours Brown cut himself with a razor upon his arm and was escorted from the housing unit to a suicide watch cell in the Health Services department.

5. The next day on June 27, 2022 Brown was released from suicide watch by a psychologist. The officers overseeing the Health Services area accidentally released Brown to the A-1 housing unit because they were unaware of the PREA complaint I had filed against Brown a day prior. Upon entering my unit I observed Brown and walked to the inmate computers to use the Trust Fund Limited Inmate Communications System (hereinafter "Trulincs") to send an emergency message to Dr. Licata alerting her to Brown's presence in the Unit. That email is attached hereto as Attachment ⟨I⟩

6. Dr. Licata immediately notified Lieutenant Andreik DeLeon that Brown was supposed to be in the SHU under a PREA investigation pursuant to 28 CFR 115.62 and 115.64, and DeLeon came to the A-1 housing unit approximately 1 hour after my email to Dr. Licata and escorted Brown to the SHU pending SIS investigation.

7. Following Brown's placement in SHU I began to ask my attorneys Andrew Talai and Jim Davy, as well as my mother Debra Pinson, to assist me in contacting the BOP to make sure that Brown was made my separatee and never housed with me again. They followed up on this request with several telephone calls to Executive Assistant/Acting Associate Warden Gregory Chaffey who instructed SIS Lt. Christensen to follow up on them.

8. Lt. Christensen was only angered by the telephone calls and called me to the Lieutenant's office to threaten and berate me about them, telling me if one more person were to call AW Chaffey that he was going to throw me into the SHU and immediately transfer me. I felt that Christensen crossed a line with his threats, so I reported the incident in an email via Trulincs to Jenna Epplin on Sept. 12, 2022 at 1:36pm. That email is Attachment ⟨I⟩ hereto.

9. The next day, Sept. 13, 2022, after my email to Epplin in BOP's Washington, D.C. headquarters, Christensen and the new Warden Mark Gutierrez arramged for Brown to be released from SHU. Brown immediately began threatening me and other inmates prompting several of them to send emails via Trulincs to report Brown under PREA seeking staff protection from him. I am submitting declarations from those inmate alongside this one with this motion to the court.

10. The next day, Sept. 14, 2022, Brown attacked me in the inmate dining hall with a prison-made weapon causing serious injuries to me, Jessica Gulisano, my cellmate Ernesto Zaragosa-Solis. After the attack I returned to my housing unit, and approximately 2-3 hours later was escorted to the SHU alongside my cellmate Zaragosa-Solis.

11. During the first week of October, I received the summary judgment decision in Case No. 19-cv-00422-RM (D.Ariz.) and on Oct. 5, 2022 when Christensen and Warden Gutierrez removed me from my cell to interview me about Brown's attack I took the

decision with me to show them that I was familiar with PREA regulations and as a result I knew that they were wrong to have allowed Brown out of the SHU to attack me after I had already reported him for trying to force me to become a prostitute for him.

12. During the interview both Christensen and Warden Gutierrez told me that I had a choice, I could drop the two cases that Judge Marquez has denied summary judgment on (No's. 19-cv-00401 and 19-cv-00422) and save the Bureau the hassle and embarrassment of a public trial, as well as any claims I was planning to file over Brown's attack, or they were going to keep me in the SHU and transfer me. They told me that all they had to do to get me transferred into permanent solitary confinement again was to "write a few lies on our report" and I would "be a dead man walking, noone will listen to you and no judge will save you, you will spend the rest of your sentence in the hole." I told them that I was not afraid of them and they needed to stop threatening me and let me out of SHU and back to my unit or they could guarantee I would eventually sue them for having the audacity to threaten me in such a brazen and arrogant manner. I told them I knew my rights and I would not be intimidated "by thugs with badges."

13. After the interview, Warden Gutierrez and Christensen interviewed my cellmate Zaragosa-Solis, and then we were returned to our cells.

14. Initially, I had no way to report Gutierrez and Christensen due to the lack of the ability to send messages via Trulincs to the Transgender Executive Council (hereinafter "TEC"). But I knew that policy required staff to report allegations against other staff (Note: that Policy is Attachment __ hereto) and so I waited for email access to the TEC to be restored to report them for threatening me with a retaliatory transfer and all the other wrongdoing I was aware of at USP Tucson.

15. Pursuant to a Protective Order in Case No. 22-cv-00298-RM (D. Ariz.) in the discovery process I was able to access and read the SIS reports Christensen created for Gutierrez to sign. There were two reports, one assigned Case No. TCP-23-0005 (hereinafter "Report 1") and a second assigned Case No. TCP-23-0021 (hereinafter "Report 2"). I learned the manner in which Christensen and Gutierrez falsified SIS reports to justify my transfer after reading them once they were produced under the protective order.

16. Report 1 is 17 pages in length, and includes interviews of the inmates who were involved in the incident with inmate Brown on 9-14-22. The report's "Summary" stated:
"On September 14, 2022 at approximately 6:30am {redacted} became disruptive in Food Service. Specifically, staff announced via radio a fight in the inmate dining hall. {redacted} was observed by staff attacking {redacted} from behind, striking {redacted} with a prison-made weapon. Staff gave direct orders to {redacted} to cease his actions, which he complied. Responding staff placed {redacted} and {redacted} in hand restraints and recovered a prison-made weapon, measuring 8 inches in length, made from a razor melted onto a toothbrush. A second razor weapon was recovered on the floor during application of hand-restraints by staff. Both inmates were place into hand restraints and escorted to Health Services for medical assessments. Staff observed {redacted} with multiple lacerations to the upper facial area which did not require outside medical attention. Both inmates were searched, medically assessed, body scanned, and placed in the special housing unit (shu). Subsequently, a review of CCTV indicated several other inmates at the scene of the incident were possibly involved. Inmates Jeremy Pinson, Reg. No. 16267-064 {redacted}. All inmates were secured in the special housing unit pending sis investigation."

17. Because I was present for Brown's attack, I know that the names listed as "{redacted}" are Tyrone Brown, the perpetrator, and Jessica Gulisano, his main victim that day.

18. One Page 6 of the report, in the "Victim Statements" section an interview of inmate Gulisano by Lt. Christensen on 10-13-22 at 11:47 AM lists her making the following statement to Christensen:
"Gulisano stated before Brown went to the special housing the first time for threatening Jeremy Pinson, Reg. No. 16267-064 Brown put $200 on Pinson's account for K2 drugs (also known as "spice"). Pinson never gave Brown the drugs and {he} threatened Pinson over it. Pinson then went to Armendariz stated {redacted} and Armendariz agreed to pay Pinson to get {redacted} removed from the A-1 housing unit, where Pinson then claimed Brown was making threats of violence towards Pinson. Gulisano was asked why Brown was so determined to commit the assault. She stated Brown must have thought that I had turned my back on him and was okay with what Pinson and Armendariz had done to him. I also probably gave Brown the idea that I had a relationship with Armendariz after ending my relationship with Brown and told him I did not want to mess around anymore due to being muslim."

19. Report 1 does not indicate whether SIS attempted to review my account statement, but if they had they would have learned Brown never put $200 on my trust account and that in fact my trust account has been frozen for years due to debt encumbrances. (See Attachment __ hereto).

20. Report 1 concludes on Page 16 with the following conclusion:
"The claim of a paid hit by Armendariz was found to be unsubstantiated" and "allegations made against Pinson and Jose Armendariz engaging in illicit activities are being investigated in a separate SIS Case No. TCP-23-0021".

21. Report 1 contained the following recommendations to Gutierrez:
"that {Pinson, Zaragosa-Solis and Armendariz} remain in SHU pending the outcome of Case No. 23-0021" and "that Pinson receive a Code 299 most like Code 203, Threatening Any Person with Bodily Harm...for demanding BOP staff return Pinson to general population and leave Pinson alone or legal action will be taken {during Oct. 5, 2022 interview with Christensen}".

22. Report 2 begins with the following "Summary":
"During the course of investigation in Case No. TCP-23-0005 it was found Jeremy Pinson and Jose Armendariz have been

engaging in illicit activities that are a risk to the safety, security, and orderly running of USP Tucson, including pimping transgender inmates in general population, dealing drugs, and filing false allegations to remove another inmate {Brown} from general population. In addition, Pinson has made threatening statements against BOP staff."

23. Because I have read both Reports 1 and 2, I can state clearly that Report 1 does not in any way support what Report 2 described in its summary as having stated. Report 1 does not support the claims in the "Summary" of Report 2, as a result the "Summary" of Report 2 is categorically false both on the basis of it not being supported by Report 1 and the fact I categorically deny what it states in its entirety. The statements about me are not true in any way.

24. On Page 11 of Report 2 it states that Christensen relief upon Jose Armendariz having "confessed" to the statements contained in the summary and then states the following:

"Inmate Pinson, also known as Grace has been assisting Armendariz in the sale of K2 drugs in general population, has been accepting payments to file false allegations against other inmates to have them removed from the A-1 housing unit, has been accepting payments to conduct legal work for other inmates and has been attempting to recruit other inmates to make false allegations against BOP staff regarding treatment towards transgender inmates" and "Pinson also threatened to pursue legal action against BOP staff at USP Tucson if Pinson was not returned to general population and left alone. Pinson received an incident report (#3695602) for the threat against BOP staff."

25. On the basis of Report 2, which Gutierrez signed on November 15, 2022, he submitted a Request for Transfer (hereinafter "409") to the Designation and Sentence Computation Center's Senior Deputy Assistant Director Linda Geter on December 2, 2022 which is Attachment B hereto requesting my transfer to "a more restrictive environment".

26. The Transgender Executive Council is responsible for the final decision on my redesignations, so they began deliberating the Dec. 2, 2022 409 at their January 3 and January 17, 2023 meetings according to their Meeting Minutes which are Attachment C hereto. They designated me to the Allenwood Secure Administrative Unit at their November 29, 2023 meeting, which they had selected in February 2023 but could not effectuate as stated in an April 2023 Meeting Minutes due to the program not being open/activated yet. (See Attachment D).

27. The Secure Administrative Unit (hereinafter "SAU") is described in Attachment A hereto.

28. I was moved to the SAU beginning on Dec. 14, 2023 and arrived to the Allenwood U.S. Penitentiary on Jan. 2, 2024 but was not formally placed into the SAU until construction teams finished remodeling the unit, on March 6, 2024.

29. I received no written notice of my referral to the SAU from the BOP. I did not receive a due process hearing before an impartial decisionmaker with regard to my placement in the SAU, nor an opportunity to speak or present witnesses and/or documentary evidence at such a due process hearing. (See Att. K)

30. Since being placed into the SAU a union dispute between the correctional officers and the psychologists operating the unit arose and a formal grievance was filed with the Bureau of Prisons by the union representing correctional officer. As a result the BOP Central Office suspended operations in the SAU pending the outcome of the union dispute and as a result none of the inmates housed in the SAU are allowed to receive programming or to begin progressing through "treatment phases" necessary to secure their release or transfer from the SAU. This information was provided to me by the psychologists in charge of the SAU - Dr. Powell and Dr. Green - to explain why our classification is suspended and remains in limbo until the union dispute is resolved by the Bureau's Executive Staff in Washington, D.C.

31. I have requested to be transferred to other programs such as the Residential Drug Abuse Program (See Att. E), the Female Integrated Treatment Program (Att. F), a vocational training or apprenticeship program (Att. G), the Reintegration Unit in another unit at USP Allenwood (Att. H) but all of my requests have been denied due to the fact the SAU is suspended in its activation and I cannot progress out of the unit due to it being suspended by the union dispute even though I have no control or influence over when that dispute is resolved and the union dispute has nothing to do with me.

EXECUTED UNDER PENALTY OF PERJURY PURSUANT TO 28 USC 1746 ON JULY 10, 2024.

JEREMY PINSON
#16267-064

Att. A
to
Pinson Decl.

FCC Allenwood Psychology Doctoral Internship

## Specialty Programs at FCC Allenwood

### Residential Drug Abuse Program (RDAP)

RDAP is the Bureau of Prisons' most intensive drug treatment program. RDAP is a unit-based program, which operates as a Modified Therapeutic Community (MTC). The community is the catalyst for change and focuses on the incarcerated individual as a whole person. The program considers an individual's overall need for change from a criminogenic lifestyle, not simply abstinence from drug use. RDAP emphasizes the importance of "community as method," emphasizing both social learning and mutual self-help, which are considered integral parts of self-change. As program participants progress through the phases of the program, they assume greater personal and social responsibilities in the community. Progress in treatment is based on the participant's ability to demonstrate comprehension and internalization of treatment concepts by taking behaviorally observable action to change his or her maladaptive and unhealthy behaviors. Research findings demonstrate that RDAP participants are significantly less likely to recidivate and less likely to relapse to drug use than non-participants. The studies also suggest that the Bureau's RDAPs make a significant difference in the lives of incarcerated individuals following their release from custody and return to the community.

FCC Allenwood is home to *two* Residential Drug Abuse Programs. The RDAP at the Low Security Institution has the capacity for 96 participants, and is staffed with a Drug Abuse Program Coordinator and three Drug Treatment Specialists. The RDAP at the medium security FCI has the capacity for 72 participants, and is staffed with a Drug Abuse Program Coordinator and four Drug Treatment Specialists.

