Exhibit 1

Preliminary Injunction Order

JDN

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

Jeremy Pinson,

           Plaintiff,

v.

Federal Bureau of Prisons,

           Defendant.

No. CV-22-00298-TUC-RM

**ORDER**

      In February 2024, the Court directed the parties to file supplemental briefing related to Plaintiff's request for female-officer searches, access to female hygiene products and undergarments, and custody classification determinations used for transgender prisoners. (Doc. 115). After the parties filed their supplemental briefs, the Court resolved the issues of female-officer searches and access to female hygiene products and undergarments, but the Court directed that it would separately resolve Plaintiff's request for injunctive relief related to custody classification determinations. (Doc. 146 at 1.) The Court addresses that issue herein and will grant Plaintiff's request for injunctive relief as explained below.

## I.    Background

      The parties are familiar with the extensive facts and background in this case. Plaintiff Jeremy Pinson, who is confined in the United States Penitentiary ("USP") Allenwood, in White Deer, Pennsylvania, brought this civil rights action under 28 U.S.C. § 1331 against the Federal Bureau of Prisons ("BOP"), USP-Tucson Complex Warden Mark Gutierrez, and BOP National Policy and Program Coordinator Ashley Noble. (Doc.

226.)[1]  In her operative Third Amended Complaint, Plaintiff states that she has gender dysphoria and identifies as female but has been incarcerated in male prisons since entering Defendant BOP's custody. (*Id.* at 11–14.)  Plaintiff explains that placement in male prisons has negatively affected her mental health, resulted in her being the victim of numerous assaults, and led to multiple suicide attempts.  (*Id.* at 14–16.)  Upon screening, the Court determined that Plaintiff sufficiently stated an Eighth Amendment medical/mental health care claim and a threat to safety/failure to protect claim against the BOP (Counts One and Three), a Fifth Amendment equal protection claim against the BOP (Count Two), a claim under 42 U.S.C. § 1985(2) against Gutierrez (Count Four), and a claim under 42 U.S.C. § 1986 against Noble (Count Four).  (Doc. 225.)

Plaintiff asserts that Defendant BOP uses male procedures to determine her custody classification score.  (Doc. 18 at 10; Doc. 62 at 35–36, 50).  According to Plaintiff's evidence, the BOP categorically uses its male procedures to calculate the custody classification scores of transgender inmates housed in male institutions. (*See* Doc. 31-4 at 1; Doc. 62-1 at 7.)  The Court recognized Plaintiff's argument that using male procedures to calculate the custody classification scores of female transgender prisoners housed in male institutions violates the Equal Protection Clause, which relates to Plaintiff's claim in Count Two.  (Doc. 115 at 36.)  Plaintiff seeks preliminary injunctive relief related to the use of male procedures to calculate her classification score, which she alleges constitutes a barrier to her gender transition. (*See* Doc. 18 at 3–4, 11; Doc. 62 at 34, 38, 52.)

## II.    Preliminary Injunction Standard

"A preliminary injunction is 'an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)); *see Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted) ("[a] preliminary injunction is an extraordinary remedy never awarded as of right").  Nonetheless, "federal courts must not shrink from their

---

[1] Plaintiff was previously housed at the USP Tucson, Arizona.  She was transferred to USP Allenwood in early January 2024.  (Doc. 103.)

1    obligation to enforce the constitutional rights of all persons, including prisoners" and must

2    not "allow constitutional violations to continue simply because a remedy would involve

3    intrusion into the realm of prison administration." *Porretti v. Dzurenda*, 11 F.4th 1037,

4    1047 (9th Cir. 2021) (citation omitted).

5           A plaintiff seeking a preliminary injunction must show: (1) she is likely to succeed

6    on the merits; (2) she is likely to suffer irreparable harm in the absence of injunctive relief;

7    (3) the balance of equities tips in her favor; and (4) an injunction is in the public interest.

8    *Winter*, 555 U.S. at 20.  When the government opposes a preliminary injunction, "[t]he

9    third and fourth factors of the preliminary-injunction test—balance of equities and public

10   interest—merge into one inquiry." *Porretti*, 11 F.4th at 1047.  The "balance of equities"

11   concerns the burdens or hardships to a prisoner complainant compared with the burden on

12   the government defendants if an injunction is ordered.  *Id.*  The public interest mostly

13   concerns the injunction's impact on nonparties rather than parties.  *Id.* (citation omitted).

14          The Ninth Circuit has articulated an alternate formulation of the *Winter* test referred

15   to as the "serious questions" or "sliding scale" approach: a preliminary injunction is

16   appropriate if a plaintiff can show "serious questions going to the merits" and that "the

17   balance of hardships tips sharply in the plaintiff's favor," and the other two *Winter* factors

18   are satisfied.  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir.

19   2011) ("the 'serious questions' approach survives *Winter* when applied as part of the four-

20   element *Winter* test").  Under this "serious questions" version of the sliding-scale test, the

21   elements of the preliminary injunction test are balanced, so that a stronger showing of one

22   element may offset a weaker showing of another.  *See id.* at 1135.

23          Where a plaintiff seeks a mandatory injunction, rather than a prohibitory injunction,

24   injunctive relief is "subject to a higher standard" and is "permissible when 'extreme or very

25   serious damage will result' that is not 'capable of compensation in damages,' and the merits

26   of the case are not 'doubtful.'" *Hernandez v. Sessions*, 872 F.3d 976, 999 (9th Cir. 2017)

27   (quoting *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879

28   (9th Cir. 2009)).  "This standard does not supersede the Ninth Circuit's 'serious questions'

1  test. Rather, the severity of the legal questions correlates with a movant's likelihood of

2  success; the greater the likelihood of success, the less doubtful the case." *Morrar v. United*

3  *States*, No. 2:19-cv00833-KJM-KJN, 2019 WL 2715618, at *4 (E.D. Cal. June 28, 2019).

4      Under the Prison Litigation Reform Act, injunctive relief must be narrowly drawn

5  and be the least intrusive means necessary to correct the harm. 18 U.S.C. § 3626(a)(2); *see*

6  *Gilmore v. People of the State of Cal.*, 220 F.3d 987, 999 (9th Cir. 2000).

7  **III.    Analysis**

8      **A.    Likelihood of Success**

9          **1.    Equal Protection**

10     Gender-based equal protection prison claims are subject to intermediate scrutiny.

11  *Harrison v. Kernan*, 971 F.3d 1069, 1076–1080 (9th Cir. 2020) (vacating and remanding

12  because the district court applied the deferential standard under *Turner v. Safley*, 482 U.S.

13  78, 89–90) (1987), instead of applying intermediate scrutiny to the prisoner's gender

14  discrimination claim). Thus, prison policies that employ gender-based distinctions "are

15  constitutional only if the government demonstrates they "serve[ ] important governmental

16  objectives and that the discriminatory means employed are substantially related to the

17  achievement of those objectives." *Id.* at 1076 (quoting *United States v. Virginia*, 518 U.S.

18  515, 533 (1996)). But deference owed to judgments made by prison officials is still

19  considered under the intermediate scrutiny standard. *Id.* at 1079. The deference owed to

20  prison officials' decisions "is factored into the importance of the government's asserted

21  interest." *Id.*

22     Under the intermediate scrutiny standard, the party seeking to uphold a regulation

23  that makes gender-based distinctions carries the burden of showing "an exceedingly

24  persuasive justification for the classification." *Miss. Univ. for Women v. Hogan*, 458 U.S.

25  718, 724 (1982). This burden is met by "show[ing] at least that the [challenged]

26  classification serves important governmental objectives and that the discriminatory means

27  employed are substantially related to the achievement of those objectives." *Virginia*, 518

28  U.S. at 533 (internal quotation omitted). "The justification must be genuine, not

1    hypothesized or invented post hoc in response to litigation.   And it must not rely on

2    overbroad generalizations about" the difference between males and females.   *Id.*

3                                 **2.     Discussion**

4            The Court directed Defendant BOP to file supplemental briefing addressing whether

5    the "use of male procedures to determine the custody classification levels of female

6    transgender prisoners housed in male institutions is substantially related to the achievement

7    of an important governmental objective." (Doc. 115 at 36–37, 39–40.)

8            In support of its Supplemental Response, Defendant BOP submits the declaration

9    of Timethea Pullen, the BOP National Policy and Program Coordinator, who explains that

10   custody classification is a procedure that assigns to a prisoner a "level of supervision"

11   according to that prisoner's criminal history and institutional behavior/adjustment. (Doc.

12   118-1 at 2, Pullen Decl. ¶¶ 1, 21.)  Pullen states that custody classification base scoring

13   considers 16 factors that are gender neutral; that is, the factors are equally applied to male

14   and female prisoners.  (*Id.* ¶ 25.)[2]  Federal BOP Program Statement 5100-08-CN at ch. 6,

15   page 2–14.  Pullen states that, while the points assessed through these factors are gender

16   neutral, there are male and female versions of the Security Level/Custody Level Table, the

17   Security Designation Table, and the Custody Variance Table.  (*Id.* ¶ 26.)  For example,

18   according to these Tables, a total of 24 points for a male prisoner would equate to a High

19   security level and a Maximum custody level, but a total of 24 points for a female prisoner

20   would equate to a Low security level and an "Out" or "In" custody level (the second lowest

21   and second highest levels).  Federal BOP Program Statement 5100-08-CN at ch. 1, page 2,

22   & at ch. 2, pages 2, 4.[3]  Custody classifications ordinarily occur every 12 months at regular

23   program reviews. (Doc. 118-1 at 2, Pullen Decl. ¶ 21.)

24

25   [2] Some of the 16 individual factors include severity of current offense, months to release
     date, criminal history score, voluntary surrender, age, educational level, drug/alcohol
26   abuse, program participation, and family/community ties. *See Federal Bureau of Prisons
     Program Statement P5100.08, Inmate Security and Designation Custody Classification,*
27   www.bop.gov/policy/progstat/5100_008cn.pdf (last visited Sept. 24, 2024).
     [3] *See Federal Bureau of Prisons Program Statement P5100.08, Inmate Security and
28   Designation Custody Classification,* www.bop.gov/policy/progstat/5100_008cn.pdf (last
     visited Sept. 24, 2024).  The BOP custody levels from lowest to highest are: Community,
     Out, In, and Maximum. *Id.* at ch. 2, pages 2, 4.