### Nonresidential Drug Abuse Treatment Program (NR-DAP)

The Nonresidential Drug Abuse Treatment Program (NR-DAP) is a flexible, general population, psychoeducational-therapeutic group designed for treatment of incarcerated individuals with self-reported substance use disorders. NR-DAP is presented through scheduled and time-limited therapeutic group sessions. The journalized program is designed to meet the specific individualized treatment needs of the participants, generally challenging their core beliefs, their most fundamental (negative and unhelpful) ideas about themselves, others, and/or their worlds within the backdrop of their individual substance use. The focus of NR-DAP treatment is to improve the participants' current functioning and alleviate symptoms that may interfere with their post-release functioning. NR-DAP is offered at all three institutions at FCC Allenwood, and is staffed with a Nonresidential Drug Abuse Program Coordinator and four Drug Treatment Specialists.

FCC Allenwood Psychology Doctoral Internship

## Medication-Assisted Treatment (MAT)

Medication-Assisted Treatment (MAT) is the use of medications, in combination with counseling and behavioral therapies, to provide a "whole-patient" approach to the treatment of substance use disorders. Methadone, buprenorphine, and naltrexone are safe and highly effective medications approved by the FDA to treat opioid use disorders. By alleviating withdrawal symptoms, reducing opioid cravings, or decreasing the response to future drug use, these medications make people with opioid use disorders less likely to return to drug use and risk fatal overdose. These medications also help people restore their functionality, improve their quality of life, and reintegrate into their families and communities. The benefits of medication for opioid use disorder have been studied in prisons and jails, and one study found that incarcerated individuals with opioid use disorder treated by medications had an 87% lower risk of death than those untreated. Improved survival can continue post-release, especially when individuals are linked to ongoing treatment in the community. MAT is offered at all three institutions through the collaboration of Health Services staff and the Medication-Assisted Treatment Coordinator.

## Reintegration Unit (RU)

The Reintegration Unit (RU) houses incarcerated individuals who consistently request protective custody or refuse to enter general population at multiple locations. The RU provides incarcerated individuals with an opportunity to obtain skills that facilitate their adjustment to general population or community reentry. Incarcerated individuals are taught skills that foster enhanced interpersonal competence, develop adequate coping skills, engage in a "real life" experience of functioning around other incarcerated individuals, and develop a rational perception of relationships within prison allowing them to safely reintegrate into general population. There are two RU units, with a RU Psychologist and four Treatment Specialists staffing the units.

## Secure Mental Health-Step Down Program (SMH-SDP)

USP Allenwood is one of two institutions in the Bureau of Prisons with a Secure Mental Health program, with the other program housed at USP Atlanta. The SMH-SDP is designed to meet the treatment needs of incarcerated individuals with serious mental illness and a history of violence that has resulted in an inability to function safely in the general population, and subsequently are placed in long-term restrictive housing. The SMH-SDP is a unit of 30 incarcerated individuals, approximately one-third of whom are civilly committed to the custody of the Attorney General. The SMH-SDP represents a holistic treatment program that includes interventions and services from a variety of departments including Psychiatry, Health Services, Social Work, and Occupational Therapy. Mental health staff on the unit include the Specialty Program Coordinator, two Advanced Care Level Psychologists, two Mental Health Treatment Specialists, and a Psychology Technician.

FCC Allenwood Psychology Doctoral Internship

**Transitional Care Unit (TCU)**

The TCU addresses the transitional needs of mentally ill incarcerated individuals who have spent extended periods of time in secure treatment programs or restrictive housing settings. It is a multidisciplinary, collaborative effort designed to prepare mentally ill incarcerated individuals to transition to a general population setting, or in certain cases, prepare incarcerated individuals for release to the community. The unit is equipped and staffed to accommodate high security level and maximum custody status incarcerated individuals. The unit is separated from general population and allows for out-of-cell, structured individual and group programming in accordance with individually developed treatment plans.  In addition to mental health treatment, the participants are encouraged to participate in an array of prosocial, healthy work and leisure activities.  The ability to structure free time is considered paramount for management of mental health symptoms, reduction of violence, and successful reentry into less restrictive environments. Some participants may become Mental Health Companions, which are incarcerated individuals who are carefully screened and serve as supports and role models for other TCU participants. Successful completers have transitioned to Challenge, STAGES programs, and general population.  The TCU has a capacity for 65 incarcerated individuals, including 40 program participants and up to 25 graduates/Mental Health Companions.  A TCU Coordinator, two Advanced Care Level Psychologists, and three Mental Health Treatment Specialists staff the TCU.

**Secure Administrative Unit (SAU) –Currently Activating**

The SAU houses incarcerated individuals diagnosed with a serious mental illness (SMI) who require a secure setting and either refuse mental health programming or are awaiting bed space at a mental health treatment program (i.e., Secure Mental Health – Step Down Program, Secure STAGES, or Secure Skills).  Placement in the SAU is administrative, not voluntary. However, mental health programming is available for incarcerated individuals who volunteer to participate, and participation is incentivized. SAU components (e.g., in-cell television, recreation time, work opportunities, enhanced access to mental health staff, enhanced programming) are designed to support incarcerated individuals vulnerable to mental health crises, motivate incarcerated individuals to participate in programming, and prepare incarcerated individuals to transition to other units.  The SAU has a capacity of 45 incarcerated individuals.  The SAU mental health staff includes an SAU Coordinator, two Advanced Care Level Psychologists, and two Mental Health Treatment Specialists.

**Secure STAGES –Coming Soon**

Steps Toward Awareness, Growth, and Emotional Strength (STAGES) is a unit-based residential Psychology Treatment Program that provides treatment to incarcerated individuals with a diagnosis of borderline personality disorder.  The program uses an integrative model that includes an emphasis on a modified therapeutic community, cognitive-behavioral therapies, and skills training.  It uses evidence-based treatments (i.e., dialectical behavior therapy) to increase

the time between disruptive behaviors, foster living within the general population or community setting, and increase pro-social skills. This program aims to prepare incarcerated individuals for transition to less secure prison settings and promote successful reentry into society at the conclusion of their terms of incarceration.  The Secure STAGES program at FCC Allenwood is appropriate for incarcerated individuals who have a maximum custody classification or require specialized security measures.  It is an 18-bed program, with the option to house incarcerated individuals on a secure side of the unit or an open side of the unit.  It is staffed with a STAGES Coordinator, two STAGES Psychologists, and two Mental Health Treatment Specialists.

**Secure Skills –Coming Soon**

The Skills Program is a unit-based residential treatment program designed to improve the institutional adjustment of incarcerated individuals who have intellectual and social impairments. Incarcerated individuals with lower IQs, neurological deficits from acquired brain injury, fetal alcohol syndrome, autism spectrum disorder, and/or remarkable social skills deficits often become victimized and/or manipulated by more criminally sophisticated incarcerated individuals. As a result, they may be placed in the Special Housing Unit (SHU) for their protection or may have frequent misconduct reports due to limited resources for adaptive decision-making.  The Skills Program employs a multi-disciplinary treatment approach aimed at teaching participants basic educational and social skills over a 12-month period.  The goal of the program is to increase the academic achievement and adaptive behavior of this group of incarcerated individuals, thereby improving their institutional adjustment and likelihood for successful community reentry.  Secure Skills at FCC Allenwood is a 40-bed program, with the option to house incarcerated individuals on a secure side of the unit or open side of the unit. Mental health staff on the unit include a Skills Coordinator, two Skills Psychologists, and two Skills Treatment Specialists.

## Psychology Internship at FCC Allenwood

### Program Aim, Competencies, and Outcomes

The aim of the doctoral psychology internship program at FCC Allenwood is to train entry-level professional psychologists who can also function competently in the correctional environment. This is achieved by using the following competencies as benchmarks for our training of interns:

**Competency 1: Research** – The intern will demonstrate proficiency in understanding and applying scientific research to the practice of psychology generally, and the professional practice of psychology in corrections specifically.

**Competency 2: Ethical and Legal Standards** – The intern will demonstrate proficiency practicing psychology within the boundaries of the ethical and legal principles governing professional behavior. The intern will also

11

Att. B
to
Pinson Decl.

EMS-409.051 **REQUEST FOR TRANSFER/APPLICATION OF MANAGEMENT VARIABLE** CDFRM
SEP 2006
**U.S. DEPARTMENT OF JUSTICE**                                    **FEDERAL BUREAU OF PRISONS**

| From: M. Gutierrez, Complex Warden | Facility: FCC Tucson, Arizona | Date 12/2/22 |
|---|---|---|

Inmate's Name: PINSON, JEREMY                          Register No.: 16267-064

To: Linda Geter, Senior Deputy Assistant Director
    Designations and Sentence Computation Center

__X__ Transfer to:   USP Thomson-Reintegration Housing Unit (RHU), 323, Close Supervision.

_____ Apply Management Variable(s) _____

_____ Update Management Variable Expiration Date.  (New Date): _____

1. Inmate's Medical Status:
Inmate Pinson is a care level 2 medical and care level 3 mental health inmate assigned regular duty status with no medical restrictions. She is cleared for work in food service.

2. Institution Adjustment:

Inmate Pinson arrived at FCC Tucson, on June 03, 2022, via a 323 transfer from USP Coleman. Her overall institutional adjustment is rated as poor. Pinson has not completed any FSA programming and is currently housed in SHU.

3. Rationale for Referral:
On September 14, 2022 Pinson was placed in the special housing unit and an investigation was initiated by SIS. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓revealed allegations that Pinson and another inmate were engaging in illicit activities that contributed to an inmate being seriously assaulted and Pinson almost being assaulted. These allegations were further investigated in ▓▓▓▓▓▓▓ which concluded that Pinson and another inmate, with an exorbitant amount of influence amongst the inmate population, were conspiring to deal drugs and "pimp" transgender inmates. Specifically, Pinson's role was to help the influential inmate with legal work and with removing inmates from the unit by filing false PREA allegations against them. She would accept payments for these services and has also been attempting to recruit other inmates to make false allegations against BOP staff regarding the treatment of transgender inmates. Pinson has a long history of disrupting the orderly running of BOP facilities and using her status as a transgender inmate to her benefit by filing false PREA allegations to remove any inmate that she has issues with. Investigations at USP Allenwood in 2016, USP Tucson in 2018 x3, and USP2 Coleman in 2022 determined that Pinson filed false PREA allegations in an attempt to remove inmates that she had a financial or drug debt to. Another investigation at USP Tucson in 2020, cleared the alleged perpetrator after a review of CCTV footage revealed Pinson had no contact with him. At USP Florence in 2015, Pinson was removed from the STAGES program after multiple inmates began voicing concerns of Pinson stealing their PAC numbers, filing false PREA allegations to get community members removed, and throwing blood at a pregnant staff member. Pinson was also proven to have been part of a drug introduction plot with several other inmates while at USP Florence in 2016. Pinson has clearly displayed an inability to successfully program and be housed in a general population environment across multiple facilities in the BOP. At the conclusion of case ▓▓▓▓▓▓, SIS recommended Pinson receive a transfer. Based on Pinson's history of disrupt behavior, a more restrictive environment is required and the Unit Team recommends she receive a transfer to USP Thomson so she can be housed in the Reintegration Housing Unit.

| 4a. Parole Hearing Scheduled: | Yes _____ | XX No | b. If yes, when: | N/A |
|---|---|---|---|---|

5. Note any past or present behavior and/or management/inmate concerns:
Pinson has the STG assignments of ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓ Pinson has the CIM assignments of ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓ Pinson also has an extensive history of fighting/assaulting, assaulting staff, and threatening bodily harm.
6. BP337/BP338 Discrepancies:
There are five discrepancies between the BP-337 and BP-338.
Pinson was originally scored with serious violence >15 years but is now scored serious violence 5-10 years due to being sanctioned for code 101-Assaulting with Serious Injury in 2017.
Pinson was originally scored with a PSF of Sentence Length but it has been removed due to the passage of time.

**USA RFP - 358**

Pinson has the PSF of Threat GOV added due to her instant offense.
Pinson was originally scored with drug/alcohol abuse <5 years but is now scored never/>5 years due to the passage of time.
Pinson was originally scored with Age <25 but is now scored 36 through 54 due to the passage of time.

Staff have checked the following SENTRY Programs to ensure that they are correct and current:

|  |  |
|---|---|
| Inmate Profile | CIM Clearance and Separatee Data |
| Inmate Load Data | Custody Classification Form |
| Sentence Computation | Chronological Disciplinary Record |

Prepared by: J. Felix, Case Manager     Unit Manager Signature: M. Palmer

If the transfer is approved, a Progress Report will be completed prior to transfer.
*For Mariel Cuban Detainees – Staff have entered the CMA Assignment of ACRP RV DT@ to indicate the need for a Cuban Review Panel Hearing four months from his/her Roll-Over Date.

*(This form may be replicated via WP)*        *This form replaces EMS-409 of DEC 99*

F.O.I. EXEMPT

Att. C
to
Pinson Decl.



January 3, 2023



- IM Pinson, Jeremy Vaughn – Reg. No. 16267-064 - monitor and maximize hormone levels, follow all staff programming and mental health treatment recommendations and continue to work with local institution to address other concerns.  Recent 409 request for REDES to TOM RU.  Will be scheduled for additional review next month.