1    Defendant BOP submits a copy of Plaintiff's "Male Custody Classification Form,"

2    which shows that, at the last review in February 2024, Plaintiff's scores totaled 22 security

3    level points and 14 custody points, which Pullen asserts equates to a Medium security level

4    and a Maximum custody level. (Doc. 118-1 at 8, Pullen Decl. ¶ 27; Doc. 118-1 at 22.)[4]

5    Pullen explains that, although a custody classification form is prepared using these

6    factors, the form is only a recommendation, and the Unit Team or Warden make the final

7    determination as to custody status. (Id. ¶¶ 23, 29.) Pullen further explains that, when a

8    transgender prisoner seeks to house at a gender-affirming institution, custody classification

9    is just one of many factors considered by Defendant BOP's Transgender Executive

10   Counsel ("TEC"). (Id. ¶ 30.) The TEC consists of senior level staff members from various

11   branches within the BOP, and it is led by the Senior Deputy Assistant Director, Reentry

12   Services; the Senior Deputy Assistant Director, Correctional Programs Division; and the

13   Senior Deputy Assistant Director, Health Services. (Doc. 54-2 at 15.) The TEC is

14   Defendant BOP's official decision-making body on all issues affecting the transgender

15   population. (Id.) Pullen asserts that the TEC has the authority to decide that a particular

16   transgender prisoner can be housed in a lesser security institution or a female institution

17   regardless of the prisoner's custody classification. (Doc. 118-1 at 8, Pullen Decl. ¶ 31.)

18   Defendant BOP argues that Plaintiff's custody classification has no relevance to the

19   claims in this action unless it prevents Plaintiff from being transferred to a female prison,

20   and that because the TEC can decide to transfer a transgender prisoner to a female

21   institution regardless of the prisoner's custody classification, the use of male versus female

22   custody classification with respect to Plaintiff does not constitute a violation of her equal

23

24   [4] The Federal BOP Program Statement 5100.08 includes a table of the security and custody
     levels that correspond to scores for males and female. Id. at ch. 1, page 2. According to
25   this table, Plaintiff's total score of 22 security level points corresponds to a Medium
     security level and an "Out and In" custody level (referring to the second and third custody
26   levels). See id. Plaintiff's Maximum custody level does not correspond with her score;
     however, Defendant BOP explains that the Unit Team and/or Warden has the final review
27   authority to determine custody level, and custody changes are not dictated solely by the
     point total. (Doc. 118 at 7.) Defendant BOP explains that Plaintiff has been designated a
28   Maximum custody prisoner since 2008. (Doc. 118-1 at 8, Pullen Decl. ¶ 27.) If Plaintiff's
     totaled score of 22 security points was applied to the female tables, she would be classified
     as Low security level and "Out and In" custody level. Id.

1    protection rights. (Doc. 118 at 10.)

2         In her Supplemental Reply, Plaintiff insists that a prisoner's security level plays a
3    central role in both the ability to transfer to a female institution and the ability to access
4    medical care in the form of gender-affirming surgery. (Doc. 129 at 3.) Plaintiff points to
5    the Transgender Resource Guide, which explains that prisoners "may need to step down to
6    a lesser security facility prior to transfer to a gender affirming facility." (Doc. 129-1 at 18.)
7    Plaintiff argues that the use of the male custody classification procedures effectively
8    prevents her from ever being able to transfer to a gender-affirming institution because she
9    must have a security classification score appropriate for the institution to which she would
10   transfer, which would most likely be a low or minimum-security institution, as most female
11   institutions are low or minimum security. (Doc. 129 at 3.)

12        As the Court explained in its prior Order, Plaintiff's challenge to the BOP's use of
13   male procedures to determine the custody classification levels of transgender prisoners in
14   male institutions is separate from Plaintiff's challenge to the TEC's decision to house
15   Plaintiff in male institutions. (Doc. 115 at 36.) Thus, the fact that the TEC may approve
16   a transfer to a gender-affirming institution regardless of the prisoner's custody
17   classification level does not excuse an allegedly discriminatory procedure for determining
18   a transgender prisoner's custody classification.

19        Moreover, Defendant previously asserted that the TEC recommended Plaintiff be
20   placed in a male facility based on a consideration of different factors, including "Plaintiff's
21   HIGH security classification, MAXIMUM custody level, failure to meet hormone
22   treatment goals, and failure to maintain clear conduct." (Doc. 54 at 5 (emphasis in
23   original).) This assertion supports that Plaintiff's security classification and custody level
24   were important factors in the decision to keep Plaintiff in a male institution and not transfer
25   her to a female institution. As argued by Plaintiff, using a male custody level table to
26   determine her classification may prevent her from obtaining a classification level she
27   requires to be eligible for transfer to a female institution. It follows that Plaintiff's custody
28   classification is relevant to the claims in this lawsuit.

1    Plaintiff points out that, despite the Court's specific directive to address "[w]hether
2    the BOP's use of male procedures to determine the custody classification scores of female
3    transgender inmates housed in male institutions is substantially related to the achievement
4    of an important governmental objective," Defendant failed to provide a single important
5    governmental objective supporting the use of male procedures to determine the custody
6    classification scores of female transgender prisoners housed in male institutions. (Doc.
7    115 at 40; Doc. 129 at 4.) The Court agrees. In relying on its claim that there is no equal
8    protection violation because the TEC can transfer a prisoner regardless of their custody
9    classification, Defendant fails to present any argument that using male procedures to
10   determine the custody classification of female transgender prisoners serves an important
11   governmental objective.

12    As stated, Defendant BOP has the burden to show that the challenged procedure
13   serves important governmental objectives and that the discriminatory means employed are
14   substantially related to the achievement of those objectives, and the justification must be
15   exceedingly persuasive. *Virginia*, 518 U.S. at 533. Because Defendant BOP fails to
16   present any governmental objective for using male procedures to determine the custody
17   classification of female transgender prisoners, it fails to meet its burden. Consequently,
18   Plaintiff has shown serious questions going to the merits of her equal protection claim, and
19   she satisfies the first *Winter* factor. *See Republic of the Phil. v. Marcos*, 862 F.2d 1355,
20   1362 (9th Cir. 1988) ("[s]erious questions need not promise a certainty of success . . . but
21   must involve a fair chance of success on the merits") (internal quotation omitted).

22    **B.    Irreparable Harm**

23    A plaintiff must demonstrate that irreparable injury is "likely in the absence of an
24   injunction." *Winter*, 555 U.S. at 22; *see Caribbean Marine Servs. Co., Inc. v. Baldrige*,
25   844 F.2d 668, 674 (9th Cir. 1988) (speculative injury is not irreparable injury sufficient for
26   a preliminary injunction). "[T]here must be a presently existing threat of harm, although
27   injury need not be certain to occur." *Villaneuva v. Sisto*, CIV S-06-2706 LKK EFB P, 2008
28   WL 4467512, at *3 (E.D. Cal. Oct. 3, 2008) (citing *FDIC v. Garner*, 125 F.3d 1272, 1279–

- 8 -

1  80 (9th Cir. 1997)).

2          Plaintiff alleges she suffers symptoms of gender dysphoria including anxiety,

3  depression, and suicidal thoughts and actions. (Doc. 62 at 39.) Plaintiff explains that her

4  mental health has suffered, which has led to suicide attempts and attempts to castrate

5  herself, and she continues to suffer depression and suicidal thoughts. (Doc. 62 at 40.)

6          Defendant BOP argues that Plaintiff cannot show irreparable harm because its staff

7  takes her suicidal ideation seriously; whenever there is a concern she may be suicidal, staff

8  places her on suicide watch until she can be assessed by a mental health care provider.

9  (Doc. 72 at 13.)

10          Although Defendant BOP staff responds to Plaintiff's suicidal ideation, that does

11  not preclude a finding that she is currently suffering due to her gender dysphoria and

12  depression. Emotional stress, depression, psychological distress, and other psychological

13  problems can constitute irreparable injury. *See Stanley v. Univ. of Southern Cal.*, 13 F.3d

14  1313, 1324 n.5 (9th Cir. 1994); *Chalk v. U.S. Dist. Ct. Cent. Dist. of Cal.* 840 F.2d 701,

15  709 (9th Cir. 1988); *see also Whitaker by Whitaker v. Kenosha Unified School Dist. No. 1*

16  *Bd. of Educ.*, 858 F.3d 1034, 1045–46 (7th Cir. 2017) (suicide and diminished well-being

17  do not have an adequate remedy at law and are irreparable harms), *abrogated on other*

18  *grounds by Illinois Republican Party v. Pritzker*, 973 F.3d 760 (7th Cir. 2020).

19          Moreover, "[t]he deprivation of constitutional rights unquestionably constitutes

20  irreparable injury." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012); *see Nelson*

21  *v. Nat'l Aeronautics & Space Admin*, 530 F.3d 865, 882 (9th Cir. 2008), *rev'd on other*

22  *grounds*, 562 U.S. 134 (2011) ("[u]nlike monetary injuries, constitutional violations cannot

23  be adequately remedied through damages and therefore generally constitute irreparable

24  harm"). Plaintiff has met the second element under *Winter*.

25          **C.    Balance of Equities/Public Interest**

26          Courts "must balance the competing claims of injury and must consider the effect

27  on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at

28  24 (quotation omitted).

1    In prior briefing, Defendant BOP relied on *Turner* to argue generally that there

2    should be judicial restraint regarding prison officials' decisions, and "it would not be

3    equitable, nor would it serve the public interest, to severely limit the Bureau's discretion

4    here" by granting injunctive relief. (Doc. 54 at 17.) Although deference owed to prison

5    officials is still considered under intermediate scrutiny, that deference must be factored into

6    the importance of the government's asserted interest, and here, as stated, Defendant BOP

7    does not assert any interest for using male procedures to determine the custody

8    classification of female transgender prisoners. *See Harrison*, 971 F.3d at 1079. As such,

9    Defendant BOP does not identify any harm it would incur if injunctive relief is granted.

10    Plaintiff notes that Defendant BOP fails to explain why its "discretion" is more

11    important than her physical, mental, and emotional wellbeing; her life; and her body

12    autonomy. (Doc. 62 at 45.) As mentioned, without relief, Plaintiff continues to suffer

13    because of her gender dysphoria and depression.