**USA RFP - 1598**



USA RFP - 1593



January 17, 2023



- IM Pinson, Jeremy Vaughn – Reg. No. 16267-064 - monitor and maximize hormone levels, follow all staff programming and mental health treatment recommendations and continue to work with local institution to address other concerns.  Recent 409 request for REDES to TOM RU.  Will be scheduled for additional review next month.

**USA RFP - 1594**

TEC to consult with Mental Health Treatment Coordinator about possible placement options.





Att. D
to
Pinson Decl.





November 29, 2023

- 



USA RFP - 1499



USA RFP - 1501



- PINSON, Jeremy Vaughn – Reg. No. 16267-064 - monitor and maximize hormone levels, follow all staff programming and mental health treatment recommendations and continue to work with local institution to address other concerns. Recent 409 request for REDES to TOM RU.  Will be scheduled for additional review next month.  TEC to consult with Mental Health Treatment Coordinator about possible placement options. Possible candidate for Secure Admin Unit (SAU) at Allenwood but program not yet established yet.  Pinson will remain at current facility for now.  TCP inquiring about transfer options to get Pinson out of SHU.  Remain at TCP until closer to SAU placement. No new updates. WASPB recently spoke with Pinson at TCP.  Continues to be housed in SHU due to incident reports.  Review case again in approximately 3 months.  Pending SAU placement.  Activation of program anticipated by end of calendar year. WASPB to ask legal if Pinson can be moved. Designated to ALP SAU.



USA RFP - 1502

Attachment E
to
Pinson Decl.

**PINSON, Jeremy**
Reg. No. 16267-064
Appeal No. 1190504-R1
Page One

---

### Part B - Response

You appeal the response of the Warden of USP Allenwood who
informed you that your application to the RDAP program was being
re-assessed.  You contend that you should be qualified to
participate in RDAP and transferred to another institution for
programming.

A review of your appeal reveals that the Warden adequately
addressed your concerns.  Although you were previously
determined unqualified for RDAP based upon the substance use
history listed in your presentence report (PSR), a re-review of
that information determined that your history was sufficient to
qualify you for an interview with the RDAP Coordinator to
determine if you are qualified for the program.  You are
currently on the wait list for that interview and will be
interviewed in order of nearness to release.  This response is
for informational purposes only.

If you are dissatisfied with this response, you may appeal to
the General Counsel, Federal Bureau of Prisons. Your appeal must
be received in the Administrative Remedy Section, Office of
General Counsel, Federal Bureau of Prisons, 320 First Street,
N.W., Washington, D.C. 20534, within 30 calendar days of the
date of this response.

Date:  May 5, 2024

AMY BONCHER
Regional Director

U.S. Depart...e
Federal Bureau of Prisons

**Regional Administrative Remedy Appeal**

Type or use ball-point pen. If attachments are needed, submit four copies. One copy of the completed BP-229(13) including any attachments must be submitted with this appeal.

From: Pinson  Jeremy  V          16267-064        SAU        USP ALP
     LAST NAME, FIRST, MIDDLE INITIAL     REG. NO.     UNIT     INSTITUTION

**Part A - REASON FOR APPEAL**

The Bureau continues to violate my statutory and constitutional rights, and deny me accomodation for my disability (opioid use Disorder) by refusing to follow the judicial recommendation and my request to transfer to RDAP despite my Medium Security points and the concomitant denial of Medication Assisted Treatment (MAT). I request transfer to RDAP immediately.

2-29-24
_____
DATE

_____
SIGNATURE OF REQUESTER

**Part B - RESPONSE**

_____
DATE

_____
REGIONAL DIRECTOR

If dissatisfied with this response, you may appeal to the General Counsel. Your appeal must be received in the General Counsel's Office within 30 calendar days of the date of this response.

ORIGINAL: RETURN TO INMATE

CASE NUMBER: 1190504R1

**Part C - RECEIPT**

CASE NUMBER: _____

Return to: _____
     LAST NAME, FIRST, MIDDLE INITIAL     REG. NO.     UNIT     INSTITUTION

SUBJECT: _____

_____
DATE

_____
SIGNATURE, RECIPIENT OF REGIONAL APPEAL

BP-230(13)

Attachment F

to

Pinson Decl.

PINSON, Jeremy
Register No.: 16267-064
Remedy No: 1190506-F1
Page 1

---

### Part B – Response

This is in response to your Request for Administrative Remedy received on February 16, 2024, in which you challenge your exclusion from participation in the Female Integrated Treatment (FIT) Program and request reconsideration of enrollment in FIT at FCI Danbury, Connecticut.

Program Statement 5200.08, <u>Transgender Offender Manual</u>, stipulates the Transgender Executive Council (TEC) "is the agency's official decision-making body on all issues affecting the transgender population" providing oversight and guidance on matters including designation issues, and reviewing all transfers for approval.  You were formally reviewed by the TEC in November 2023 and are appropriately designated. You will again be reviewed by the TEC for your annual review in approximately November 2024.

Therefore, based on the above information, this response to your Request for Administrative Remedy is for informational purposes.

If you are not satisfied with this response, you may appeal to the Regional Director, Federal Bureau of Prisons, Northeast Regional Office, U.S. Customs House, 2nd and Chestnut Streets, 7th Floor, Philadelphia, Pennsylvania, 19106, within 20 calendar days of this response.

_____
D. Christensen
Complex Warden

_____
03/28/2024
Date

Attachment G
to
Pinson Declaration

PINSON, Jeremy
Reg. No. 16267-064
Appeal No. 1189914-R1
Page One

---

### Part B - Response

You appeal the response of the Warden of USP Allenwood. You state your designation to the Secure Administrative Unit (SAU) at USP Allenwood will exclude you from certain program opportunities, such as Vocational Training (VT) and Apprenticeship programs. You request access to these programs.

Program Statement 5100.08, <u>Inmate Security Designation and Custody Classification Manual</u>, provides policy and procedure regarding the BOP classification and transfer process. The DSCC Administrator is responsible for ensuring designation and redesignation decisions are applied consistently on a bureau-wide basis. The redesignation process takes into account the prisoner's security designation, programmatic needs, mental and medical health needs, any request made by the prisoner related to faith-based needs, recommendations of the sentencing court, and other security concerns of the Bureau of Prisons.

A review of your appeal reveals the Warden adequately addressed your complaint. On November 29, 2023, the Designation and Sentence Computation Center (DSCC) redesignated you to the SAU at USP Allenwood. The DSCC and Central Office Psychology Branch reviewed this designation and found SAU placement to be appropriate. Appropriate programming opportunities will be made available to all inmates assigned to the SAU in accordance with Program Statement 5335.01, <u>Secure Mental Health Units</u>. Accordingly, this response is for informational purposes.

If you are dissatisfied with this response, you may appeal to the General Counsel, Federal Bureau of Prisons. Your appeal must be received in the Administrative Remedy Section, Office of General Counsel, Federal Bureau of Prisons, 320 First Street, N.W., Washington, D.C. 20534, within 30 calendar days of the date of this response.

Date: May 6, 2024

AMY BONCHER
Regional Director

U.S. Department o                          **Regional Administrative Remedy Appeal**

Federal Bureau of Prison.

---

Type or use ball-point pen. If attachments are needed, submit four copies. One copy of the completed BP-229(13) including any attachments must be submitted with this appeal.

From: __Pinson   Jeremy  V__     __16267-064__     __SAN__     __USP ALP__
       LAST NAME, FIRST, MIDDLE INITIAL        REG. NO.         UNIT         INSTITUTION

**Part A - REASON FOR APPEAL**

I Am, of course, aware that BOP discriminates against the mentally ill and transgender by coming up with a solitary confinement SAN that denies them the programs and services of general population. But demonstrating, via a paper trail, that BOP issues empty promises an false hopes of rehabilitation and faithful execution of Congress' law is a tedious task. The Handbook says "all" inmates have access to Vocational and Occupational Training or Apprenticeship programs. Im asking for immediate enrollment in one of them since "_all_" inmates may do so.

__3-1-24__                                    _[signature]_
DATE                                         SIGNATURE OF REQUESTER

**Part B - RESPONSE**

---

DATE                                         REGIONAL DIRECTOR
If dissatisfied with this response, you may appeal to the General Counsel. Your appeal must be received in the General Counsel's Office within 30 calendar days of the date of this response.
ORIGINAL: RETURN TO INMATE                   CASE NUMBER: __1189914R1__

**Part C - RECEIPT**
                                             CASE NUMBER: _____

Return to: _____
           LAST NAME, FIRST, MIDDLE INITIAL       REG. NO.        UNIT        INSTITUTION
SUBJECT: _____

---

DATE                                         SIGNATURE, RECIPIENT OF REGIONAL APPEAL

Attachment H
to
Pinson Declaration

PINSON, Jeremy
Reg. No. 16267-064
Appeal No. 1190505-R1
Page One

_____

### Part B - Response

You appeal the response of the Warden of USP Allenwood. You contest
your designation to the Secure Administrative Unit (SAU) at USP
Allenwood. You request designation to the Reintegration Unit (RU)
at USP Allenwood or another RU within 500 miles of your release
residence.

Program Statement 5100.08, <u>Inmate Security Designation and Custody
Classification Manual</u>, provides policy and procedure regarding the
BOP classification and transfer process. The DSCC Administrator is
responsible for ensuring designation and redesignation decisions are
applied consistently on a bureau-wide basis. The redesignation
process takes into account the prisoner's security designation,
programmatic needs, mental and medical health needs, any request made
by the prisoner related to faith-based needs, recommendations of the
sentencing court, and other security concerns of the Bureau of
Prisons.

A review of your appeal reveals the Warden adequately addressed your
complaint. On November 29, 2023, the Designation and Sentence
Computation Center (DSCC) redesignated you to the SAU at USP
Allenwood. The DSCC and Central Office Psychology Branch reviewed
this designation and found SAU placement to be appropriate.
Accordingly, this response is for informational purposes.

If you are dissatisfied with this response, you may appeal to the
General Counsel, Federal Bureau of Prisons. Your appeal must be
received in the Administrative Remedy Section, Office of General
Counsel, Federal Bureau of Prisons, 320 First Street, N.W.,
Washington, D.C. 20534, within 30 calendar days of the date of this
response.

Date: May 3, 2024

AMY BONCHER
Regional Director

U.S. Department of Ju.                                2/29/24          **Regional Administrative Remedy Appeal**

Federal Bureau of Prisons                            NY

Type or use ball-point pen.  If attachments are needed, submit four copies.  One copy of the completed BP-229(13) including any attachments must be submitted with this appeal.

From: Pinson, Jeremy V          16267-064          SAU          USP ALP
      LAST NAME, FIRST, MIDDLE INITIAL          REG. NO.          UNIT          INSTITUTION

**Part A - REASON FOR APPEAL**

The Warden's response fails to specify why he will not submit me for redesignation to the RHU Program. It does not say I a ineligible, and the SAU absolutely does not provide equal treatme to RU inmates, nor equal access to programs and services of the BOP. The BOP is discriminating against me and violating the Constitution in multiple areas, in denying me the ability to enter the RU at ALP. I request reassignment to the ALP RU or a RU within 500 miles of my release residence (i.e. Pollock).

2-29-24
DATE                                                        SIGNATURE OF REQUESTER

**Part B - RESPONSE**

_____          _____
DATE                                    REGIONAL DIRECTOR

If dissatisfied with this response, you may appeal to the General Counsel. Your appeal must be received in the General Counsel's Office within 30 calendar days of the date of this response.

ORIGINAL: RETURN TO INMATE                          CASE NUMBER: 1190500R1

**Part C - RECEIPT**

                                                    CASE NUMBER: _____

Return to: _____
            LAST NAME, FIRST, MIDDLE INITIAL          REG. NO.          UNIT          INSTITUTION

SUBJECT: _____

DATE                                    SIGNATURE RECIPIENT OF REGIONAL APPEAL

Attachment I
to

Pinson Declaration

Date:   03/25/2024
Time:    11:11 AM

Facility: TCN

Federal Bureau of Prisons
TRULINCS
Message
Sensitive But Unclassified

| Message |
| --- |

FROM: 16267064 PINSON, JEREMY VAUGHN
TO: USP/SPC Psychology/Psicología
SUBJECT: ***Request to Staff*** PINSON, JEREMY, Reg# 16267064, TCP-A-A
DATE: 06/28/2022 03:21 PM

To: LICATA
Inmate Work Assignment: NONE

How exactly is the perpetrator or a prea violation released into my unit to retaliate against me? (Brown)

**USA RFP - 2692**

Date:   03/25/2024                     Federal Bureau of Prisons                     Facility: TCN
Time:      11:11 AM                            TRULINCS
                                               Message
                                     Sensitive But Unclassified

| Message |
| --- |

FROM: USP/SPC Psychology/Psicología
TO: 16267064 PINSON, JEREMY VAUGHN
SUBJECT: RE:***Inmate to Staff Message***
DATE: 06/29/2022 07:07 AM

Pinson,
I hope you have reported this to the appropriate department already.  I know that often times people like to vent to psychology,
but, it is important to get these concerns to correctional services and unit team.  - Dr. Hayden

From: ~^! PINSON, ~^!JEREMY VAUGHN <16267064@inmatemessage.com>
Sent: Tuesday, June 28, 2022 10:21 PM
To: TCP-InmatetoUSP-SPCPsychology (BOP) >
Subject: ***Request to Staff*** PINSON, JEREMY, Reg# 16267064, TCP-A-A

To: LICATA
Inmate Work Assignment: NONE

How exactly is the perpetrator or a prea violation released into my unit to retaliate against me? (Brown)

**USA RFP - 2691**

Attachment J
to
Pinson Declaration

Date:      03/25/2024
Time:      11:11 AM

Federal Bureau of Prisons
TRULINCS
Message
Sensitive But Unclassified

Facility: TCN

>
I will discuss with AW Williams.