14    Finally, "it is always in the public interest to prevent the violation of a party's

15    constitutional rights." *Melendres*, 695 F.3d at 1002; *see United States v. Raines*, 362 U.S.

16    17, 27 (1960) ("there is the highest public interest in the due observance of all the

17    constitutional guarantees"). And the public has an interest in ensuring that the plaintiff's

18    health is maintained during the pendency of a lawsuit. *Farnam v. Walker*, 593 F. Supp. 2d

19    1000, 1017 (C.D. Ill. 2009).

20    The *Winter* factors favor a preliminary injunction.

21    **D.    Remaining Factors**

22    Federal Rule of Civil Procedure 65(c) provides that "[t]he court may issue a

23    preliminary injunction or a temporary restraining order only if the movant gives security

24    in an amount that the court considers proper to pay the costs and damages sustained by any

25    party found to have been wrongfully enjoined or restrained." Despite this mandatory

26    language, "Rule 65(c) invests the district court with discretion as to the amount of security

27    required, if any." *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (internal

28    quotation omitted). The district court may dispense with the filing of a bond when it

- 10 -

1    concludes there is no realistic likelihood of harm to the defendant from enjoining his or her

2    conduct. *Id.*

3          Defendants have not requested a bond or submitted any evidence regarding likely

4    damages.  Accordingly, the Court will waive the bond requirement.

5          As stated, the PLRA requires any injunctive relief to be narrowly drawn and the

6    least intrusive means necessary to correct the harm.  18 U.S.C. § 3626(a)(2).  The Court

7    can fashion relief that is narrowly drawn by limiting an injunction to Defendant BOP's use

8    of procedures to determine Plaintiff's security level and custody classification.

9          According to the documents proffered by Defendant BOP, Plaintiff is scheduled for

10   her formal annual review by the TEC in approximately November 2024.  (Doc. 118-1 at

11   31.) The Court will therefore order that, before this next formal annual review, Defendant

12   BOP must calculate Plaintiff's custody classification score based on the 16 gender-neutral

13   factors and then determine Plaintiff's security and custody levels using the female versions

14   of the Security Level/Custody Level Table, the Security Designation Table, and the

15   Custody Variance Table.  The BOP must then notify the TEC of Plaintiff's security

16   classification score under the female tables, and the TEC must consider this revised

17   score/custody level when discussing Plaintiff's housing placement at the November 2024

18   annual review.

19         **IT IS ORDERED:**

20         (1)    Plaintiff's request for injunctive relief related to custody classifications based

21   on gender (set forth in part within Docs. 18, 62) is **granted in part** as set forth herein.

22         (2)    Prior to Plaintiff's November 2024 TEC annual review, Defendant BOP must

23   calculate Plaintiff's custody classification score based on the 16 gender-neutral factors and

24   then determine Plaintiff's security and custody levels using the *female* versions of the

25   Security Level/Custody Level Table, the Security Designation Table, and the Custody

26   Variance Table.

27         (3)    Defendant BOP must notify the TEC of Plaintiff's revised security/custody

28   level according to the female tables.

- 11 -

(4)     At the November 2024 TEC annual review of Plaintiff, the TEC must consider Plaintiff's revised security/custody level under the female tables when discussing Plaintiff's housing placement.

(5)     Within **ten (10) days** from the date of Plaintiff's annual review by the TEC, Defendant BOP must file a Notice indicating:

        (a)     Plaintiff revised security/custody level under the female tables:

        (b)     the TEC's November 2024 housing decision; and

        (c)     how Plaintiff's revised custody/security level under the female tables factored into and affected the TEC's decision.

(6)     This relief is narrowly drawn, extends no further than necessary to correct the harm, and is the least intrusive means necessary to correct the harm.  See 18 U.S.C. § 3626(a)(2).

(7)     Plaintiff is not required to post bond.

Dated this 30th day of September, 2024.

Honorable Rosemary Márquez
United States District Judge

- 12 -

Exhibit 2

Declaration of Jeremy Pinson

Declaration of Jeremy Pinson

I declare under penalty of perjury that the following is true and correct:

1. I am the plaintiff in both Civil Action No's. 22-CV-00298 and 23-CV-00442 before the Hon. Rosemary Marquez and requested by motion the preliminary injunction that is filed herewith as Exhibit 1 to the Motion this declaration is filed as Exhibit 2 upon. Following the entry of that preliminary injunction on Sept. 30, 2024 I was redesignated to USP Terre Haute, IN — an all male High-Security penitentiary — where I was housed from Oct. 9, 2024 until Oct. 31, 2024 when I was removed therefrom en route to the Federal Correctional Institution — an all male medium-security FCI — in El Reno, OK where I arrived Nov. 1, 2024.

2. From Oct. 8-9, 2024 and Oct. 31-Nov. 1, 2024 I was housed at the Federal Transfer Center in Oklahoma City, OK where Lt. Jones housed me in the Health Services Department in a "Medical Isolation Cell". From Oct. 8-9, 2024 Jones persuaded Psychologist Dr. Armando Torres to house me on a fake "suicide watch" despite my having expressed no suicidal ideation nor ideas of self-harm. Upon further inquiry Torres apologized and revealed Lt. Jones concocted the idea of a "fake suicide watch" to circumvent the fact that as a newly-reclassified medium security inmate I could no longer be mandated to house in the Special Housing Unit where Jones wanted me locked-up rather than in general population where inmates have access to the U.S. Mail, telephones, email and law library terminals for nearly 12 hours per day. But when I returned to the

-1-

facility on 10-31-24 Dr. Thomas - another Psychologist - refused to aid and abet Lt. Jones with a "fake suicide watch" forcing Jones to house me in the isolation cell on a fake "Inmate Observation Status" which is reserved for inmates suspected of secreting drugs in their rectum. I asked Jones why he wanted to circumvent the preliminary injunction leading to my security level reclassification and he told me that he personally disagreed with Judge Marquez stating "I don't care what that Judge says. To me you'll always be a man who is Max custody." Dr. Thomas later that evening stated she told Jones she "refused to authorize a fake suicide watch" stating she could lose her credentials for such misuse of her clinical authority.

3. On Nov. 1, 2024 I arrived to FCI El Reno where I was met by Warden K. Goldey who informed me that the only prior Trans-inmate to enter general population - Rodger Moran - had been violently attacked by 3 white supremacist gang members due to their gang's anti-LGBTQIA sentiments.

4. On Nov. 12, 2024 I was placed into the Special Housing Unit ("SHU") at FCI El Reno pending an "SIS Threat Assessment" (see Att. B) due to an inmate trying to extort me and my 67-year old Mother Debra Pinson using the inmate Telephone System which she and I both reported to BOP officials at FCI El Reno. My attorney Lisa Bivens reported it to AUSA Sarah Letzkus in the Tucson U.S. Attorneys Office who in turn notified BOP officials. This occurred after my extortionist read an Oct. 9, 2024 news article that

2

Stated I won $10,000 dollars in Pinson v. United States,
No. 19-CV-00422-RM (D. Ariz. 2024) which is Att. A hereto.

5. FCI El Reno officials, despite knowing the identity of
my extortionist Tyler McGee and 2 others, did not place
them in SHU under investigation nor disciplined them
nor referred them for FBI investigation. On Saturday,
Nov. 23, 2024 I asked SIS investigator T. Rice why this was
so given it stood as a violation of federal laws and BOP
policies mandating reporting of all serious crimes in a
federal jurisdiction and she stated that my investigation
and transfer decision took 4 days, the fastest I've ever
seen since 2007. She told me the Warden stated he
wanted "that Judge off our backs" and that the main
difference between McGee and I was that I am "suing
the BOP, suing us really" and mention in particular Doc. 233
and 236 in Case No. 22-CV-00298 entered by Judge
Marquez as "particularly out of line."

6. At my prior facility Warden Merendino of USP Terre Haute had
told me on Oct. 17, 2024 that he was suspicious of Judge
Marquez's power to enter a systemwide injunction stating to
me - inter alia - "can a federal Judge in Arizona tell me what
to do in Indiana? I don't think so" when plaintiff asked him
why he was denying her female clothing, undergarments,
hygiene, makeup and other items such as facial hair removal
and female-only pat and strip searches. Upon entering SHU
at FCI El Reno Warden Goldey began the exact same behavior
claiming the Court's injunctions "don't apply in SHU."

3

7. While housed at FCI El Reno I was in SHU after I had been placed into SHU on 11-12-24 when I asked Officer Atkinson to remove me from the cell with Victor Puente - a convicted sexual offender - under PREA regulations due to Puente sexually harrassing me. Before I was removed Puente viciously assaulted me by punching me with closed fists all over my body until I lay prone on my back being punched in the face. Lt. Crawford, witnessing Puente's assault, deployed a huge burst of Oleoresin Capsicum gas from an aerosolized canister all over me and Puente both causing severe and unremitting pain, coughing, respiratory distress vomiting for which I was denied a decontamination shower or medical aid for 30 to 45 minutes while I was in acute distress. Like the prior 2019 attack described in Att. A hereto, my cell in SHU at the time of the attack by Puente lacked a duress alarm to alert staff of my emergency situation.

8. On Oct. 7, 2024 Transgender inmate Rodger "Becky" Moran was attacked by 3 white supremacist gang members. When I asked Warden Goldey why he allowed gangs to dominate his prison so completely that gangs could freely deny LGBTQIA people a place to sit to eat meals in the dining hall he stated, "I do not meddle in prison politics, you figure it out yourselves." No LGBTQIA inmates may eat in the dining hall at FCI under threat of violence from criminal gangs. The Warden stated to me his plan is to keep the gangs but transfer LGBTQIA inmates to other facilities. He appears to lack the will to challenge these criminal gangs controlling his prison.

9. It is common Knowledge among inmates and staff that the majority of medium-security Transgender inmates are housed with gang dropouts at the Federal Correctional Institution's in Marion, IL; Fairton, NJ; and Marianna, FL. When I learned I'd been designated to FCI El Reno on 10-31-24 I was aghast that staff had selected an "active" gang-dominated prison as I knew immediately my life was in danger as did BOP staff at the Federal Transfer Center tasked with my escort to FCI El Reno who urged me to "try to stay safe as best you can." The 3-facilities in Illinois, Florida and New Jersey are known to be "Trans-Friendly yards" in BOP lingo. Like I stated in Sec. 8 herein, no transgender woman in general population remains unless they submit to a "pimp" to exchange sexual favors for gang protection like Ms. Moran agreed to do upon her 11-1-24 release from SHU following her 10-7-24 attack.