Thank you for letting me know.  Keep doing what you are doing and I am sure AW Williams and Warden Gutierrez will handle this appropriately.

Ms. E

As a reminder, this email box does not replace the BOP Administrative Remedy Program.

J. Epplin, National Policy and Program Coordinator
Women and Special Populations Branch
Transgender Executive Council

From: ~^! PINSON, ~^!JEREMY VAUGHN <16267064@inmatemessage.com>
Sent: Monday, September 12, 2022 1:36 PM
To: BOP-RSD-InmateToTEC-S (BOP) >
Subject: ***Request to Staff*** PINSON, JEREMY, Reg# 16267064, TCP-A-A

To: epplin
Inmate Work Assignment: na

To be honest, I am greatly hesitant to report anything to do with safety at the local level. A gentlemen here was the subject of a PREA complaint I filed. I went through the protocol, had no issues with the SIS staff or any other staff during the process. At the same time however, I was emailing one of my attorneys through the corrlinks service and a Lieutenant Christensen got ahold of my emails, called me to the Lieutenant's office to tell me he was the new PREA lieutenant and then proceeded to read me the riot act. He was angry because he had been reading my emails to my lawyers and felt that my emails did not reflect his competence as a PREA LT and that I was jumping the gun by criticizing the local staff to my attorneys. He got himself so worked up that he ended the conversation by saying that I should be careful filing any kind of PREA because if I am "too much of a victim here" he can put me in the SHU for my own safety and then keep me there until I go home or get transferred. He clearly was threatening me with long-term placement in SHU if I utilize the PREA complaint process. I was aghast that he would so overtly threaten me with the SHU if I exercised my right not to be sexually harrassed or abused. He also went on a tirade about how "PREA is only used by trannies" in this prison and he's on a mission to start locking up victims who report abuse to stop the volume of complaints under PREA being processed here. In the end he encouraged me to talk to him and not my lawyers if I wanted help, and I agreed to do so, but to be honest I would be afraid to report anything here locally because of this conversation with Christensen. I also harbor concern about how detailed I am in my emails to my lawyers because I feel like that man is electronically looking over my shoulder looking for me to say something in an email to one of my lawyers to screw me over. This is not to say that I do not recognize the challenges that abusive or false PREA's can be on the SIS department of any prison, or how the filing of more than one by a particular inmate can be wrongly perceived as an abuse of the process. But I know a threat when I hear it, and Christensen was clearly threatening me. So, unfortunately I feel threatened by him and I feel like he is out to use any complaint as a pretext to put me in SHU and try to transfer me again which would mean - as you know - probably another year or more in the SHU. I have spent a minimum of 10 of the last 14 years in the SHU. 10 years Ms. E. Think about how long that is. And I am not here getting myself into trouble, but let me tell you something, 10 years in SHU is traumatizing. It leaves scars that maybe cannot be seen but they are there all over the brain. If they put me in the SHU it would not surprise me if I dont try to open my carotid artery up. I am tired of the SHU. And it is hard enough to be a victim of something and then be kept hostage in SHU by staff who dont want you in their prison. In Coleman-2 I went to SHU because a man struck me in the head repeatedly with a combination lock tied to a belt. And I never got out of the SHU. 10 years Ms. E. I got hit because a man perceived I was snitching on the drug dealers down there. Guess who spent a year in SHU and got transferred? Me. Because the drug dealers dont sue or file on staff, but I did. And the man who hit me in the head with a lock? He was released from SHU to GP where he went on to attack and victimize someone else.

Prison is not fair nor just, but Lt. Christensen made me feel that anything I report to staff is a potential ticket to term to SHU. Its why I wrote to you. I trust you. I dont trust him. I do trust Williams and Im learning the Warden. He's a hard man to read. But I do not trust that man in SIS.

-----Transgender Executive Council on 9/12/2022 1:02 AM wrote:

Date: 03/25/2024
Time:      11:11 AM

Federal Bureau of Prisons
TRULINCS
Message
Sensitive But Unclassified

Facility: TCN

>

Thank you for letting me know. I have forwarded this information to AW Williams and the Warden. I would suggest you talk to AW Williams the next time you see him as well.

If you are in fear for your safety, I recommend you report to the nearest staff member immediately.

Thank you.

Ms. E

As a reminder, this email box does not replace the BOP Administrative Remedy Program.

J. Epplin, National Policy and Program Coordinator
Women and Special Populations Branch
Transgender Executive Council

From: ~^! PINSON, ~^!JEREMY VAUGHN <16267064@inmatemessage.com>
Sent: Saturday, September 10, 2022 7:07 PM
To: BOP-RSD-InmateToTEC-S (BOP) >
Subject: ***Request to Staff*** PINSON, JEREMY, Reg# 16267064, TCP-A-A

To: epplin
Inmate Work Assignment: na

Ms. E,

I am writing about an incident which occurred the other day and which I am deeply concerned about. Inside my unit an inmate (Floyd) approached me and said that when inmate Luis Rivera came out of the SHU he was going to stab me and my cellmate for "being in his cell". Floyd went on to elaborate that he and Rivera are "Kings" which I believe is a reference to "Latin Kings" and generally they conduct themselves as if they are active gang members looking up people's legal cases, calling people sex offenders and "chomos" and generally I fear there may be an violent incident if Rivera and Floyd are allowed to gang up on me to take my cell from me and I am not trying to get into any trouble. Can you please help me with this? I have done well outside the SHU in the mental health unit, but the non-mental health people living in this unit can sometimes bring alot of stress and anxiety to the care level 3 inmates in this unit.

Thank you for your time and consideration.

Grace

**USA RFP - 2606**

Attachment K
to
Pinson Decl.

. Department **Regional Administrative Remedy Appeal**

Federal Bureau of P~~~~~

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

Type or use ball-point pen. If attachments are needed, submit four copies. One copy of the completed BP-229(13) including any attachments must be submitted with this appeal.

From: __Pinson Jeremy V__     __16267-064__     __SHU__     __USP ALP__
　　　LAST NAME, FIRST, MIDDLE INITIAL　　REG. NO.　　UNIT　　INSTITUTION

**Part A - REASON FOR APPEAL**

Based upon existing Third Circuit precedent, Talley v. Clark 851 Fed. Appx. 306 (3d Cir. 2021); Williams v. Pa. Dept. of Corr, 848 F.3d 549 (3 Cir. 2017) the BOP have violated my right to due process in violation of my constitutional and statutory rights by designating me to a Secur Administrative Unit without written notice, a hearing, nothing. It was arbitrary and capricious decision and I demand my release from the conditions back to general population and compensation for violation of my rights.

__1-29-24__
DATE

SIGNATURE OF REQUESTER

**Part B - RESPONSE**

DATE                                    REGIONAL DIRECTOR

If dissatisfied with this response, you may appeal to the General Counsel. Your appeal must be received in the General Counsel's Office within 30 calendar days of the date of this response.

ORIGINAL: RETURN TO INMATE                    CASE NUMBER: __1187949(R)__

**Part C - RECEIPT**

CASE NUMBER: _____

Return to: _____
　　　　　LAST NAME, FIRST, MIDDLE INITIAL　　REG. NO.　　UNIT　　INSTITUTION

SUBJECT: _____

DATE                    SIGNATURE, RECIPIENT OF REGIONAL APPEAL

USP LVN                    PRINTED ON RECYCLED PAPER                    BP-230(13)

PINSON, Jeremy
Reg. No. 16267-064
Appeal No. 1187949-R1
Page One

## Part B - Response

You appeal the response of the Warden of USP Allenwood. You contest
your designation to the Secure Administrative Unit (SAU) at USP
Allenwood. You allege you were denied due process in the designation
process. You request compensation and immediate release to general
population.

Program Statement 5100.08, <u>Inmate Security Designation and Custody
Classification Manual</u>, provides policy and procedure regarding the
BOP classification and transfer process. The DSCC Administrator is
responsible for ensuring designation and redesignation decisions are
applied consistently on a bureau-wide basis. The redesignation
process takes into account the prisoner's security designation,
programmatic needs, mental and medical health needs, any request made
by the prisoner related to faith-based needs, recommendations of the
sentencing court, and other security concerns of the Bureau of
Prisons.

A review of your appeal reveals the Warden adequately addressed your
complaint. On November 29, 2023, the Designation and Sentence
Computation Center (DSCC) redesignated you to the SAU at USP
Allenwood. The DSCC and Central Office Psychology Branch reviewed
this designation and found SAU placement to be appropriate. You will
receive notice of a more formal hearing concerning your designation
to the SAU.

Monetary Damages cannot be provided through the Administrative
Remedy Program. If you wish to seek monetary compensation, you may
consider filing a separate claim under the appropriate
administrative claim process (i.e., 31 U.S.C. 3723 or the Federal
Tort Claims Act). Accordingly, your appeal is denied.

If you are dissatisfied with this response, you may appeal to the
General Counsel, Federal Bureau of Prisons. Your appeal must be
received in the Administrative Remedy Section, Office of General
Counsel, Federal Bureau of Prisons, 320 First Street, N.W.,
Washington, D.C. 20534, within 30 calendar days of the date of this
response.

Date: April 5, 2024

AMY BONCHER
Regional Director

Attachment L

to

EXHIBIT 1

<div align="center">

# UNITED STATES DISTRICT COURT

# THE DISTRICT OF ARIZONA

</div>

| | |
|---|---|
| Jeremy Pinson,<br><br>    Plaintiff,<br><br>vs.<br><br>Federal Bureau of Prisons,<br><br>    Defendant. | No. CV 22-00298-TUC-RM<br><br>**DECLARATION OF**<br>**JOSHUA ANSPACH** |

I, Joshua Anspach, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge and information made known to me from official records reasonably relied upon by me in the course of my employment, hereby make the following declaration relating to the above-titled matter.

1. I am employed by the United States Department of Justice, Federal Bureau of Prisons, as a Trust Fund Specialist at the United States Penitentiary Allenwood in White Deer, Pennsylvania (USP Allenwood). I have been employed by the Bureau, in positions of increasing responsibility since March 2013. I have been employed in my current position since August 2019.

2. As a Trust Fund Specialist, my duties include responsibility for implementation, administration, and coordination of Trust Fund programs and operations at USP Allenwood. These programs include commissary services, inmate telephone services (TRUFONE), Trust Fund Limited Inmate Computer System Services (TRULINCS), Trust Fund Account, institution warehouse, institution laundry, and other Trust Fund operations. The Trust Fund Commissary and Accounting System (TRUFACS) supports all inmate deposit fund account activities. I address inmate institutional needs on a daily basis. I have access to various records maintained by the Bureau in the ordinary course of business and the record attached herein is a true and accurate copy of a Bureau records maintained in the ordinary course of business.

1

2       3.      I am familiar with the plaintiff in this litigation, inmate Jeremy Pinson,

3   Federal Register No. 16267-064.  Inmate Pinson arrived at USP Allenwood on January

    2, 2024.

4       **A.      Inmate Account Encumbrances**

5       4.      An encumbrance is a transaction that temporarily places a hold on an

6   inmate's available Trust Fund Account balance.  *See* Program Statement 4500.12, *Trust

7   Fund/Deposit Fund Manual* at 9.[1]  "Encumbrance of inmate funds for various reasons is

8   essential.  Careful consideration is given before any action; encumbrances are not made

9   indiscriminately.  An encumbrance may be made for various reasons (e.g., to ensure

10  inmates do not deplete their funds before release, disciplinary measures, inmate's

11  request, claims).  Encumbrances are at the Warden's discretion or the result of a

12  disciplinary hearing sanction or notification of a pending Federal court order.  This

13  authority is not delegated below the Associate Warden.  Funds the Warden encumbers

    may only be released upon his/her approval or upon inmate release."  *Id.* at 71.

14      5.      "No funds are withdrawn from an inmate's account without his/her prior

15  consent except as noted below.  The inmate's prior consent is his/her signature; it is

16  required to authorize withdrawals except[,]" for example, for "court-ordered PLRA

17  filing fees[,]" medical care co-pay payments, phone transfers, and to "comply with

18  Federal court orders."  *Id.* at 87.

19      **B.      Pinson Trust Fund Debts and Encumbrance**

20      6.      Currently, inmate Pinson's Trust Fund Account is encumbered because of

21  approximately 337 pages of debts totaling $321,547.37.  *See* Att. 1, TRUFACS Inmate

22  Debts Report (Excerpt) at 1.[2]  These debts range from institution debt agreements

23  between inmate Pinson and the institution for photocopies, postage, and other services

24

25

26  [1] Available at https://www.bop.gov/progstat/4500.12.pdf (last visited on Apr. 29, 2024).