10. The process of repeatedly transferring inmates to a string of clearly unsuitable facilities in retaliation for filing lawsuits against the BOP is known as "diesel therapy." When USP Tucson Warden Mark Gutierrez threatened me as described in the First Amended Complaint in this case (and Third Amended Complaint in Case No. 22-CV-00298-RM) he was referring to diesel therapy. Ever since his threats I have been housed in a string of BOP facilities and air travel that has taken me to more than 10 states since 2022.

11. When I arrived to USP Terre Haute on 10-9-24 I was informed by the Captain, Warden that the BOP Director and North

Central Regional Director ordered me placed into SHU as a result of Att. A hereto which had published that day in Mother Jones Magazine and because of Doc. 233 in Case No. 22-CV-00298-RM issued 9 days earlier by Judge Marquez.

12. My conditions in SHU are substantially more restricted than general population. When my mom travelled to visit me on 11-30-24 FCI El Reno staff turned her away cancelling my visit for no reason given to me. I am limited to 15 minutes phone time per month instead of 510 minutes. I have no email access. And as stated in Sec. 6 hereiu, I am being denied access to all gender-affirming items ordered to be available to me in Doc. 146 and 236 in Case No. 22-CV-00298 by Judge Marquez since 11-12-24.

Executed under penalty of perjury pursuant to 28 U.S.C. 1746.



Jeremy Pinson

6

Attachment A

POLITICS

# Assaulted by Her Cellmate, a Trans Woman Took the Federal Prisons to Court

*When you are harmed in a place whose purpose is punishment, why is justice so hard to come by?*

BETH SCHWARTZAPFEL    OCTOBER 9, 2024

Joseph Gough for The Marshall Project



Joseph Gough for The Marshall Project

*Fight disinformation: Sign up for the free Mother Jones Daily newsletter and follow the news that matters.*

*This article was published in partnership with The Marshall Project, a nonprofit news organization covering the U.S. criminal justice system, and Arizona Luminaria.*

**The first punch** to her head knocked Grace Pinson to the floor. She put up her arms to protect her face as Ricki Mahkimetas struck her again. When his fist hit her nose, she felt it crunch.

almost impossible to see what is going on inside. Each cell is designed with an alarm button that can alert corrections officers down the hall if there's an emergency. But Pinson's cell had no button—just a hole in the wall with exposed wires.

Pinson is transgender, a woman with breasts and long curly hair in a prison full of men. She is also a dogged jailhouse lawyer. Over the 17 years she's spent in federal prison, she's brought more than 100 lawsuits against the Bureau of Prisons and its staff. For refusing to provide her with adequate gender-affirming care. For refusing to move her to a women's prison. For failing, again and again, to keep her safe. In the years leading up to the July 2019 attack in cell B-140, she had been beaten, stabbed, slashed, and struck in the head with a padlock. Government lawyers, prison officers, and psychologists have kept meticulous records of these assaults and described them in court. "I have been attacked many times," she told me. "My trauma haunts my very dreams."

## "I have been attacked many times. My trauma haunts my very dreams."

This beating by her cellmate, who is serving more than 16 years for sexual assault, became the basis of another lawsuit. Neither the Bureau of Prisons nor Makkimetas disputed that she beat her, but they contested her other allegations. Pinson said that during the attack Makkimetas tried to yank off her pants. Whenever she reached down to hold up her waistband, he would punch her in the face. He denied this to prison investigators, saying there was nothing sexual about the assault. She said she had told a guard earlier in the day that Makkimetas had been threatening to rape her and asked to be moved to another cell. The guard later said he knew nothing in advance. So much of the case came down to who could be believed about what happened to Pinson that day.

Over several years and hundreds of handwritten pages of filings, Pinson jumped over one legal hurdle after another, all the way to trial. Fewer than 1 percent of federal prisoner civil rights claims reach that stage without an attorney, a luxury almost no one in prison can afford.

The federal Bureau of Prisons declined multiple requests to make officials available for an interview and declined to comment on the assault and the ensuing lawsuit, citing privacy, safety, and deference to the court. The bureau "takes seriously the duty to protect individuals entrusted in our care," spokesperson Randilee Giamusso said in an emailed statement. "When we are made aware of security hazards, such as faulty duress alarms, we take steps to immediately address the issue."

If Pinson's legal tenacity makes her unusual, the harm she has suffered in federal prison does not. Life in prison is relentlessly dangerous, and for transgender people especially so. More than 1,500 trans women are locked in federal prisons alongside men. Not only are they at risk for extortion and assault, they are particularly vulnerable to sexual abuse. A 21-year-old law meant to prevent prison rape created a world of rules and procedures, yet hundreds of people continue to report being violated in federal prison each year. The prison where Pinson was held has and one of the highest rates of sexual abuse allegations in the entire federal system.

doing so, raised other questions: Why is it so dangerous to be a trans woman in prison? And when you are harmed in a place whose purpose is to punish wrongdoing, why is it so hard to get justice?

Curled up in the fetal position as Mahkimetas beat her, Pinson yelled for help. It felt like the beating went on for a very long time. The floor began to tremble as people in nearby cells started kicking their doors, trying to get the attention of the guards. Pinson said she felt a pang of gratitude that people didn't want her to die.

Finally, she heard keys jangling as officers made their way toward her cell. Mahkimetas backed away. When officers rolled the steel door open, they found Pinson bruised and bloodied, her nose broken and her eyes beginning to swell shut.



Joseph Gough for The Marshall Project

***Pinson v. the United States of America*** convened in November 2023, on a hot Monday in Tucson. Pinson shuffled into a federal courtroom wearing an oversized white T-shirt and prison-issued, gray-green canvas pants, shackles clanking at her ankles. She sat alone at the plaintiff's table, her left hand padlocked to a chain around her waist. She couldn't afford an attorney, or even the $350 filing fee for the lawsuit, and so she represented herself. Three lawyers in dark suits sat at the defendant's table, representing the Bureau of Prisons for the US Attorney's office.

The courthouse sits about 20 minutes away from the prison, a complex that includes a high-security penitentiary, where Pinson was housed, a medium-security correctional institution, and a low-security camp.

Pinson hoped her case would lead to a sort of #MeToo moment for the federal prison system. Her court filings framed Mahkimetas's attack as part of a longstanding, pervasive pattern of sexual violence at her facility. And in the months leading up to the trial, she proposed a list of witnesses that included dozens of people who said they saw, or in some cases experienced, sexual assaults in the penitentiary—and the staff's indifference when they tried to report it.

Pinson argued that the assault represented a failure of Bureau of Prisons employees to enforce the Prison Rape Elimination Act, almost universally referred to by its acronym, PREA. Passed by Congress in 2003, the law's stated purpose was to "establish a zero-tolerance standard for the incidence of prison rape" in the United States. Its passage created a universe of new procedures and requirements and—as a result—increased awareness among correctional workers of the problem of sexual assault in prisons and jails.

Pinson, who is serving time for writing threatening letters to public officials, tried to argue that the officers guarding her in the Tucson penitentiary should have known that as a transgender woman, she was at high risk for sexual assault. Prison psychologists knew she'd been raped before. And yet officers assigned her to a cell without a working alarm, locking her in with Mahkimetas, who had been convicted of sexually assaulting a young girl. Pinson said she had warned an officer, Miguel Vasquez, earlier that day that Mahkimetas was threatening to rape her, and she needed to be moved. She said that after Mahkimetas attacked her, officers didn't take what happened to her seriously and gave her a disciplinary infraction for fighting, leaving her to languish in the special housing unit. Mahkimetas did not respond to letters seeking comment on Pinson's allegations. Vasquez declined to comment through a representative from his union.

not about whether Makhmetas was punished for attacking her, the lawyers told the judge. It was not about her cell's missing duress alarm; alarms are provided at the bureau's discretion, they said, and are not required.

As far as the government was concerned, the only relevant questions were: Did the officer on duty the day of the attack know Pinson's cellmate had threatened to rape her? And, if so, did he fail to separate them?

Federal District Judge Rosemary Márquez agreed and denied Pinson's request to call witnesses about the rape elimination law.

On the stand during the trial, Vasquez testified he was "100 percent positive" that Pinson did not warn him in advance that Makhmetas had threatened to rape her.

Pinson later tried to get Vasquez to admit that he didn't always act on requests to change cellmates. "If a cellie is telling staff they're about to be raped, what's the response?" she asked.

"We would move them immediately," Vasquez said.

**She talked about her gender identity and the Bureau of Prisons' failure to "recognize me for the woman that I am"**

In an attempt to keep the focus on her suffering, Pinson put her psychologist on the stand and asked him about her experiences of being assaulted, about her anxiety, her self-harm, her PTSD. She talked about her gender identity and the Bureau of Prisons' failure to "recognize me for the woman that I am." She asked the officer who investigated Makhmetas' assault if he had treated the cell as a crime scene or reviewed video of that night. (He did neither, he testified.)

In closing arguments, one of the government's lawyers repeated that these issues "have no bearing." The judge was clear in her pretrial ruling, he reminded her. "Plaintiff focuses on these extraneous issues because she cannot meet her burden to prove that alleged negligence actually occurred in this case."

1  GARY M. RESTAINO
   United States Attorney
   District of Arizona
2  MICHAEL L. LINTON
3  Assistant U.S. Attorney
   State Bar No. 024729
4  United States Courthouse
   405 W. Congress Street, Suite 4800
5  Tucson, Arizona 85701
   Telephone: (520) 620-7300
6  Email: michael.linton@usdoj.gov
   Attorneys for Defendant
7

8

9

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

10

11  Jeremy Pinson,                           CV-19-00422-TUC-RM

12              Plaintiff,                    PROPOSED JOINT PRETRIAL ORDER

        vs.

13  United States of America,

14              Defendant.

*Handwritten note:* Trial is Set for Nov. 2023 And is Expected To Last 2 Weeks!! #MeToo

**Every year since** 2016, the penitentiary in Tucson has been among the top 5 percent of federal facilities with the most allegations of sexual abuse or harassment, according to federal data analyzed by *The Marshall Project.* **Courtesy of Grace Pinson**

Pinson sent this legal document to a reporter, expressing in a handwritten note at the top that the trial in the case about her beating in the penitentiary in Tucson would act as a #MeToo moment of reckoning for the federal prison system.