27  [2] Because of the large number of pages involved in the full TRUFACS Inmate Debts
    Report for inmate Pinson, only the final page of this report is included with this
28  declaration.  If the full report is necessary, it can be provided.

provided at the institution during inmate Pinson's period of incarceration.  These debts also include federal court-ordered PLRA filing fees.  *Id.* ("Debt Type" as "PLRA").

7.      Since January 2, 2024, inmate Pinson has not requested to purchase anything from the Transgender Special Purpose Order (SPO) list.  When inmate Pinson receives incoming funds to the Trust Fund Account, they are encumbered to pay off the institutional debt agreements that inmate Pinson signed or to be applied toward the federal court-ordered PLRA filing fees.  Currently, because of these outstanding debts, inmate Pinson's entire Trust Fund Account balance of $11.95 (as of May 1, 2024) is encumbered and inmate Pinson is not able to make purchases through the commissary or SPO.

8.      Since January 1, 2024, inmate Pinson has received $60.00 in deposits from individuals in the community.  These deposits have been encumbered toward the satisfaction of inmate Pinson's outstanding debts.

//

//

//

//

//

//

//

//

- 3 -

Executed on this 2nd day of May 2024, in White Deer, Pennsylvania.

Joshua Anspach
Trust Fund Specialist
USP Allenwood, Pennsylvania
Federal Bureau of Prisons

**Enclosures**

Att. 1, TRUFACS Inmate Debts Report (Excerpt)

Exhibit ● 1,
Attachment L,

Attachment No. 1

Date: 04/29/2024
Time: 5:17:11 AM

Facility: ALX

Federal Bureau of Prisons
TRUFACS

**Inmate Debts Report**
Sensitive But Unclassified

Pinson, Jeremy Case 4:23-cv-00298-RM
16267-064

| Alpha Code | Debt Type | Original Amount Owed | Remaining Amount Owed | Status | Ref# | Entered Date | Entered By | Deactivated Date | Deactivated By |
|---|---|---|---|---|---|---|---|---|---|
| | PLRA | $350.00 | $323.87 | I | KTDGD009 | 12/06/2020 | Sentry | 12/15/2020 | Sentry |
| | PLRA | $455.00 | $433.79 | I | KTDGD014 | 12/06/2020 | Sentry | 12/15/2020 | Sentry |
| | PLRA | $450.00 | $446.91 | I | KTDGD035 | 12/06/2020 | Sentry | 12/15/2020 | Sentry |
| | PLRA | $350.00 | $350.00 | I | LFLXD223 | 12/06/2020 | Sentry | 12/15/2020 | Sentry |
| | PLRA | $455.00 | $455.00 | I | MFLXD186 | 12/06/2020 | Sentry | 12/15/2020 | Sentry |
| | PLRA | $350.00 | $346.42 | I | MFLXD977 | 12/06/2020 | Sentry | 12/15/2020 | Sentry |
| | PLRA | $350.00 | $350.00 | I | NFLXD328 | 12/06/2020 | Sentry | 12/15/2020 | Sentry |
| | PLRA | $350.00 | $330.00 | I | NFLXD554 | 12/06/2020 | Sentry | 12/15/2020 | Sentry |
| | PLRA | $350.00 | $348.47 | I | NFLXD611 | 12/06/2020 | Sentry | 12/15/2020 | Sentry |
| | PLRA | $505.00 | $505.00 | I | NFLXD612 | 12/06/2020 | Sentry | 12/15/2020 | Sentry |
| | PLRA | $350.00 | $348.32 | I | NFLXD613 | 12/06/2020 | Sentry | 12/15/2020 | Sentry |
| | PLRA | $505.00 | $505.00 | I | PSPGD020 | 12/06/2020 | Sentry | 12/15/2020 | Sentry |
| | PLRA | $505.00 | $484.96 | I | RFLXD001 | 12/06/2020 | Sentry | 12/15/2020 | Sentry |
| | PLRA | $252.50 | $252.50 | I | RFLXD324 | 12/06/2020 | Sentry | 12/15/2020 | Sentry |
| | PLRA | $400.00 | $400.00 | I | RFLXD325 | 12/06/2020 | Sentry | 12/15/2020 | Sentry |
| | PLRA | $505.00 | $481.71 | I | SSPGD010 | 12/06/2020 | Sentry | 12/15/2020 | Sentry |
| | PLRA | $350.00 | $350.00 | I | SSPGD021 | 12/06/2020 | Sentry | 12/15/2020 | Sentry |
| | PLRA | $505.00 | $484.82 | I | SSPGD061 | 12/06/2020 | Sentry | 12/15/2020 | Sentry |
| | PLRA | $350.00 | $339.77 | I | SSPGD079 | 12/06/2020 | Sentry | 12/15/2020 | Sentry |
| | PLRA | $505.00 | $504.77 | I | SRCHD003 | 12/06/2020 | Sentry | 12/15/2020 | Sentry |
| | PLRA | $505.00 | $502.73 | I | UTCND014 | 12/06/2020 | Sentry | 12/15/2020 | Sentry |
| | PLRA | $350.00 | $348.00 | I | UTCND030 | 12/06/2020 | Sentry | 12/15/2020 | Sentry |
| | PLRA | $350.00 | $337.74 | I | UTCND031 | 12/06/2020 | Sentry | 12/15/2020 | Sentry |
| | PLRA | $350.00 | $350.00 | I | UTCND059 | 12/06/2020 | Sentry | 12/15/2020 | Sentry |
| | PLRA | $350.00 | $345.00 | I | VTCND019 | 12/06/2020 | Sentry | 12/15/2020 | Sentry |
| | PLRA | $350.00 | $350.00 | I | VTCND034 | 12/06/2020 | Sentry | 12/15/2020 | Sentry |
| | PLRA | $350.00 | $348.40 | I | VTCND037 | 12/06/2020 | Sentry | 12/15/2020 | Sentry |
| | PLRA | $350.00 | $350.00 | I | VTCND042 | 12/06/2020 | Sentry | 12/15/2020 | Sentry |
| | PLRA | $505.00 | $505.00 | I | VTCND047 | 12/06/2020 | Sentry | 12/15/2020 | Sentry |
| | PLRA | $505.00 | $505.00 | I | VTCND048 | 12/06/2020 | Sentry | 12/15/2020 | Sentry |
| | Initial PLRA | $1.60 | $1.60 | I | VTCND037 | 12/06/2020 | Sentry | 12/15/2020 | Sentry |
| **Total:** | | **$335,464.52** | **$321,547.37** | | | | | | |

Attachment M
to
Exhibit 1:
Pinson Declaration

8.  **REPORTING INCIDENTS OF STAFF MISCONDUCT**

a.    **Staff  Reporting**.    In  accordance  with  the  Bureau's Standards  of  Employee  Conduct,  staff  who  become  aware  of  any violation  or  alleged  violation  of  the  Standards  of  Employee Conduct must

report them to management (the CEO or OIA) or to the OIG at the

Department of Justice.

+ OIG has established a toll-free hotline

(1-800-869-4499) which is available to anyone wishing

to report Department of Justice employees' misconduct,

as well as fraud, waste, or abuse in government.

+ All Bureau staff are encouraged to use the OIG hotline if they wish to remain anonymous or fear retaliation or reprisal.

+  To  report  violations  directly  to  OIA,  Central  Office  call (202-307-3286)  or  fax  (202-514-8625),  to  OIA,  Denver  Field Office, call (303-365-4400) or fax

(303-365-4445).

+  If  an  employee  is  sued  for  reporting  violations  or  alleged violations  of  the  Standards  of  Employee  Conduct,  when  notified, an  OGC  representative  will  provide  the  employee  with  its understanding of 28 CFR with regard to legal representation.

+   All  Bureau  staff  may  also  report  waste,  fraud,  abuse, mismanagement,  and  prohibited  personnel  practices  defined  in  5 U.S.C.  §  2302(b)  directly  to  the  Office  of  Special  Counsel,  an independent  government  agency.    The  reporting  hotlines  are either (1-800-872-9855) or

(202-643-7188).  More  information  about  the  Office  of  Special Counsel  and  its  functions  can  be  found  at  its  website, www.osc.gov.

b.    **CEO  Reporting**.    Upon  becoming  aware  of  any  possible violation  of  the  Standards  of  Employee  Conduct  (either  through  a report  from  staff  or  through  personal  knowledge),  the  CEO  at  the

progstat                                          1

© 2024 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.



Att M, P.1

institution, Regional Office, or Central Office Division, or his or her designee, is to report the violation to OIA in accordance with the following time frames.

(1)   **Report Immediately.** Classification 1 and 2 cases must be reported to OIA immediately. OIA is to be notified of Classification 1 and 2 cases, including:

• the identity of the complainant(s), subject(s),

witness(es), and victim(s);

• the details of the allegation(s); and

• any corroborating evidence.

When a Classification 3 case is complex and would result in severe disciplinary or adverse action, the above referenced reporting procedures should be followed.

Notification to OIA will be made within 24 hours (not to include weekends and holidays) of the time management learns of the matter.

(2)   **Referral to the FBI/Other Law Enforcement Agencies.**

When it is suspected that criminal conduct has occurred, the CEO may refer the matter directly to OIA and to the local OIG/FBI simultaneously.

(3)   **Initial Information.**   An OIA Referral of Incident form

(BP-S715.012), for contract employees use form

(BP-S774.012), is used to organize the information to

be provided in the telephonic reporting of cases listed

in subsection b.(1) of this section.

**+   The subject of the allegation or complaint must not be questioned or interviewed prior to OIG clearance and OIA's approval.**   This is to ensure against procedural error and safeguard the rights of the subject.

(4)   **Supporting Documentation.** Supporting documentation, such as victim or witness statements, medical reports, photos, and

progstat                                     2

© 2024 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.


Att. M P. 2

related memoranda, must be transmitted via facsimile to OIA, Central Office at (202-514-8625) or OIA, Denver Field Office, at (303-365-4445) or by

e-mail via the OIA resource mailbox (BOP-DIR/Internal

Affairs~) and a copy should be forwarded to the case

agent **immediately, but not later than 24 hours** after the telephonic report.

+   If an inmate alleges physical or sexual abuse by a staff member and has not received a medical examination, the CEO must arrange an immediate,

confidential medical examination and forward a copy of the results to OIA as soon as possible.)

  CEOs must notify OIA before initiating investigations involving any misconduct alleged against management staff occupying GS-13

or above positions.   OIA will coordinate further action with OIG.

+   The OIA referral of incident form must be completed on all management staff in positions GS-13 and above.

  Unless the CEO and the Chief of OIA agree to a different method, ordinarily, investigations involving Classification 3 cases are to be conducted using local resources.

  **Contact OIA immediately, if there is any question as to the classification of the misconduct.**

  **It is important to note that while case classifications are many times based on limited information, as an investigation unfolds, the severity of misconduct may increase or decrease, thereby moving it into another classification.**

  Both fax and e-mail referrals are acceptable.   An e-mail referral should include scanned supporting documentation.   The OIA resource mailbox (BOP-DIR/Internal Affairs~) should be used and a copy should be forwarded to the case agent.

  c.   **Referral to OIG.**   OIA will refer Classification 1 and 2 allegations and, when appropriate, Classification 3 allegations

© 2024 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.


Att. M P-3

to OIG for review within 48 hours.

+ OIG will advise OIA of its decision either to investigate the matter or defer it to the Bureau for an administrative investigation

+ OIG may refer criminal matters (i.e., physical abuse, sexual abuse of an inmate) to the Department of

Justice, Civil Rights Division (CRT), for prosecutorial consideration under the provisions of the Sexual Abuse Act of 1986 and other applicable statutes.

If OIG or CRT accepts the case, no further action may be taken at the institution, regional, or Central Office level without OIG's or CRT's approval.

+ Normally, OIA will serve as the contact point for all communication between institution, regional, and Central Office staff and OIG or CRT in these cases.

+ In cases when field staff are in contact directly with

OIG, status updates will be reported to OIA regularly.

d. **Notification to CEOs.** OIA will notify the CEO originating the referral immediately when a case has been deferred back to the Bureau for investigation.

+ The CEO and OIA are to decide jointly whether the case is to be investigated locally or if OIA is to conduct an on-site investigation.

+ The OIA agent assigned to the case is to advise the CEO

of OIG's decision.

© 2024 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.



Exhibit 2

Declaration of Debra Pinson

(2 Pages)

X
X
X
X
X
X
X

DECLARATION OF DEBRA LYNN PINSON

I DECLARE UNDER PENALTY OF PERJURY THAT THE STATEMENTS LISTED BELOW ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE AND BELIEF, AND ARE BASED UPON MY OWN PERSONAL KNOWLEDGE:

1. The Secure Administrative Unit (hereinafter "SAU") is described in BOP documentation a  unit that "houses incarcerated individuals diagnosed with serious mental illness (SMI) who require a secure setting and either refuse mental health programming or are awaiting bed space at a mental health treatment program. Placement in the SAU is administrative, not voluntary."

2. My daughter Jeremy Pinson #16267-064 whom I refer to as "Grace" was moved to the SAU beginning in 2023 at the Allenwood U.S. Penitentiary on but was not formally placed into the SAU until construction teams finished remodeling the unit, on March 6, 2024. She was housed in the Special Housing Unit of USP Allenwood prior to the construction crews completing the remodeling of the unit which had begun in 2020. Prior to her arrival to USP Allenwood on Jan. 2, 2024 she was housed at USP Tucson from June 3, 2022 until Dec. 14, 2023.