Incarcerated people and prison workers alike attribute the high rate of sexual assault at the prison in part to the mix of people housed there. The penitentiary in Tucson is home to a sex offender treatment program, one of 10 throughout the federal system. People convicted of sex offenses are widely despised and often targeted for physical and sexual abuse in prison.

retired as the bureau's PREA coordinator in 2021. "In an institution with a sex offender treatment program, you'll usually have a lot more allegations" of prisoner-on-prisoner sexual assault and harassment.

The program at Tucson is the only one in a high-security penitentiary that holds people with serious or violent convictions or disciplinary problems. Keith Raniere, convicted of sex trafficking as head of the NXIVM sex cult, is incarcerated in Tucson. Larry Nassar, the disgraced USA Gymnastics doctor who molested hundreds of girls in his care, was there for a time too. Roughly 60 percent of the population at the penitentiary is in the sex offender program, according to numbers provided by the Bureau of Prisons.

In a prison full of predatory men, transgender women are a ready target. Trans people in prison are sexually assaulted at a much higher rate than prisoners in general. A federal survey published in 2014 estimated that nearly 40 percent of transgender people in prison were sexually assaulted, compared with 4 percent of all people in prison. According to the bureau's data, the penitentiary in Tucson houses 120 transgender women, more than any other federal prison.

Under PREA's rules, prison officials should decide where to house transgender people on a case-by-case basis, with the person's "views with respect to his or her own safety...given serious consideration." Yet, in practice, transgender people are almost always housed according to their sex assigned at birth. Last year, of the more than 1,000 transgender women in federal prison, only 10 were held in women's facilities, according to information that bureau Director Colette Peters provided to Congress.

PREA also requires that staff assess each person's "risk of sexual victimization," and in a statement, spokesperson Scott Taylor said the Bureau of Prisons "uses that information to inform housing, bed, work, education, and program assignments." Taylor said the bureau "works to ensure the best fit for everyone in our care and custody."

Despite all of its infrastructure, PREA often fails to protect vulnerable people like Pinson, prisoners and correctional experts say. Effective implementation relies on the good faith of prison staff, many of whom share the prejudices against LGBTQ people that make them vulnerable in the first place. To Pinson, because the law includes few repercussions for staff who break it, her lawsuit was an opportunity to prove the devastating consequences of their indifference.

But the dynamics of victimization are complicated. At the Tucson penitentiary, 75 percent of the transgender women —who as a population are so vulnerable to sexual assault—have committed sex crimes, according to data provided by the Bureau of Prisons. For them, lonely men can also be targets, Pinson and others say.

"Some people are doing forever in there. They want companionship," said Eric Ontiveros, who served time with Pinson at Tucson. Some transgender women exploit that loneliness and "use that to manipulate the situation in their favor, to get money, drugs, whatever they need."

**"Some people are doing forever in there. They want companionship."**

it's unclear whether this reflects over-policing, unfair treatment within the system, or other dynamics is difficult to say, says Ilan Meyer, a public health researcher at UCLA law school. Transgender people face significant barriers in housing, education, and employment, and those limited opportunities can force people into sex work and other black market jobs that can lead to legal trouble, research shows.

After an incarcerated person reports a sexual assault, PREA requires that the prison conduct an internal investigation. Federal prison investigators almost never prove, or "substantiate," that an assault happened. From 2016 through last year, officials corroborated fewer than 6 percent of the 4,100 allegations in federal prisons, according to bureau data analyzed by The Marshall Project. Tucson's rate was similar to the national rate. At dozens of facilities each year, investigators don't substantiate any allegations at all.

Experts say prison investigators should confirm far more reports of assault because under PREA they do not have to meet the high bar of "beyond a reasonable doubt" required in a criminal courtroom. Instead, investigators must be more certain than not—at least 51 percent sure—that an assault happened.

"PREA fails in a whole shit-ton of ways," said Julie Abbate, an attorney who helped implement the law while working at the civil rights division of the Department of Justice in the 2010s and now works for an organization dedicated to ending prison rape.

Bureau of Prisons leadership "say the right things at the headquarters level, and, for the most part, I believe them," she said. "The disconnect happens between headquarters, regional offices, and individual facilities."

Several correctional experts noted that investigators too often discount testimony if it comes from incarcerated people. "The only people that say it happened were inmates," was a common refrain at the penitentiary in Tucson, according to a recently retired bureau official who asked not to be named because they still have family working at the agency. A 2022 report by the inspector general who oversees the bureau said investigators' practice of not relying on this testimony also makes it harder for the agency to punish staff who break rules in other ways.

Giamusso, the bureau spokesperson, said in an emailed statement that the inspector general's concerns have been addressed, that investigations are thorough and witnesses' credibility is "evaluated on a case-by-case basis, and is not based on the individual's status as an incarcerated individual." "Sexual abuse investigations in prison, she added, "are as complicated, if not more so, than those outside of prison."

For all its shortcomings, PREA does offer victims and those at risk of sexual assault one protection: Each allegation sets in motion a chain of events—reporting, investigation, response. Other kinds of physical assault are often downplayed or ignored by prison officials. No federal law requires officers to investigate when an incarcerated person is beaten or stabbed. In a place where incarcerated people feel helpless and silenced, PREA can become an avenue to make someone take notice.

"You're looking at people who have very few options," said Cathy Thompson, who retired last year as a top psychologist at the Bureau of Prisons. "There's nothing else they can allege that is given that kind of attention." Staff, correctional

retaliating against an ex-lover, or having an enemy removed from a compound.

**"Someone legitimately made me feel so unsafe that I did not feel I could spend another 24 hours with them having access to me without hurting me."**

Pinson herself has been accused of using false allegations of sexual harassment "as a weapon against other inmates," according to incident reports the government filed in response to one of her lawsuits. She denied this but did concede that sometimes PREA is the only way to get officers to take a scary situation seriously. "Every single person I have filed a PREA complaint against them, I can tell you this much is true: I genuinely feared that person was going to hurt me," she said. "Whether I feared they were going to rape me is a different story. Someone legitimately made me feel so unsafe that I did not feel I could spend another 24 hours with them having access to me without hurting me."

She insists that in the case of Maikimetas, the attempted sexual assault was real, and terrifying. But when it came to PREA, it was her word against his: There were no cameras in their cell and no eyewitnesses. Investigators at the Tucson penitentiary labeled Pinson's allegation that Maikimetas tried to rape her as unsubstantiated.

She had little redress beyond going to the courts.



Joseph Gough for The Marshall Project

**In some of** Pinson's earliest memories, she is rummaging through her mother's jewelry box, trying on the shiny baubles and makeup. "And my mom would just look at me with amusement and befuddlement," Pinson recalled in an interview. Debra Pinson didn't know what to make of this child of hers. When, as a teenager, Pinson told her mother she was a girl, Debra replied, "You're just gay." Grace didn't argue.

Extremely precocious, Pinson was also troubled. She began reading the newspaper before she started kindergarten, her mother recalled. Debra's father was "so abusive and so tortuously cruel" to Grace, according to a psychologist's court testimony, once locking her out of the house overnight in the winter. A neighbor began sexually abusing her when she was 7, and she was hospitalized for psychotic symptoms and suicide attempts several times throughout her childhood.

In school, Pinson was bullied by other kids who called her "queer" and "fag." Whenever she had problems at school, her mother would move them—they moved a lot. Children can be vicious, and so could Pinson. Once, she stabbed a classmate with a pen. She threatened to blow up her school with her Toys R Us chemistry set. Debra Pinson recalls one psychiatrist telling her, "Ma'am, your child is just evil."

Pinson was diagnosed at different times with bipolar disorder, schizophrenia and PTSD. "Pinson had not experienced any significant period of effective psychological functioning since early childhood," according to a court evaluation.

At some point in her adolescence, her mother gave up and didn't enroll Pinson in school at all. That meant even fewer checks on her impulsive behavior. While living in North Carolina, she got into trouble with the law, ransacking an office where she worked after she said a coworker made a homophobic comment. She pleaded guilty to several felonies and spent time in a county jail and a psychiatric hospital. They moved again.

In Oklahoma City, she was arrested again. She had gotten a job in a congressman's district office and was accused of stealing campaign money. In recent interviews, she said she spent money she was told to spend, but in 2003, at age 17, Pinson pleaded guilty to embezzlement and was sentenced to three years in an adult state prison.

While waiting for her case to be resolved, Pinson spent months in the Oklahoma County jail. At that time, the US Department of Justice was investigating conditions at the jail and a report released years later revealed violence,

was in jail that she read a book with a chapter called "Grace," and thought, "That's me."

Pinson said her cellmate at the state prison—which Pinson said was even more violent than the jail—told her about the cushy setup in "Club Fed," a slang term for federal prison. All she needed to escape the oppressive conditions in the Oklahoma system, she was told, was to commit a federal crime. So she dashed off a seven-word letter and mailed it to the White House. "YOU WILL DIE SOON!" she scrawled. "DIE BUSH DIE."

"I thought I was playing a big prank on the federal government," she said in a recent interview. "As it turns out, I was playing a prank on myself."

## "I thought I was playing a big prank on the federal government. As it turns out, I was playing a prank on myself."

The Secret Service descended on the Oklahoma County jail. Sitting in endless interrogation sessions and facing a slew of new charges, it dawned on her that she had traded a three-year state sentence for much more serious trouble. Still, she scrawled more threatening letters, "in impotent anger at a situation that I had created myself," she told me: one to a Secret Service agent, one to a US Marshal, one to a judge.

Pinson emerged from the letter-writing spree with a new sentence: 21 years. She arrived in a maximum-security federal prison in 2007 and discovered that for a transgender woman, it was hardly "Club Fed" at all.

**By the time** she was processed into federal prison, Pinson had already suffered stabbings, beatings, and sexual assault in Oklahoma, she said in court papers. She filed more than half a dozen lawsuits, accusing sheriffs and corrections officials there of failing to keep her safe. In each of those instances, the cases were dismissed, or Pinson lost, or gave up and voluntarily dismissed the case when it was clear she was not going to win.