3. On Sept. 13, 2022 my daughter called me using the inmate telephone system at USP Tucson to tell me that an inmate named Tyrone Brown was threatening to rape and murder her and that he had previously targeted her to become a prostitute for him and that she was terrified he would physically attack her and injure her or kill her. She asked me to call the prison and report this information.

4. I immediately called the prison at 520-663-5000 several times, speaking first to a staff member in the "front lobby" who stated that they would pass along my concerns to "Operations Lieutenant Falconer" and after I insisted several times on speaking to someone in a position of authority I was transferred to an assistant to the Warden named Gregory Chaffey whom I told in detail the concerns that had been passed along to me by my daughter about Brown and that he was a danger to her, her cellmate Ernesto Zaragosa-Solis III and a third inmate named Jessica Gulisano who was also a vulnerable transgender inmate in danger.

5. I do not trust the Bureau of Prisons to protect my daughter so I also emailed the BOP using a "Report an Incident" or "Report a Concern" function on www.bop.gov to report that she was in danger, and I also emailed her attorneys Andrew Talai in Los Angeles and Jim Davy in Philadelphia to ask them to also contact the BOP immediately which they stated they would do.

6. My daughter was attacked the next day by Brown anyways and placed into the Special Housing Unit. She would call me twice each month and often asked me for assistance reporting what had happened to her to the Office of Inspector General, civil rights organizations, and representatives of the news media like Beth Schwartzapfel at The Marshall Project.

7. Her counselor Yadhira Flores advised me by telephone that my daughter would not be able to receive contact visits while in the SHU at USP Tucson so I waited the entire time from 9-14-22 until 12-14-23 for her to get out of SHU to visit because I wanted a contact visit where I could hug my daughter. But when she was transferred to the Federal Transfer Center in Oklahoma City on 12-14-23 I was told by a counselor at that facility that I was not allowed to visit her at all until she "arrived at her designated institution".

8. I have diabetes and a diagnosed and very serious spinal injury. I cannot sit for long periods of time in a car or an airplane without causing severe and debilitating pain that can last for days. I take very strong pain medications for my injury but they are largely ineffective. Now that my daughter is in Allenwood, PA far more than 500 driving miles it would be an impossible hardship for me to travel that far in a car or airplane to visit her. Moreover, her counselor George Hottenstein has advised me that in the SAU she is not allowed to receive contact visits so I can only see her behind a glass partition if I was able to make the trip to

see her. Other family members such as her uncle Larry Pinson who is past the age of 80 has very serious heart disease and also cannot visit her because of her current location and the distance needed to travel to visit her. He has only 6 months to live and will likely be deceased before he is ever able to see Grace again.

9. In addition to being physically prohibitive, my daughter's new location is simply too expensive for me to afford the cost required for an airplane ticket, rental car, hotel, etc. to visit her. This was not a problem in Tucson because I could have driven to see her and could have stayed with a friend who lives in that area, but this is not the case with her facility in Pennsylvania.

10. My health is not well at the age of 65, or 66 in November, and I fear that now that my daughter is in her current location I could be deceased before I am ever able to see her again because of where the Bureau of Prisons has placed her. I suffer from serious depression and anxiety now because I am unable and unlikely to ever see her again in her current location.

11. If I am called to testify in this matter, I respectfully ask to be permitted to appear via telephonic or videoconferencing due to my health and physical condition as well as the financial hardship I would suffer.

EXECUTED UNDER PENALTY OF PERJURY PURSUANT TO 28 USC 1746 ON JULY 1, 2024.

Debra Pinson
9304 Rhythm Road
Midwest City, OK, 73130
PinsonDebraL@gmail.com
405-706-8586

Exhibit 3

Declaration of Ernesto Zaragosa-Solis III

(17 Pages)

05/03/2024

### Declaration of Ernesto Zaragosa-Solis III

I declare under penalty of perjury that the following is true and Correct:

1. On Sept 13, 2022 Jeremy Pinson, Jessica Gulasano, Keyshia Hadaway (all 3 transgender women) Rickie R[Essay], Singer, [Albert] , I and other inmates to which I cant recall their actual names reported a threat of Rape and Murder of Jeremy Pinson, Jessica Gulisano, Jose Armendariz and Me, (by letter) by inmate Tyrone Brown to The DOJ Box electronic Mail box on the Trulincs. as well To Dr Lakata, to which Dr Lakata said She advised LT. Christensen, and Administration.

2. That same day Sept 13, 2022 at around 5:30 – 6:00 pm of pill line in the main Corridor. Tyrone Brown Came aggressivaly to attack and decided to Threaten Jeremy Pinson, Jessica Gulisano, and Me of Rape and Murder as well as any other person that wanted to get "Killed and Fucked," for Helping Us.

3. Same day Sept 13, 2022 at almost, but not exactly 8 pm I stood at the window Facing the LT's office (where A-1 unit is where I was housed at with all Inmate I just mentioned). and Noticed LT—

05/03/2024

Falconer smoking a cig and LT. Christensen, to which LT. Christensen using a flash light indicated for me to get away from the window. which I did not but was joined by Jeremy Pinson, Jessica Gulisano, Keyshia Hadaway, just to see.

4. Same day (sept 13, 2022) as we Jeremy Pinson, Jessica Gulisano, Keyshia Hadaway were watching, Tyrone Brown came walking towards LT's Falconer and Christensen, and LT. Christensen started to speak to Tyrone Brown and pointed to us in the window (Jeremy "Grace" Pinson, Jessica Gulisano, Keyshia Hadaway, and Me) and told Tyrone Brown that we were snitching on Tyrone Brown with PREA Aligations (To which Tyrone Brown admitted to, and also would say to us in special Housing Unit (SHU) also to Daniel Mcneal)

5. LT. Christensen and LT. Falconer then let Tyrone Brown go back to his unit in E-1 on the South side with out taking underconsideration our Safty and lifes, also, The Rules and Regulations of PREA Aligations.

6. The yard (institution USP Tucson) is split with a South Side and North Side sections to where inmates from the South side can not have pyshical contact with inmates on the North side at this

05/03/2024

time.(Sept 13, 2022)

7. Then on Sept 14, 2022 while Jeremy "Grace" Pinson, Jessica Gulisano and I where walking to pill line through the Dinning Hall, (That had to be cleared of all South side inmates, officers Duty) from the Dish washers Room, Came in attack mode Tyrone Brown wm Sear swinging a Razor type weapon where he (Tyrone Brown) started to slash Jeremy "Grace" Pinson in the Back of Her head down to her neck and back.

8. I then rushed in to save/Help and protect Jeremy "Grace" Pinson as by rushing and pushing Tyrone Brown towards the wall, thats when Tyrone Brown started to Swing his Razor type weapon on Me and Cut Me on the Nose (Brim of the Nose) and ex got to get away from My Grip. (Sept 14, 2022)

9. Thats when He continued towards Jessica Gulisano and was able to Cut her in the face, before I rushed him again to help her also. Tyrone Brown scared her for life with a Cut on the face. (Sept 14, 2022)

05/03/2024

10. He then again slipped out of his Jacket
(Tyrone Brown) and ran out the exit door
while swinging the Razor type weapon he
made, screaming for the officer that is suppose
to be posted at that exit, and was not-(Sept 14, 2022)

11. There was no officer at there post, which there are
normally 2 officer in the Dinning hall (1 at Exit of
Dinning Hall, another one at the slot where inmates
pick up there trays, on this day (sept 14, 2022) there
was only one at the slot.(If I recall correctly it
was officer Jones but am not sure) there was no
officer at the Exit or he/she would of seen the
attack and the officer that was suppose to be in
the Corridor (Metal Detector) was also not at his post,
(I dont remember His/Her name CO') because if the officer
was there, Tyrone Brown wouldint of had to scream
for Help.

12. Sept 14, 2022, after they (staff SIS Moran, Caption Reyes,
and others) did there sweep of picking up the inmates
closed that where involved in the incident at the Dinning
Hall (by viewing there cameras) I was seen by
Nurse Newland to which she gave me Medication
on Pill line and a injection for the Cut I got on

05/03/2024

the brim of my nose.

13. (Sept 14, 2022) We, Jeremy Pinson, Jessica Gulisano, Barrios Sr, other inmate that I can't recall his name, and Jose Armandarez, and me where placed in the (SHU) special Housing Unit.

14. (Sept 14, 2022) I was housed with (in SHU) Jeremy "Grace" Pinson and was told by Sis Moran that it was for a Sis investigation to what happened at the Dinning Hall.

15. From Sept 14, 2022 to Oct 5, 2022 (date of interview) Jeremy "Grace" Pinson and I would ask Warden Gutierrez what is going on to which He would just walk away, as well as others from Administration A-Stangle, A.W. Williams, Caption Marlow, and so on.

16. As the days passed till we had our interview we Jeremy "Grace" Pinson and I started to ask for BP'8 from our Counselour and O.V.Flores in A-1 and our Unit Manager Palmer to which Unit Manager Palmer would tell me and Grace "That will be useless to do, because ya'll getting shipped."

05/03/2024

17 - Our Couns. Y. Flores would just laugh and walk away.

18. So That where we started (Grace and I) to write outside for help, to lawyers like Stacy Scheff, James Davy, Andrew Tali, and other Prison advocates and Have family members like my Sister Brenda Lee Solis, Mother Maria A Torres, and My Daughter NASHLEE N. Solis Call to the prison and to Congress men of Texas and Arizona for Help, Grace Did that also with Her Mother Debra Pinson.

19 - So on Oct 5, 2022 The Day of the interview me and Grace where pulled out of the Cell to have the interview with LT. Christensen and Warden Mark Gutierrez was also present for a short period just to say his threating remarks.

20. I was placed in the Recreational Cages first in the SHU. As I was escorted by officer Flores He told me "To watch out with what I do with Pinson against Tueson, because They Dont like Her (Pinson) at all". That Confussed me at the beging but understood as the interview was taking place.

05/03/2024

21. As The Interview started LT. Christensen seemed angry and annoyed. First Thing He told Me is "What The Fuck is this shit about". He was referring to a letter that I had sent to a lawyer asking for help pertaining to the incident that happened Sept 14, 2022 at USP Tucson.

22. I had told LT Christensen that "It was my right to bring a case against His misconduct to take the proper action's to prevent My and Grace's, and Gulisano's Assault and Safty, which he did not, and that It was his fault I got Cut and also Grace and Gulisano, because He didn't follow PREA policy and let Tyrone Brown Assault us. Also That, He is Tampering with My Mail legal Mail at that"

23 To which LT Christensen said "Look Zavayoun all This shit happened, was because The warden signed to have Brown released from the SHU, because Prison had The feeling She was untouchable with Her lawyers, so It had nothing to do go against you or the others, even though you sent the PREA Aligation also as did the others, but

05/03/2024

I can tell you that Tyrone Brown will never
bee able to assult you because He does have
a Sepratee with you, so does Nicole Marie Johnson,
So lock Zaragosa. if you drop this shit your
lawsuit shit and writing everybody and having
people Call here the warden will let you Back
to GP Remove your sepratee with Johnson and
all will be Okay, but I tell you if you Continue
to press the issue in Court, then"... He stopped
because Mark Gutierrez Came around the
Corner and Continued.

24. The warden Mark Gutierrez told me on Oct
5, 2022 as part of LT Christensen's interview
That. "It's Simple, Stop all That Constitutional
rights bullshit because you Dont Have no
rights Here, The Courts will not help you
because I run this, not them. or believe me
Zaragosa you will never be safe in U.S.P." and
I'll ship you and Pinson as well as whom
ever Continues this shit." and He walked
off before I could adress him.

25. I Continued on speaking to LT.Christensen about
How Come He let Tyrone Brown Back to his
unit, if we had told him that He was going to

05/03/2024

Rape and Murder Me. To which He said "I'll tell you the truth Zaragosa.. Im the PREA LT and Im not doing that PREA SHit, because people like you (faggets) make me sick and should Kill ya'lls self".

26. I Had enough of LT.Christensens stupidity at that time and @ I decided to end the interview.

27. I was then placed in the Holding cell to wait for the officer to take me back to the cell. but I could Hear and see LT.Christensen and Pinson going at it, and then Mark Gutierrez went in to the interview and walked out with a evil smirk.

28. As I was waiting to be tooken back to my Cell I could see in the officers station and see the warden Mark Gutierrez speak to the officers there. which I Can remember Flores (officer) because he was the one that escorted me to my cell.

29. As I was being escorted to my cell by officer Flores. He stated to me" You should drop the lawsuits Zaragosa, because the Big guy is going to make sure you go to another U.S.P, you've seen

.9.

05/03/2024

how they are, they lie about everything Zaragoza". The warden told me to talk to you, let me know if you want to get out the cell with pinson, so He knows you'll stop, shit He'll (the warden) put you in with Johnson." and laughed I said No.

30 . AFTER Pinson made it back to the cell with me, we continued with our legal activitys. that till this day the Courts Keep ignoring our plea for help, and refuse to see the violations of My rights.

31 . I am housed at Coleman II in florida, and am in the (SHU) as of 3-28-2024 for being in unauthorized area. Then I was in another cell because I refused to live with another inmate, but they wanted to force me to live there. So now I am in the SHU and will be, because I don't feel safe to be on a compound where My Sept 14, 2022 assultant and seprater is at.