These were her first lessons in the Prison Litigation Reform Act. The 1996 federal law, passed during an era of tough-on-crime legislation, "made cases harder to bring and harder to win," said Margo Schlanger, a law professor at the University of Michigan who studies civil rights litigation. It was meant, she said, to stem what legislators described as a wave of frivolous prisoner lawsuits by throwing up legal hurdles that no one else faces in the courts.

Pinson's early years in federal prison did not go well, either. She tried to repress her gender identity, wearing a beard and short hair and joining a gang for protection. She fought with other incarcerated people and guards; she set fires and flooded cells.

A psychologist had testified at her sentencing that she would need intensive mental health treatment, so the judge recommended she be sent to a federal medical center for care. Instead, she was sent to some of the system's most notorious penitentiaries, including one known as "Bloody Beaumont" and the supermax in Florence, Colorado, where she was held in solitary confinement alongside the Unabomber, Ted Kaczynski. The placements meant "extreme

According to lawsuits she filed later, she was sexually harassed and assaulted.

When PREA went into effect in 2012, it created new procedures to keep people safe from sexual assault, but it did not create a way to sue officials when they failed to follow those rules.

**"All transgender inmates interviewed reported that they were asked about their safety but felt staff did not take their concerns seriously."**

The law does require prisons to hire outside auditors to assess their compliance. But audits are often rushed and cursory, according to Abbate. Tucson's most recent audit, in 2023, said, "All transgender inmates interviewed reported that they were asked about their safety but felt staff did not take their concerns seriously." Still, the auditor gave the prison high marks and did not require any corrective action.

"Every supposed mandate that is included within the guidelines has weasel language that the government can use to say, 'Well, we can't really be held to it, we're only required to make reasonable efforts,'" said Gregory Sisk, a professor at the University of St. Thomas School of Law in Minnesota who represented a transgender woman who said she was sexually assaulted at the penitentiary in Tucson. She sued the Bureau of Prisons and lost.

Pinson learned all this the hard way. "I learned to litigate through books and I learned to litigate through filing lawsuits, and ultimately losing a lot of them," she said. "But the thing is, I'm an incredibly stubborn individual."

In 2012, while at the supermax unit in Colorado, Pinson was a plaintiff in a landmark class action lawsuit that challenged the use of solitary confinement for people with mental illnesses. The case ultimately led to an overhaul of the bureau's treatment of mentally ill people, updating policies and creating new housing units and treatment programs.

She "has a brain for law," said Deborah Golden, one of the lead attorneys on that case. Pinson was smart and organized and "by self-training and instinct she was really good at figuring out relevant facts," she said. "Maybe in a different world, she would have been a law professor."



Grace Pinson, bottom right, with a group of friends at the U.S. Penitentiary in Tucson in 2020. **Courtesy of Grace Pinson**

In 2014, prison psychologists diagnosed Pinson with gender dysphoria—the distress resulting from her body not matching her gender identity—and she began to receive hormone therapy. Still, housed among men and being

include a long list of suicide attempts and self-harm, including trying to castrate herself in her cell.

Pinson has asked the Bureau of Prisons many times to move her to a women's facility. Each time, the bureau's Transgender Executive Council—a team of psychologists and administrators who make decisions about trans people in federal prison—have said no, arguing that Pinson needs to stay in maximum security and isn't on the proper dosage of hormones. A lawsuit Pinson filed requesting a transfer to a women's prison and gender-affirming medical treatments is ongoing. The judge in that case has issued several rulings in her favor, ordering the government to provide her with female undergarments and toiletries and to make housing decisions about her as they would about any other woman.

In a case brought by another trans woman, Cristina Iglesias, a judge found in 2022 that the Transgender Executive Council offered shifting and contradictory reasons to deny Iglesias' transfer to a women's facility and her access to surgery. The judge ultimately ordered the bureau to provide Iglesias with gender-affirming surgery, which it did last year—only the second time the bureau has ever done so.

In 2018, Pinson arrived in Tucson, where she kept landing in the special housing unit after a series of assaults. Special housing in Tucson is structured like solitary confinement with a cellmate: two people locked in a claustrophobic concrete box together around the clock, with little access to programs, work, or recreation.

Still, people build relationships in the most austere circumstances, passing notes under cell doors and talking through cages in the rec yard, and Pinson has made a lot of friends in prison. One of them, Bruce Altenburger, wrote in a recent letter to me that Pinson often spotted errors in people's convictions or sentences and helped correct them. "There really ain't too many remarkable individuals with such a big heart like her."

In 2020, Pinson had been in special housing for most of the year following Maikimetas's assault. Officials would not allow her to transfer back into a less restrictive part of the prison, even after she filed numerous complaints. In an act of protest, she said, she used a razor to cut herself 243 times—one for each day she had been held in the special housing unit, by her count. Then, she sued, arguing officers at Tucson should not have provided her a razor blade, given her long history of suicide attempts and a rule that prohibited razors in special housing. After a two-day trial, the judge found her more credible than the officer who denied having given her the razor. That officer was Vasquez, the same man who insisted that Pinson had not warned him about Maikimetas before she was attacked. The judge awarded her $243 in damages: one dollar for each cut.

In Pinson's lawsuit about Maikimetas' assault, she argued that officials had failed to protect her by not providing a functional duress alarm. In pretrial briefs, she asked the government about procedures for responding to emergencies in a cell, but the bureau's lawyers told her there were no such documents. In the absence of any rule requiring duress alarms, the government argued, the bureau could decide whether or not to provide one.

Because the judge agreed with the bureau, the only issue at trial was whether Pinson had warned Vasquez that Maikimetas had threatened her, and, if she did, whether she was seriously harmed by his failure to move her.

the Bureau of Prisons. "She's been stricken by a sock with a lock in it. She was attacked in the general population on the prison yard," Assistant U.S. Attorney Michael Linton told the judge. Then there was "a more recent incident involving an inmate swinging a rope with a sharp object at her." She couldn't prove that she had developed PTSD due to Mahkimetas' assault specifically, the attorney argued—so the judge should not find in her favor.

Pinson was floored.

**As the trial** was winding down, government attorneys handed Pinson a document. They had told the court months before that there were no documents regarding duress alarms, but after "re-reviewing" their paperwork, they said, they were turning over instructions for officers working in the special housing unit in Tucson. Amid pages of blacked-out language, one paragraph said that each cell in the special housing unit contains a duress button on the wall. The instructions continued, "In the event that the duress alarm is pushed...Staff must immediately respond to the cell."

She asked the judge for a mistrial. The trial had been shaped by the government's claim that there were no rules about duress alarms, Pinson said. The judge said she would consider the request, but that closing arguments would continue in the meantime. A few hours later, the trial was over, and Pinson went back to her cell to wait for the judge's verdict.

Two months later, the Bureau of Prisons transferred Pinson from Tucson to a more restrictive unit in rural Pennsylvania. She was locked in an 8-by-10-foot cell by herself around the clock. The bureau said the unit "is designed to support individuals vulnerable to mental health crises." Pinson believes that the warden in Tucson was retaliating against her because of her outspokenness. Others she served time with in Tucson thought so too. In requesting the move, the warden had said Pinson was fabricating PREA allegations and recruiting other transgender people to invent complaints about their treatment by the prison's staff. He said she was a disciplinary problem and needed more intensive supervision. The near-total isolation in her new prison cell led her to constant thoughts of suicide, she said. She also said she was sexually assaulted again, this time by a correctional officer, and filed a complaint with the Bureau of Prisons.

Bureau spokespeople declined to explain why Pinson was transferred, and wouldn't comment on her allegations of sexual abuse. "Allegations of misconduct are thoroughly investigated, and appropriate action is taken if such allegations are proven true," said spokesperson Emery Nelson.

Pinson is scheduled to be released from federal prison in 2016 after serving more than two decades. When she gets out, she will be 40 years old, free for the first time in her adult life.

In June, a prison staffer arrived at Pinson's cell with a slim manila envelope from the court. The judge had ruled in her case.

Marquez did not grant Pinson's request for a mistrial. She did not find that the government was negligent by placing Pinson in the cell with Mahkimetas. She did not believe that Pinson had asked Vasquez to be moved. But the judge did find the government had violated its own guidelines by not having a functional duress alarm in the cell and that if Pinson had access to the alarm, she would have had officers there to help her within one minute.

minutes, the judge wrote in her decision. With an alarm, Pinson would have still been beaten, but her injuries would have been less severe. The judge ordered the government to pay her $10,000. The bureau declined to comment on the ruling.

Pinson is gratified that the judge found in her favor, but frustrated she was prevented from making a broader point—one that was, in her mind, more important—because of how the judge limited the issues at trial. She has filed paperwork to begin an appeal.

Because she wasn't allowed to introduce evidence of all the other sexual assaults in Tucson, she said, the judge could only weigh this one incident and Pinson was prevented from showing that her suffering was part of a larger pattern of staff disregarding PREA and not taking sexual assault seriously. In a recent call, Pinson reflected on how the experience continues to weigh on her. "The thing that has driven me crazy in this case, start to finish," she said, "is that the bureau was never willing to acknowledge, not even at the trial, that it could have done things differently to keep me safe."

*Additional reporting by John Washington. Data analysis by Geoff Hing.*

This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply. Do Not Sell or Share My Personal Information

Copyright © 2024 Mother Jones and the Foundation for National Progress. All Rights Reserved.

Attachment B

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jeremy Pinson, | CV 23-00442-TUC-RM |
| Plaintiff, | |
| vs. | **DECLARATION OF ERICA HOLLIS** |
| United States of America, | |
| Defendant. | |

I, Erica Hollis, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge and information made known to me from official records reasonably relied upon by me in the course of my employment, hereby make the following declaration relating to the above-entitled matter.

1.    I am employed by the United States Department of Justice, Federal Bureau of Prisons ("Bureau") as a Unit Manager at the Federal Correctional Institution in El Reno, Oklahoma ("FCI El Reno"). I have been employed by the Bureau, in positions of increasing responsibility since March 23, 2014. I have been employed in my current position since July 14, 2024.

2.    As part of my official duties, I have access to records maintained by the Bureau in the ordinary course of business, including administrative remedy requests of federal inmates, information maintained in the SENTRY[1] database, and inmate central files. All records attached to this declaration are true and accurate copies of Bureau records maintained in the ordinary course of business.

---

[1] SENTRY is the Bureau's national database which tracks various data regarding an inmate's confinement, including, but not limited to, an inmate's institutional history, sentencing information, participation in programs, administrative remedies, and discipline history.