32 . BOP Keeps putting me in danger by placing me in a prison that my sepratee is housed at. This also happened to a friend that was involved in

05/03/2024

I can not remember his name Lil Joe as Alias his separtee was here and a life was almost tooken. But That is not going to be me, especially at the hands of BOP Employees.

33. This Concern was also told to TEC in Electronic Email in the Month of Oct when I arrived or was able to have access to TRUlinks and I had a PREA with another situation here at USP Coleman II.

34. BOP has ignored all my Safty Concernse, I say this because It is all in the MatoDate Base. All. But I dont Have access to that and when I try to go to FOIA, BOP getts in the way and tampers with mail.

35. AFTER The Oct 5, 2022 interview, with My and Pinson's Refusal to drop our legal activity's against Warden Mark Gutierrez a retaliation started, Just how LT. Christensen and Warden Mark Gutierrez said was going to happen.

36. As the long moNths dragged at USP Tucson I was subjected to retaliation from A.W. williams,

05/03/2024

Gutierrez.

37. The first retaliation came from Warden Mark Gutierrez and A.W. Williams wanting me transferred for having done nothing wrong, no disciplinary shincidents, not even on the Sept 14, 2022 incident. They or A.W. Williams asked for my transferee for 323, Close Supervision. and applyed a Management Variable (U) Greater Security. (ATT. EX. A)

38. A.W. Williams made my Move from Unit C-1 to A-1 to be Jeremy "Gracie" Pinson Cell-mate and told me to "Protect and keep Pinson Safe and out of trouble. no matter what". which I did, and I still got A.W. Williams retaliation against me.

39. I had reported a Sexual assult in 2020 at USP TUCSON SHU (Trans seg from FCI) from a inmate from USP TUCSON, which was also sent to Regional Director BP9 sensitive and Reported on Electronic Email TO TEC (TRANSGENDER EXECUTIVE Com) and DOJ Electronic Box. ~~(ATT: (also~~

40. There has also been incidents where my mail was tampered with (EXAMPLE FOIA claim) that contained

05/03/2024

other personal issuess.

41. The staff at USP Tucson (SHU) Special Housing Unit
would laugh at me and Pinson and tell us "we
Know what your telling OIA and DOJ, but it doesn't
matter, because they never do anything about it, because
of your Celly Pinson". This would be said by officer's
M. Vasquez, Farrugoso, Flores, Ruiz, Gibell, if
it wasn't the same way said, it was as close as
possible to it, but still letting me and Pinson
Know that they Know what we were telling
OIA and DOJ.

42. There are also facts to which the retaliation
happened to secure my redesignation to a High
security from Medium and that my points would
be changed to Medium Custody, but still be designated
to a violent Prison (USP) with a Management Verbal.
This was told to me by officer. A Diaz which is
my Case Manager. "I Fixed your points and am
redesignating you to a FCI,.. but the High ups
who want to place a Management Verbal on you.
there's nothing I can do Zaragoza. The Warden
sign's my check's".

05/03/2024

43. I can say that if this Court would look at the Meta data Base records that as a pro se litigant not represented by a Attorney can not get, this Court would see the "Common Sense" of where, when and who the retaliation started and has not finished.

44. Here is a BP 11 that says that I did ask for OIA Help and for the DOJ stop warden Mark Gutierrez from retaliation and Reporting Other Misconduct from staff. That officer special agent Cramer from OIA finally interviewed Me, Pinson, and Daniel Mcneal, but I can not recall the actual Date.

45. Officer Special Agent Cramer came to USP Tucson and asked me about Mark Gutierrez and his use of or abuse of power, isolation of to a Range by ourself to keep us away from witness that have done declarations, and this Day we was pulled to speak to Agent Cramer. A. Stangel, AW. Zantout, warden Mark Gutierrez, Captin Marlow and others that I cant remember there names, but also unit teams from the North side. Ms Diaz, A. Diaz, Palmer, V. Flores Dr. Lakata. It was alot of people seeing me

05/03/2024

to OIA Special Agent Cramer in the LT's office. another way they knew about our Complaints to OIA.

46. I have also spoken to a representitive of PREA Auditors of America and written to them to state my Complaints.

47. IO AT that interview, which took place in the (SHU) was not what I expected from a agency that is to help victims of sexual abuss. That lady confirmed by her words that "They cant go against the Warden", and "That in there report, they were not going to say anything bad about USP TUCSON".

48. I have also sent Colette Peters letters, to help and stop Warden Mark Gutierrez from Violating My Constitutional Right and stop retaliation, but never got an answers.

I declare under the penalty of perjury, pursuant to Title 28, 1746, that the foregoing is true and Correct to the best of my information knowledge and belief.

x _Ernesto Bermayosa John III_

Ernesto Bermayosa Sen's

Attachment/Exhibit A to
Declaration of Ernesto Zaragosa-Solis
Request For Transfer (Signed 8-16-23)
(Signed by Muhammad Zantout)

05/03/2024 051 REQUEST FOR TRANSFER/APPLICATION OF MANAGEMENT VARIABLE CDFRM
SEP 2006

**U.S. DEPARTMENT OF JUSTICE**                                                    FEDERAL BUREAU OF PRISONS

| From: M. Gutierrez, Complex Warden | Facility: FCC Tucson, Arizona | Date |
|---|---|---|
| *Fm Uro* | | *8-16-23* |

Inmate's Name: ZARAGOSA-SOLIS, ERNESTO

Register No.: 64572-179

To: Shannon Robbins, Senior Deputy Assistant Director
    Designations and Sentence Computation Center

X  Transfer to: __Any appropriate high security level facility, 323, close supervision.__

X  Apply Management Variable(s)   (V) Greater Security

____  Update Management Variable Expiration Date.   (New Date): ____

1. Inmate's Medical Status:

2. Institution Adjustment:

Inmate Zaragosa-Solis arrived at USP Tucson on February 4, 2021, via a 323 transfer from FCI
Tucson. His overall institutional adjustment is rated as poor. Zaragosa-Solis has not completed any
FSA programming. He is currently housed in SHU and does not have a work assignment.

3. Rationale for Referral:

On May 19, 2022, Zaragosa-Solis was placed in the Special Housing Unit and an investigation was
initiated by SIS.

To avoid PREA concerns and contact with a separatee, the Unit Team recommends a
Greater Security Management Variable be applied and Zaragosa-Solis be transferred to any
appropriate High Security facility commensurate with his security and programming needs.

| 4a. Parole Hearing Scheduled: | | Yes ____ | XX No ____ | b.  If yes, when: | N/A |
|---|---|---|---|---|---|

5. Note any past or present behavior and/or management/inmate concerns:

6. BP337/BP338 Discrepancies:
There are two discrepancies between the BP-337 and BP-338.
Zaragosa-Solis was originally scored Age 25-35 but is now scored 36 through 54 due to the passage
of time.
Zaragosa-Solis was originally scored with Drug/Alcohol Abuse less than 5 years but is now scored
never greater than 5 years due to the passage of time.

Staff have checked the following SENTRY Programs to ensure that they are correct and current:

| Inmate Profile | CIM Clearance and Separatee Data |
|---|---|
| Inmate Load Data | Custody Classification Form |
| Sentence Computation | Chronological Disciplinary Record |

Prepared by: A. Diaz, Case Manager  *A. Diaz*        Unit Manager Signature: M. Palmer  *M. Pal*

If the transfer is approved, a Progress Report will be completed prior to transfer.
*For Mariel Cuban Detainees - Staff have entered the CMA Assignment of ACRP RV DT@ to indicate the
need for a Cuban Review Panel Hearing four months from his/her Roll-Over Date.

(*This form may be replicated via WP*)                    *This form replaces EMS-409 of DEC 99*

F.O.I EXEMPT

Exhibit 4

Declaration of David Green

(6 Pages)

07/01/2024

Supplemental Declaration of David L. Green #40171-044

I declare under penalty of perjury that the following is true and correct:

1. I David L Green #40171-044 am writing this declaration about the negligence that happens in U.S.P. Tucson Special Housing Unit (SHU) concerning the safty of inmates and the retaliation as myself experienced.

2. I am cureantly incarserated at U.S.P. Coleman #2, which I was transfered to from USP Tucson (SHU), where I was trans-seged from the Federal Correchional Institution (FCI) Tucson for an assult against my life that took place on 1-22-23.

3. The assult involds of (FCI Tucson) 5 x MS-13 gang member Inmates, 1st of whom is Jose Hernandez #85273-007

4. Inmates at F.C.I. Tucson are trans-seged to U.S.P. Tucson because F.C.I. Tucson dosenot place there inmates in there Segregation Unit (S.H.U.) Reasons unknown to me

(-1-)

07/01/2024

5. In the altercation I was involed in at F.C.I Tucson (Mesquito North Unit). I was stabbed over 40 times by inmate Jose Hernandez # 85273-007 and had to be taken by abulance to a local Hospital at Tucson Arizona

6. I was treated at the hospital in Tucson Arizona for (1) a collasped right lung due to being stabbed, (2) And 8 staples put on the back of my head from being hit with a lock (3) a black right eye and then taken back to the S.H.U at U.S.P. Tucson after five days of being in the Hospital

7. Because of the altercation I was notified that I had a separtee between Me and Jose Hernandez # 85273-007 and the other inmates involved by Special Investagtive servies (S.IS) M Castro from the F.C.I in Tucson

8. On 4-6-23 I was taken from my cell in USP Tucson (SHU) # 241 E-Range for my one hour recreation. Recreation officer was Martinez (first name unknown to me)

9. While being escorted by officer Martinez, to recreation cages Officer Martinez asked me what cell I was in, to which I replyed E-Range cell 241

07/01/2024

10. Officer Martinez looked at his clipboard which has all SHU inmates names that have seprateez with other inmates at ( F.C.I and U.S.P. inmates)

11. As I was standing in recreational (rec) cage #2 talking to an inmate in rec cage #3 I heard rec cage #2 gate open, when I turned around, I saw inmate Jose Hernandez #85213-007 was placed into the same rec cage #2 as Me.

12. This incident is all on CCTV footage from the recreation SHU at USP Tucson on 4-6-23 which I stated in my Administrative Remedy: ID 1158291-F1

13. When officer Martinez was notified of the situation. He officer Martinez came back and took me back to my cell 241 E-Range and smiling said to me "Don't worry about it, we do it all the time to see a fight."

14. I voiced my complaint to LT. Alcantar she at the time (4-6-23) was the S.H.U. LT. at U.S.P. Tucson. She stated "She runs the SHU and she will talk to S.H.U. officers about the situation."

07/01/2024

15. While being housed at U.S.P. Tucson I got familiar with Inmate Jeremy Pinson #16267-064 known as "Grace" (a transgender inmate) and her cellmate Zaragosa-Solis # 64572-179 known as (zombie), because they where on F-Range to which I could speak by sign to both of them.

16. Inmate Pinson #16267-064 "Grace" was and is know as a transgender advocate and civil rights litigant (Jail house lawyer) that helps out inmates that have there constitutional rights violated by BOP officials and DOJ. Documented in lexus Nexus legal libary.

17. At recreation time in U.S.P. Tucson. I would hear inmates ask "Grace" Inmate Pinson #16267-064 for legal help and advice

18. At times officers M. Vasquez, Faragossa, Flores and others that I don't remember their names would say out loud "Thats why the Warden has inmate Pinson (#16267-064) isolated, so ya'll Faggets can't snitch on us" and laugh.

19. So I asked Inmate Pinson (#16267-064) for advice. To which She said "file your Administrative Remedys first" which I did

(-4-)

07/01/2024

20. I then proceded to file My Administrative Remedys BP.8 which I turned in an 4-10-23 then two different BP.9's

21. My origonal BP.9 was rejected because "BP.9 cannot be dated before the conclusion of BP.8"
Remedy ID: 1158297-F1
Date Recieved  April 17,2023

22. So I then placed Second BP.9 to which they only sent me a copy of my BP.9 and not my attachment, Which they gave me the week I was being transfered Administrative Remedy ID: 1158297. F2  Date recived May 2, 2023

23. I have clearly been retaliated against by the Administrative Remedy Cordinatate at F.C.I Tucson (Name unknown) for Violating my due process on Administrative Remedy Request ID: 1158297-F2

07/01/2024

24. I have also been clearly Retaliated against by the Unit Manager at F.C.I Tucson Mr. Makowski — Unit Case Manager Mr. Nicholson and Unit Counselor Ms Smith for violation of due process by singing Remedy ID: 1158291 -F1 without giving me all of my documents to proceed my complaints

25. Pursuant to provisions of 28 U.S.C. §1746 I declare under penalty of perjury that the foregoing is true and Correct to the best of my Knowledge and belief

May 17, 2024                    David L. Green #40171-044
                               David L Green #40171-044

(-6-)

Exhibit 5

Declaration of Jose Armendariz

(3 Pages

DECLARATION OF JOSE ANTONIO ARMENDARIZ

I declare under penalty of perjury that the following statements are true and correct:

1. I was previously  housed in USP Tucson with Jeremy Pinson #16267-064 and I am very familiar with her as I interacted with her from 2019-20 and June 3, 2022 until my transfer to USP Terre Haute in Indiana where I am now housed because I interacted with her on a near daily basis.