3.    Plaintiff in this action, federal inmate Jeremy Pinson, Federal Register No. 16267-064, is currently confined at FCI El Reno. *See* Att. 1, SENTRY Public Information Inmate Data at 1 ("ERE" is the facility code for FCI El Reno).

4.    Inmate Pinson arrived at FCI El Reno on November 1, 2024. *See* Att. 2, Inmate History ADM-REL at 1. Upon arrival inmate Pinson housed in General Population ("GP") at FCI El Reno. *See* Att. 3, Inmate History Quarters. Inmate Pinson is no longer housed in GP at FCI El Reno. *See* Sec. D., Page 5-6.

**A.    Property**

5.    On November 4, 2024, four (4) boxes containing inmate Pinson's property were shipped directly from the United States Penitentiary in Terre Haute, Indiana ("USP Terre Haute"), to FCI El Reno via UPS. On November 5, 2024, inmate Pinson's property arrived at FCI El Reno.

6.    On November 7, 2024, at 10:16 a.m., inmate Pinson's property was inventoried at FCI El Reno and issued to inmate Pinson. *See* Att. 4, Property Forms FCI El Reno.

7.    As part of her property, inmate Pinson was provided with her legal files and documents. Inmate Pinson may have any personal and/or legal material that can fit within her assigned cell locker. The assigned locker is approximately 40-inches high by 2-feet wide and 18-inches deep. If all of inmate Pinson's legal property does not fit inside her in-cell locker, she will be provided with a separate legal locker to store the materials for her active court cases. The legal locker is located outside her cell but within the unit. Inmate Pinson can coordinate with the Unit Team to access the material stored in the legal locker. Legal materials that are contained on a disk or thumb drive will be stored with the Unit Team, in which case inmate Pinson can sign them out and utilize the computers in the law library.

**B.    Access to Telephone, E-Mail or US Mail**

8.    Inmate Pinson may request legal calls by submitting a legal call request form. Once the Unit Manager approves that form, the unit team will coordinate scheduling the legal call.

- 2 -

9.     Upon her transfer from USP Terre Haute, inmate Pinson had two (2) legal calls in need of rescheduling. The legal call to Lisa Bivens of the firm Zwillinger Wulkan was provided and completed on November 4, 2024. A follow-up call with Lisa Bivens has scheduled for November 12, 2024.

10.     When attempting to reschedule the legal call with Kristian McGough, I learned she is no longer with the Washington Lawyers Committee for Civil Rights and Urban Affairs. Paralegal Olivia Fajardo of the Washington Lawyers Committee for Civil Rights and Urban Affairs reached out to me, and we have scheduled a phone call with inmate Pinson for November 21, 2024.

11.     Inmate Pinson has access to the Inmate Telephone System ("TRUFONE") in the unit for social calls. *See* Att. 5, Excerpt of Program Statement 4500.12, Trust Fund/Deposit Fund Manual,[2] Chapter 6. The access to the telephone system requires 24-hours to process the change in an inmate's location. Inmate Pinson's access to TRUFONE was activated on November 2, 2024.

12.     Inmate Pinson is allowed 300 calling minutes per month. *See* Att.6, Institutional Supplement, Telephone Regulations, ERE-5264.08D, at 5. Each call is limited to 15 minutes and there is a one-hour waiting period between calls. *See id.* at 4. Multiple telephones are located in inmate Pinson's housing unit. Inmates, including inmate Pinson, may access the telephones at their leisure (that is, when the inmate is not participating in a scheduled program or work assignment, or during official counts). *See id.*

13.     From November 2, 2024, to November 8, inmate Pinson made 11 phone calls. *See* Att. 7, TRUVIEW Inmate Center Report (Nov. 1, 2024, to Nov. 8, 2024) (Redacted) at 1.

14.     Inmate Pinson has access to the inmate email system via the TRULINCS terminals[3] for Public Messaging Service located in her housing unit. Initially, the email

---

[2]     The full Program Statement 4500.12 is available at https://www.bop.gov/policy/progstat/4500.12.pdf, last visited November 8, 2024.
[3] TRULINCS terminals are available on the housing unit to create, update, and edit inmate contact lists, check commissary, telephone, and release savings accounts, read notices from

system requires 24-hours to process an inmate's change in location. Inmate Pinson's access to TRULINCS was activated on November 2, 2024.

15.    Inmate Pinson is allowed sessions of up to 30 minutes at a time for electronic messaging, and there is a 30-minute waiting period between sessions. *See* Att. 8, Institutional Supplement, TRULINCS, ERE-4500.12, at pages 8, 10. Multiple TRULINCS workstations are located in each housing unit and available from 6:00 a.m. until 9:00 p.m. daily, including weekends and holidays. *See id.* at 8.

16.    From November 2, 2024, to November 8, inmate Pinson has sent and received numerous emails. *See* Att. 7 at 1–5. During that same time frame, inmate Pinson has accessed the TRULINCS system for a total of 1,063 minutes, or 17 hours and 43 minutes, *see* Att. 9, TRULINCS Activity by Inmate Report (Nov. 1, 2024, to Nov. 8, 2024) (Redacted) at 1.

17.    TRULINCS Electronic Law Library stations at FCI El Reno are located in the library and are available in accordance with the Education Departments scheduled hours. The library is open Monday through Friday, 12 p.m. to 3 p.m. Additional hours include Tuesdays and Thursdays from approximately 4 p.m.[4] until 7:00 p.m.; and Sundays from 6:15 a.m. to 9:45 a.m. and 10:45 a.m. to 3:30 p.m. There are multiple terminals available in the library. Inmate Pinson may access the law library at any time during its operational hours and work at any available terminal. *See* Att. 8 at 8.

18.    Inmate Pinson has not accessed the Electronic Law Library since arriving at FCI El Reno. *See* Att. 9.[5]

---

the electronic bulletin board, send and receive electronic Inmate Requests to Staff, email family and friends in the community, purchase/download music for personal MP3 players, and schedule Video Sessions.
[4] On Tuesdays and Thursdays, the library opens only after the 4 p.m. official count is completed. The time it takes to complete that count can vary depending on a variety of factors and can be anywhere from thirty minutes to an hour or longer. The opening time of the library on Tuesday and Thursday afternoons, therefore, can vary from day to day.
[5] Electronic Law Library usage is categorized as "Law Library" on TRULINCS reports.

**C.     Access to Pens, Paper, Envelopes, Postage, and Photocopier**

19.     Upon her arrival at FCI El Reno on November 1, 2024, I provided inmate Pinson with one pen, several pieces of paper, several envelopes, and 5 stamped envelopes for personal mail.[6] Inmate Pinson can obtain additional writing utensils, paper, and envelopes from the Unit Officer. If the Unit Officer does not have any of the items readily available, inmate Pinson can request the items from her Unit Team.

20.     When inmate Pinson lacks funds or sufficient postage and wishes to mail legal mail (including courts and attorneys) or Administrative Remedy forms, she will be provided the postage necessary for those mailings. *See* Att. 10, Excerpt of Program Statement 5265.14, Correspondence,[7] at § 13(d). Inmate Pinson, like all other inmates who lack funds or sufficient postage for legal mail, is limited to five postage stamps (denomination for first-class, domestic, 1-ounce mailing) or the equivalent each week, for legal mail or Administrative Remedy filing. *See id.*; Att. 11, Institution Supplement, Correspondence, ERE-5265.14D at 7. When an inmate requires postage for legal mailings, they bring that mail to the Unit Manager, who will place the appropriate postage on the mail.

21.     While inmate Pinson's Trust Fund[8] account remains encumbered, she will be provided access as needed to a photocopier via her Unit Team at no cost. Inmate Pinson can request and coordinate photocopier use with her Unit Team. Whenever inmate Pinson's funds are released, she will gain access to a photocopier in the library.

**D.     Transfer to Secured Housing Unit**

22.     On November 12, 2024, inmate Pinson was transferred to the Secured Housing Unit ("SHU") at FCI El Reno on Administrative Detention. *See* Att. 12, Administrative Detention Order. This transfer was based on the need for a Threat

---

[6] When inmate Pinson lacks funds or sufficient postage, she will be provided postage for up to five personal mailings per month in order to maintain community ties. *See* Att. 10; Att. 11, Institution Supplement, Correspondence, ERE-5265.14D at page 7.
[7] The full Program Statement 5265.14 is available at https://www.bop.gov/policy/progstat/5265_014.pdf, last visited November 8, 2024.
[8] Trust Fund is the account designated by the U.S. Treasury for programs, goods, and services for the benefit of inmates. *See* Att. 5 at 10.

1   Assessment after inmate Pinson's counsel contacted the USAO in the District of Arizona

2   raising a concern regarding inmate Pinson's safety in GP.

3   //

4       Pursuant to the provisions of 28 U.S.C. § 1746, I declare under penalty of perjury

5   that the foregoing is true and correct to the best of my information, knowledge, and belief.

6

7   Executed on this _14_ day of November 2024, in El Reno, Oklahoma.

8

9                                          _Erica Hollis_ (signature)

10                                         Erica Hollis

11                                         Unit Manager

12                                         FCI EL Reno,
                                           Federal Bureau of Prisons

13

14

15  **Enclosures**

16  Att. 1, SENTRY Public Information Inmate Data

17  Att. 2, Inmate History ADM-REL

18  Att. 3, Inmate History Quarters

19  Att. 4, Property Forms FCI El Reno

20  Att. 5, Excerpt of Program Statement 4500.12, Trust Fund/Deposit Fund Manual

21  Att. 6, Institutional Supplement, Telephone Regulations, ERE-5264.08D

22  Att. 7, TRUVIEW Inmate Center Report (Nov. 1, 2024, to Nov. 8, 2024) (Redacted)

23  Att. 8, Institutional Supplement, TRULINCS, ERE-4500.12

24  Att. 9, TRULINCS Activity by Inmate Report (Nov. 1, 2024, to Nov. 8, 2024) (Redacted)

25  Att. 10, Excerpt of Program Statement 5265.14, Correspondence

26  Att. 11, Institution Supplement, Correspondence, ERE-5265.14D

27  Att. 12, Administrative Detention Order

28

Exhibit 3

Declaration of Jason Jackson

Declaration of Jason Jackson
I declare under penalty of perjury that the
following is true and correct:

1. I was placed into the cell with Jeremy Pinson # 16267-064
on November 29, 2024 in the Special Housing Unit
at El' Reno. I write this declaration in support of
her emergency motion for a preliminary injunction in
Case # 23-CV-00442-RM in the district of
Arizona.