2. I have been made aware that Lieutenant J. Christensen claimed in an SIS report that he interviewed me in the USP Tucson SHU in October 2022 and wrote in his report that I said I paid inmate Pinson to make allegations against other inmates to have them removed from our housing unit in USP Tucson. This is categorically false.

3. I do recall being interviewed by Lieutenant J. Christensen in October of 2022 because  Tyrone Brown had used a weapon in the dining hall to attack Pinson and Jessica Gulisano and that Ernesto Zaragosa-Solis was also injured when he intervened to protect Pinson from Brown on September 14, 2022. Brown told staff that he attacked them because he believed that I had put a 'paid hit' on him because I wanted Gulisano to end her sexual relationship with Brown and become my sexual partner. As a result, a few hours after Brown's attack I was admitted to SHU for an SIS investigation.

4. I told Christensen during the interview that Pinson was a "legal beagle" who liked to help people with their post-conviction cases and also with civil claims for things like poor medical care. I did tell him that I was aware Pinson had filed a PREA complaint against Brown in June 2022 which Christensen himself had made general knowledge within the prison by doing interviews, including of myself, in the Lieutenant's Office where he was asking everyone the same question: "Why did Grace or Jeremy Pinson put a PREA on Tyrone Brown, if you know the answer?". I did not at any time tell Christensen that I asked or paid Pinson in any way to file allegations to get Brown or anyone else moved out of our unit. That never happened.

5. I recall very clearly that Christensen was so eager for allegations agains Pinson he could use to transfer her that he offered to pay me to make up allegations against her which I refused to do.

6. I was charged while in SHU with an Incident Report for Introduction of Narcotics because Chaplain Gomulka caught a package sent to me that did

ARMENDARIZ DECLARATION CONTINUED:

    contain material that tested positive during a NIK test as narcotics. I
    had a hearing before Discipline Hearing Officer Antoinetta Estrada for
    this incident report and was found guilty.

7. The only involvement whatsoever that inmate Pinson had with my incident
    report for introduction of narcotics, was helping me write an appeal on
    due process grounds for the Regional Director on a BP-10 form once I had
    received the DHO report because I was not and am not familiar with the
    legal issues surrounding due process and she is an expert on those kind
    of issues so I paid her a bag of Keefe coffee for her time in writing up
    an appeal for me. She had no involvement otherwise with that matter and
    absolutely had no involvement or knowledge that drugs were going to be
    mailed to me.

8. I would not have told inmate Pinson anything about drugs or illicit
    activities I would have been involved in while at USP Tucson because
    I know her very well and I know if she could have figured out a way to
    get her sentence reduced by acting as an informant she would have helped
    the authorities against me. Pinson would have been the last person that
    I or anyone else involved in a drug operation or any other kind of illici
    activities and I know that because I knew her and all the other inmates
    at USP Tucson for years and I am experienced enough and knowledgable
    of that environment to say I do not believe anyone would allow her  to
    be involved in such activities and would have gone to great lengths to
    prevent her from knowing such information because she would have reported
    to the authorities anything she knew to try to get out of prison. Period.

9. Jessica Gulisano converted to being a muslim while Tyrone Brown was in
    SHU under investigation for the PREA allegations Pinson had made because
    she wanted to be under the protection of muslim inmates from Brown. This
    was because Jessica was a small, young, vulnerable transgender inmate and
    had been getting "pimped out" by Brown for months, meaning he arranged
    for her to perform oral sex or have anal sex with other inmates who would
    then pay Brown in drugs or other forms of money. This was also why he had
    caused Pinson to file a PREA against him because when he approached her
    in our unit to try to persuade her to become one of his transgender
    prostitutes Pinson became livid and screamed at him to get away from her.
    When this upset Brown he tried to intimidate Pinson and she walked down
    the stairs to Dr. Licata's office an put a PREA against him immediately.

ARMENDARIZ DECLARATION CONTINUED:

10. If called to testify in this case, please allow me to appear via a
videoconference as I do not wish to travel in person to Tucson.

Executed Pursuant To 28 U.S.C 1746

Jose Armendariz
27073-225

6-16-2024

Exhibit 6

Declaration of Juan Vargas

(1 Page)

X
X
X
X
X
X
X

DECLARATION OF JUAN BENJAMIN VARGAS

I DECLARE UNDER PENALTY OF PERJURY THAT THE STATEMENTS LISTED BELOW ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE AND BELIEF, AND ARE BASED UPON MY OWN PERSONAL KNOWLEDGE:

1. The Secure Administrative Unit (hereinafter "SAU") is described in BOP documentation a  unit that "houses incarcerated individuals diagnosed with serious mental illness (SMI) who require a secure setting and either refuse mental health programming or are awaiting bed space at a mental health treatment program. Placement in the SAU is administrative, not voluntary."

2. I was moved to the SAU beginning in 2023 at the Allenwood U.S. Penitentiary on but was not formally placed into the SAU until construction teams finished remodeling the unit, on March 6, 2024. I was housed in the Special Housing Unit of USP Allenwood prior to the construction crews completing the remodeling of the unit which had begun in 2020.

3. I received no written notice of my referral to the SAU from the BOP. I did not receive a due process hearing before an impartial decisionmaker with regard to my placement in the SAU, nor an opportunity to speak or present witnesses and/or documentary evidence at such a due process hearing.

4. Since being placed into the SAU a union dispute between the correctional officers and the psychologists operating the unit arose and a formal grievance was filed with the Bureau of Prisons by the union representing correctional officer. As a result the BOP Central Office suspended operations in the SAU pending the outcome of the union dispute and as a result none of the inmates housed in the SAU are allowed to receive programming or to begin progressing through "treatment phases" necessary to secure their release or transfer from the SAU. This information was provided to me by the psychologists in charge of the SAU - Dr. Powell and Dr. Green - to explain why our classification is suspended and remains in limbo until the union dispute is resolved by the Bureau's Executive Staff in Washington, D.C.

5. I have requested to be transferred to other programs such as the Residential Drug Abuse Program, a vocational training or apprenticeship program, the Reintegration Unit in another unit at USP Allenwood but all of my requests have been denied due to the fact the SAU is suspended in its activation and I cannot progress out of the unit due to it being suspended by the union dispute even though I have no control or influence over when that dispute is resolved and the union dispute has nothing to do with me.

6. I do not believe that I suffer from a serious mental illness and to the best of my knowledge I am not diagnosed with a serious mental illness. I do not believe that I require a secure setting as I am due to be released from the custody of the BOP before the end of 2025, no later than April 2025. I need reentry preparation programming or time in a halfway house to help me prepare myself to reenter society but I am receiving neither at this time because I am housed in the SAU and the staff running the SAU tell me that no such assistance or programming will be provided to me or anyone else in the SAU.

7. I am held in solitary confinement in a cell physically constructed to house one inmate. I am confined to my cell 24 hours per day with a concrete bunk, metal desk, metal toilet/sink, and a television mounted inside a metal box upon the wall. I am not allowed to exit my cell for outdoor exercise nor am I given any human contact with other inmates for socialization of any kind.

EXECUTED UNDER PENALTY OF PERJURY PURSUANT TO 28 USC 1746 ON JULY 10, 2024.

JUAN BENJAMIN VARGAS
#58241-083

Exhibit 7

Declaration of Bruce Altenburger

(1 Page)

X
X
X
X
X
X
X

DECLARATION OF BRUCE ALTENBURGER

I DECLARE UNDER PENALTY OF PERJURY THAT THE STATEMENTS LISTED BELOW ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE AND BELIEF, AND ARE BASED UPON MY OWN PERSONAL KNOWLEDGE:

1. The Secure Administrative Unit (hereinafter "SAU") is described in BOP documentation a unit that "houses incarcerated individuals diagnosed with serious mental illness (SMI) who require a secure setting and either refuse mental health programming or are awaiting bed space at a mental health treatment program. Placement in the SAU is administrative, not voluntary."

2. I was moved to the SAU beginning in 2023 at the Allenwood U.S. Penitentiary on but was not formally placed into the SAU until construction teams finished remodeling the unit, on March 6, 2024. I was housed in the Special Housing Unit of USP Allenwood prior to the construction crews completing the remodeling of the unit which had begun in 2020.

3. I received no written notice of my referral to the SAU from the BOP. I did not receive a due process hearing before an impartial decisionmaker with regard to my placement in the SAU, nor an opportunity to speak or present witnesses and/or documentary evidence at such a due process hearing.

4. Since being placed into the SAU a union dispute between the correctional officers and the psychologists operating the unit arose and a formal grievance was filed with the Bureau of Prisons by the union representing correctional officer. As a result the BOP Central Office suspended operations in the SAU pending the outcome of the union dispute and as a result none of the inmates housed in the SAU are allowed to receive programming or to begin progressing through "treatment phases" necessary to secure their release or transfer from the SAU. This information was provided to me by the psychologists in charge of the SAU - Dr. Powell and Dr. Green - to explain why our classification is suspended and remains in limbo until the union dispute is resolved by the Bureau's Executive Staff in Washington, D.C.

5. I have requested to be transferred to other programs such as the Residential Drug Abuse Program, a vocational training or apprenticeship program, the Reintegration Unit in another unit at USP Allenwood but all of my requests have been denied due to the fact the SAU is suspended in its activation and I cannot progress out of the unit due to it being suspended by the union dispute even though I have no control or influence over when that dispute is resolved and the union dispute has nothing to do with me.

6. I do not believe that I suffer from a serious mental illness and to the best of my knowledge I am not diagnosed with a serious mental illness. I do not believe that I require a secure setting as I am due to be released from the custody of the BOP before the end of 2024, no later than December 2024. I need reentry preparation programming or time in a halfway house to help me prepare myself to reenter society but I am receiving neither at this time because I am housed in the SAU and the staff running the SAU tell me that no such assistance or programming will be provided to me or anyone else in the SAU.

7. I am held in solitary confinement in a cell physically constructed to house one inmate. I am confined to my cell 24 hours per day with a concrete bunk, metal desk, metal toilet/sink, and a television mounted inside a metal box upon the wall. I am not allowed to exit my cell for outdoor exercise nor am I given any human contact with other inmates for socialization of any kind.

EXECUTED UNDER PENALTY OF PERJURY PURSUANT TO 28 USC 1746 ON JULY 10, 2024.

*Bruce Altenburger*
BRUCE ALTENBURGER
#34208-057

52 PM

X
X
X
X
X
X
X

DECLARATION OF ERIC TEMPLE

I DECLARE UNDER PENALTY OF PERJURY THAT THE STATEMENTS LISTED BELOW ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE AND BELIEF, AND ARE BASED UPON MY OWN PERSONAL KNOWLEDGE:

1. The Secure Administrative Unit (hereinafter "SAU") is described in BOP documentation a unit that "houses incarcerated individuals diagnosed with serious mental illness (SMI) who require a secure setting and either refuse mental health programming or are awaiting bed space at a mental health treatment program. Placement in the SAU is administrative, not voluntary."

2. I was moved to the SAU beginning in 2023 at the Allenwood U.S. Penitentiary on but was not formally placed into the SAU until construction teams finished remodeling the unit, on March 6, 2024. I was housed in the Special Housing Unit of USP Allenwood prior to the construction crews completing the remodeling of the unit which had begun in 2020.

3. I received no written notice of my referral to the SAU from the BOP. I did not receive a due process hearing before an impartial decisionmaker with regard to my placement in the SAU, nor an opportunity to speak or present witnesses and/or documentary evidence at such a due process hearing.

4. Since being placed into the SAU a union dispute between the correctional officers and the psychologists operating the unit arose and a formal grievance was filed with the Bureau of Prisons by the union representing correctional officer. As a result the BOP Central Office suspended operations in the SAU pending the outcome of the union dispute and as a result none of the inmates housed in the SAU are allowed to receive programming or to begin progressing through "treatment phases" necessary to secure their release or transfer from the SAU. This information was provided to me by the psychologists in charge of the SAU - Dr. Powell and Dr. Green - to explain why our classification is suspended and remains in limbo until the union dispute is resolved by the Bureau's Executive Staff in Washington, D.C.

5. I have requested to be transferred to other programs such as the Residential Drug Abuse Program, a vocational training or apprenticeship program, the Reintegration Unit in another unit at USP Allenwood but all of my requests have been denied due to the fact the SAU is suspended in its activation and I cannot progress out of the unit due to it being suspended by the union dispute even though I have no control or influence over when that dispute is resolved and the union dispute has nothing to do with me.

6. I do not believe that I suffer from a serious mental illness and to the best of my knowledge I am not diagnosed with a serious mental illness. I do not believe that I require a secure setting I am serving a life sentence but I have been in solitary confinement for most of the last 20 years and I do not feel that I pose a threat to the life or safety of any other person and that I would function just fine in a normal prison.

7. I am held in solitary confinement in a cell physically constructed to house one inmate. I am confined to my cell 24 hours per day with a concrete bunk, metal desk, metal toilet/sink, and a television mounted inside a metal box upon the wall. I am not allowed to exit my cell for outdoor exercise nor am I given any human contact with other inmates for socialization of any kind.

EXECUTED UNDER PENALTY OF PERJURY PURSUANT TO 28 USC 1746 ON JULY 10, 2024.

*Eric Temple*

ERIC TEMPLE
#33039-018