2. F.C.I. El' Reno is an all male medium security
federal prison. The only LGBTQ offenders I know of
at F.C.I. El' Reno are myself (openly gay-male),
Pinson (Transgender woman), and Rodger Moran (trans-
gender woman).

3. F.C.I. El' Reno is dominated by a number of gangs who
control under threat of violence where all inmates must
sit, eat, and sleep, which the staff all the way up to the
warden K. Goldy have ceded to the gangs. The gangs
do not like the presence of LGBTQ inmates which has led
to Moran being assaulted on 10-7-24, Pinson being put
is SHU 11-12-24 as a victim of extortion, and my own
placement in SHU after gangs threatened me to leave the
general population due to my sexual orientation or be
assaulted, on or about 08-11-2024.

4. After I entered the SHU seeking protective custody,
an investigation by SIS was began and because the

—1—

the gangs would not admit to the fact that they threatened me due to my sexual orientation, SIS wrote a report concluding that I was an unverified protective custody case and would need to re-enter general population and be assaulted first in order to qualify for a transfer.

5. I Refused to re-enter general population and risk being assaulted just to be transferred to a safer facility. The BOP has 3 medium security T.C.I's that are well known by inmates and staff to be (LGBTQ-friendly) which are located in Marion, Illinois and Tarkten, New Jersey and Marianna, Florida. The Staff at T.C.I. El/Reno would not transfer me to one of these facilities unless I re-entered general population and got assaulted.

6. On September 3rd, 2024 Staff began the disciplinary process with Incident Report number 3990238 charging me for refusing to re-enter general population and risk being assaulted which is attached here to as Attachment A.

7. At my UDC hearing for attachment A, I told my Unit Team Staff that I was only refusing general population under duress and needed to be transferred to an LGBTQ-friendly T.C.I. They told me I needed (A) to be assaulted, OR (B) refuse general population once every 30 days 3 times in order

to qualify for a transfer. I was sanctioned to a loss of commissary and telephone privileges until October 8th, 2024 when I was issued 2 incident reports written by the same staff member at the exact same time for refusing general population. Incident report number 4007671 is attachment B hereto and 4007674 is attachment C hereto. And I remain pending a hearing before the DHO as outlined in attachment D hereto.

**8.** At my prior institution F.C.I. Forrest City, AR I spent 7 months in the special housing unit because I refused to enter general population where homophobic gangs threatened to assault me on the basis of my sexual orientation. I was subjected to the same process of having to acquire 3 incident reports for refusing to enter general population or enter general population and be assaulted before staff would consider me for transfer to a safer facility.

**9.** I have been personally astonished by the speed in which staff have handled Pinson's case by closing her investigation and submitting her for transfer in only 4 days when I have spent 11 months in SHU in 2 different facilities trying to get transferred to an LGBTQ-friendly facility where I can do my time in safety. Pinson's case illustrates that when

— 3 —

Staff want to subject an inmate to ("Diesel therapy") to harass them maliciously for their litigation activities, they can move rapidly to secure a transfer to where in cases like my own LGBTQ inmates who are unsafe in general population languish in SHU for months or years while they plead with BOP officials to house them somewhere safer.

Executed under penalty of perjury pursuant to 28 U.S.C. 1746.

[signature]

Jason P. Jackson

Attachment A



**BP-A0288**      **INCIDENT REPORT**
Dept. of Justice / Federal Bureau of Prisons

## Part I - Incident Report

| 1. Institution: **EL RENO FCI** | | Incident Report Number: **3990238** | |
|---|---|---|---|
| 2. Inmate's Name<br>**JACKSON, JASON** | 3. Register Number<br>**09733-509** | 4. Date of Incident<br>**09-03-2024** | 5. Time<br>**1415 hrs** |
| 6. Place of Incident<br>**SHU** | 7. Assignment<br>**UNASSG** | 8. Unit<br>**3 GP** | |
| 9. Incident<br>**306 -- REFUSING WORK/PGM ASSIGNMENT.** | | 10. Prohibited Act Code(s)<br>**306** | |

11. Description Of Incident
   (Date: **09-03-2024**   Time: **1415 hrs**   staff became aware of incident)

    **Inmate JACKSON, JASON, #09733-509 refused to go to GP. 1st order out.**

| 12. Typed Name/Signature of Reporting Employee<br>**C Wilds** | 13. Date And Time<br>**09-03-2024 1430 hrs** | |
|---|---|---|
| 14. Incident Report Delivered to Above Inmate By<br>(Type Name/Signature)<br>*M. Harvey M.H* | 15. Date Report<br>Delivered<br>*9-3-24* | 16. Time Report<br>Delivered<br>*1659* |

The Government Paperwork Elimination Act (GPEA) of 1998 authorized Federal Agencies the use of electronic forms, electronic filing, and electronic signatures to conduct office business.

Attachment B



BP-A0288          **INCIDENT REPORT**
Dept. of Justice / Federal Bureau of Prisons

## Part I – Incident Report

| 1. Institution:   **EL RENO FCI** | | Incident Report Number: **4007671** | |
|---|---|---|---|
| 2. Inmate's Name<br>**JACKSON, JASON** | 3. Register Number<br>**09733-509** | 4. Date of Incident<br>**10-08-2024** | 5. Time<br>**1415 hrs** |
| 6. Place of Incident<br>**SHU** | 7. Assignment<br>**ADM DET** | 8. Unit<br>**3 GP** | |
| 9. Incident<br>**306 -- REFUSING WORK/PGM ASSIGNMENT.** | | 10. Prohibited Act Code(s)<br>306 | |

11. Description Of Incident
    (Date: **10-08-2024**   Time: **1415 hrs**   staff became aware of incident)

**Inmate JACKSON, JASON, #09733-509 was ordered to return to general population on October 8, 2024 at approximately 1415 hours. Inmate Jackson refused, stating he would not be returning to the compound.**

| 12. Typed Name/Signature of Reporting Employee<br>**C Wilds** | | 13. Date And Time<br>**10-08-2024 1430 hrs** | |
|---|---|---|---|
| 14. Incident Report Delivered to Above Inmate By<br>(Type Name/Signature) | | 15. Date Report<br>Delivered | 16. Time Report<br>Delivered |

The Government Paperwork Elimination Act (GPEA) of 1998 authorized Federal Agencies the use of electronic forms, electronic filing, and electronic signatures to conduct office business.

Attachment C



BP-A0288                    **INCIDENT REPORT**
Dept. of Justice / Federal Bureau of Prisons

### Part I - Incident Report

| 1. Institution: **EL RENO FCI** | Incident Report Number: **4007674** | | |
|---|---|---|---|
| 2. Inmate's Name<br>**JACKSON, JASON** | 3. Register Number<br>**09733-509** | 4. Date of Incident<br>**10-08-2024** | 5. Time<br>**1415 hrs** |
| 6. Place of Incident<br>**SHU** | 7. Assignment<br>**ADM DET** | 8. Unit<br>**3 GP** | |
| 9. Incident<br>**306 -- REFUSING WORK/PGM ASSIGNMENT.** | | 10. Prohibited Act Code(s)<br>**306** | |

11. Description Of Incident
    (Date: **10-08-2024**    Time: **1415 hrs**    staff became aware of incident)

**Inmate JACKSON, JASON, #09733-509 was ordered to return to general population on October 8, 2024 at approximately 1415 hours. Inmate Jackson refused, stating he would not be returning to the compound. 2nd order out.**

| 12. Typed Name/Signature of Reporting Employee<br>**C Wilds** | 13. Date And Time<br>**10-08-2024 1430 hrs** | |
|---|---|---|
| 14. Incident Report Delivered to Above Inmate By<br>(Type Name/Signature)   A Storm Lt | 15. Date Report<br>Delivered<br>10-8-24 | 16. Time Report<br>Delivered<br>1849 |

The Government Paperwork Elimination Act (GPEA) of 1998 authorized Federal Agencies the use of electronic forms, electronic filing, and electronic signatures to conduct office business.

Attachment D

BP-A0294    **Notice of Discipline Hearing Before the (DHO)** CDFRM
AUG 11
**U.S. DEPARTMENT OF JUSTICE**                                    **FEDERAL BUREAU OF PRISONS**

|  |  |
|---|---|
| | FCI EL RENO |
| | Institution |
| | 10/10/2024 |
| | Date |

TO: JACKSON, JASON | REG. NO.: 09733-509

ALLEGED VIOLATION(S): REFUSING WORK/PROGRAM ASSIGNMENT

DATE OF OFFENSE: 10/08/2024 | CODE NO.: 306

You are being referred to the DHO for the above charge(s).

The hearing will be held on: _____ at _____ (A.M./P.M.) at the following location:
NEXT AVAILABLE DOCKET

You are entitled to have a full-time staff member represent you at the hearing. Please indicate below whether you desire to have a staff representative, and if so, his or her name.

I (do) ____ (do not) ✓ wish to have a staff representative.

If so, the staff representative's name is: _____

You will also have the right to call witnesses at the hearing and to present documentary evidence in your behalf; provided, calling your witnesses will not jeopardize institutional safety. Names of witnesses you wish to call should be listed below. Briefly state to what each proposed witness would be able to testify.

I (do) ____ (do not) ✓ wish to have witnesses.

| NAME: | CAN TESTIFY TO: |
|---|---|
| | |
| NAME: | CAN TESTIFY TO: |
| | |
| NAME: | CAN TESTIFY TO: |
| | |

The Discipline Hearing Officer will call those witnesses (Staff or Inmate) who are reasonably available, and who are determined by the DHO to have information relevant to the charge(s). Repetitive witnesses and repetitive character references need not be called. Unavailable witnesses may be asked to submit written statements.

If additional space is needed, use the reverse side of this form. Date, sign, and return this form to the DHO.

DATE: 10/10/2024 | SIGNATURE: ✗

Notice of hearing before DHO given inmate 10-10-24/0770 by J. SMITH
                                    Date/Time              Staff Printed Name/Signature

*(This form may be replicated via WP)*                    *Replaces BP-294(52) of JAN 88*

PDF                              Prescribed by P5270