Jeremy Pinson # 16267-064
_____
Name and Prisoner/Booking Number

USP Allenwood S.A.U.
_____
Place of Confinement

P.O. Box 3000
_____
Mailing Address

White Deer PA 17887
_____
City, State, Zip Code

**(Failure to notify the Court of your change of address may result in dismissal of this action.)**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

Jeremy Pinson
_____ ,
(Full Name of Plaintiff)

                    Plaintiff,

v.

(1) Federal Bureau of Prisons ,
(Full Name of Defendant)

(2) United States of America ,

(3) Mark Gutierrez ,

(4) Muhammad Zantout ,

                    Defendant(s).

☒ Check if there are additional Defendants and attach page 1-A listing them.

CASE NO. 4:23-CV-00442-RM
           (To be supplied by the Clerk)

**CIVIL RIGHTS COMPLAINT
BY A PRISONER**

☐ Original Complaint
☐ First Amended Complaint
☒ Second Amended Complaint

## A.  JURISDICTION

1.  This Court has jurisdiction over this action pursuant to:
    ☐ 28 U.S.C. § 1343(a); 42 U.S.C. § 1983
    ☒ 28 U.S.C. § 1331; *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971).
    ☒ Other: FTCA, 28 U.S.C. 1346(b), 2671-80

2.  Institution/city where violation occurred: Systemwide (AZ, PA, DC etc.)

**550/555**

(5) Christopher Marlow
(6) Ashley Noble
(7) Stephen Williams

## B.  DEFENDANTS

1.  Name of first Defendant: _Federal Bureau of Prisons_. The first Defendant is employed
as: _Federal Agency_ at _systemwide_.
          (Position and Title)                              (Institution)

2.  Name of second Defendant: _United States of America_. The second Defendant is employed as:
as: _FTCA Defendant/Government_ at _Systemwide_.
          (Position and Title)                              (Institution)

3.  Name of third Defendant: _Mark Gutierrez_. The third Defendant is employed
as: _Complex Warden_ at _USP Tucson_.
          (Position and Title)                              (Institution)

4.  Name of fourth Defendant: _Muhammad Zautout_. The fourth Defendant is employed
as: _Associate Warden_ at _USP Tucson_.
          (Position and Title)                              (Institution)
                                    (Continued on Page 2-A)

**If you name more than four Defendants, answer the questions listed above for each additional Defendant on a separate page.**

## C.  PREVIOUS LAWSUITS

1.  Have you filed any other lawsuits while you were a prisoner?    ☐ Yes    ☐ No

2.  If yes, how many lawsuits have you filed? _Hundred +_.  Describe the previous lawsuits:

   a.  First prior lawsuit:
       1.  Parties: _Pinson_ v. _United States_
       2.  Court and case number: _No. 22-CV-00298-RM (D. Ariz.)_
       3.  Result: (Was the case dismissed?  Was it appealed?  Is it still pending?) _Pending_

   b.  Second prior lawsuit:
       1.  Parties: _Pinson_ v. _United States_
       2.  Court and case number: _No. 22-CV-00375-RM (D. Ariz.)_
       3.  Result: (Was the case dismissed?  Was it appealed?  Is it still pending?) _Pending_

   c.  Third prior lawsuit:
       1.  Parties: _Pinson_ v. _FBOP_
       2.  Court and case number: _23-CV-00417-RM_
       3.  Result: (Was the case dismissed?  Was it appealed?  Is it still pending?) _Pending_

**If you filed more than three lawsuits, answer the questions listed above for each additional lawsuit on a separate page.**

2

## B. Defendants (Continued):

5. Name of fifth Defendant = Christopher Martan . The fifth Defendant is employed as = Captain     at USP Tucson .

6. Name of Sixth Defendant = Ashley Noble . The sixth Defendant is employed as = Coordinator WASPB at BOP Central Office

7. Name of Seventh Defendant = Stephen Williams . The Seventh Defendant is employed as = Associate Warden ) at USP Tucson .

Page 2-A

## D.  CAUSE OF ACTION

### COUNT I

1.  State the constitutional or other federal civil right that was violated: _Violation of First Amendment_

2.  **Count I.** Identify the issue involved.  Check **only one.**  State additional issues in separate counts.
    - ☐ Basic necessities
    - ☐ Mail
    - ☐ Access to the court
    - ☐ Medical care
    - ☐ Disciplinary proceedings
    - ☐ Property
    - ☐ Exercise of religion
    - ☒ Retaliation
    - ☐ Excessive force by an officer
    - ☐ Threat to safety
    - ☐ Other: _____.

3.  **Supporting Facts.**  State as briefly as possible the FACTS supporting Count I.  Describe exactly what **each Defendant** did or did not do that violated your rights.  State the facts clearly in your own words without citing legal authority or arguments.

    _See Pages 7 thru 19 at Paragraphs 1-26, 27-37, 40 to 76, 77 to 82._

4.  **Injury.**  State how you were injured by the actions or inactions of the Defendant(s).

    _Same as 3 Above, violation of Constitutional rights_

5.  **Administrative Remedies:**
    a.  Are there any administrative remedies (grievance procedures or administrative appeals) available at your institution?  ☒ Yes   ☐ No
    b.  Did you submit a request for administrative relief on Count I?  ☒ Yes   ☐ No
    c.  Did you appeal your request for relief on Count I to the highest level?  ☒ Yes   ☐ No
    d.  If you did not submit or appeal a request for administrative relief at any level, briefly explain why you did not.  _____

3

## COUNT II

1. State the constitutional or other federal civil right that was violated: Violation of Fifth Amendment to U.S. Constitution

2. **Count II.** Identify the issue involved. Check **only one**. State additional issues in separate counts.
   - ☐ Basic necessities
   - ☐ Disciplinary proceedings
   - ☐ Excessive force by an officer
   - ☐ Mail
   - ☐ Property
   - ☐ Threat to safety
   - ☐ Access to the court
   - ☐ Exercise of religion
   - ☒ Other: Due Process
   - ☐ Medical care
   - ☐ Retaliation

3. **Supporting Facts.** State as briefly as possible the FACTS supporting Count II. Describe exactly what **each Defendant** did or did not do that violated your rights. State the facts clearly in your own words without citing legal authority or arguments.

Continued on pages 7 to 19, at Paragraphs 52-67, 75-79.

4. **Injury.** State how you were injured by the actions or inactions of the Defendant(s).
Violation of Constitutional Rights, placement into and retention in psychologically devastating isolation without due process leading to self-harm, suicide attempts, anxiety, panic attacks, depression.

5. **Administrative Remedies.**
   a. Are there any administrative remedies (grievance procedures or administrative appeals) available at your institution?  ☒ Yes  ☐ No
   b. Did you submit a request for administrative relief on Count II?  ☒ Yes  ☐ No
   c. Did you appeal your request for relief on Count II to the highest level?  ☒ Yes  ☐ No
   d. If you did not submit or appeal a request for administrative relief at any level, briefly explain why you did not. _____

4

## COUNT III

1. State the constitutional or other federal civil right that was violated: Violation of the Federal Tort Claims Act, negligence, assault, intentional infliction of Emotional Distress

2. **Count III.** Identify the issue involved.  Check **only one.**  State additional issues in separate counts.
   - ☐ Basic necessities
   - ☐ Disciplinary proceedings
   - ☐ Excessive force by an officer
   - ☐ Mail
   - ☐ Property
   - ☒ Threat to safety
   - ☐ Access to the court
   - ☐ Exercise of religion
   - ☐ Other: _____
   - ☐ Medical care
   - ☐ Retaliation

3. **Supporting Facts.** State as briefly as possible the FACTS supporting Count III.  Describe exactly what **each Defendant** did or did not do that violated your rights.  State the facts clearly in your own words without citing legal authority or arguments.

Continued on Pages 7 to 19, at Paragraphs 27-40, 42-49, 62-67, 71-75, & 81-82.

4. **Injury.** State how you were injured by the actions or inactions of the Defendant(s).
   Laceration, pain and suffering, Post-Traumatic Stress Disorder (hereinafter "PTSD")

5. **Administrative Remedies.**
   a. Are there any administrative remedies (grievance procedures or administrative appeals) available at your institution?   ☒ Yes   ☐ No
   b. Did you submit a request for administrative relief on Count III?   ☒ Yes   ☐ No
   c. Did you appeal your request for relief on Count III to the highest level?   ☒ Yes   ☐ No
   d. If you did not submit or appeal a request for administrative relief at any level, briefly explain why you did not. _____

→ Plaintiff filed an SF-95 which was acknowledged by BOP in Oct. 2022 and

If you assert more than three Counts, answer the questions listed above for each additional Count on a separate page.

was subsequently denied.

5

Count IV - Appears on Page 5-A but is separate from Count III

## D.  CAUSE OF ACTION

### COUNT IV

1. State the constitutional or other federal civil right that was violated: _Violation of the 8th Amendment to U.S. Constitution AND FTCA 28 U.S.C. 2671-80, 1346(b)_

2. **Count I.** Identify the issue involved.  Check **only one.**  State additional issues in separate counts.
   - ☐ Basic necessities
   - ☐ Mail
   - ☐ Access to the court
   - ☐ Medical care
   - ☐ Disciplinary proceedings
   - ☐ Property
   - ☐ Exercise of religion
   - ☐ Retaliation
   - ☐ Excessive force by an officer
   - ☐ Threat to safety
   - ☒ Other: _Deliberate Indifference to Mental Health Needs in Segregation_

3. **Supporting Facts.**  State as briefly as possible the FACTS supporting Count I.  Describe exactly what **each Defendant** did or did not do that violated your rights.  State the facts clearly in your own words without citing legal authority or arguments.

   _Beginning on Page 17 to 21, At Paragraphs 1 to 31_

4. **Injury.**  State how you were injured by the actions or inactions of the Defendant(s).
   _See Pages 17 to 21, at Paragraphs 19, 25-31_

5. **Administrative Remedies:**
   a. Are there any administrative remedies (grievance procedures or administrative appeals) available at your institution?  ☒ Yes  ☐ No
   b. Did you submit a request for administrative relief on Count I?  ☒ Yes  ☐ No
   c. Did you appeal your request for relief on Count I to the highest level?  ☒ Yes  ☐ No
   d. If you did not submit or appeal a request for administrative relief at any level, briefly explain why you did not.

   _An SF-95 Claim was filed with BOP Regional Counsel who denied it in March 2024._          _Page 5-A_

## E.   REQUEST FOR RELIEF

State the relief you are seeking:

1. Award damages against defendant USA in the amount of Ten Million U.S. Dollars on Count III;

2. Award damages in the amount of $500,000 against each of defendants Gutierrez, Noble, Zantout, Williams and Marlow on Count IV;

3. Permanent Injunction against BOP, on Counts I and II enjoining: (i) plaintiffs' continued housing in the Secure Administrative Unit (hereinafter "SAU") and any similar unit that houses BOP inmates in a solitary confinement housing 22 or more hours per day;

(Continued on Page 6A)

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 4/25 - 1 - 2024
_____
DATE

_____
SIGNATURE OF PLAINTIFF

Jeremy Pinson # 16267-064

_____
(Name and title of paralegal, legal assistant, or
other person who helped prepare this complaint)

_____
(Signature of attorney, if any)

_____
(Attorney's address & telephone number)

## ADDITIONAL PAGES

All questions must be answered concisely in the proper space on the form.  If you need more space, you may attach no more than fifteen additional pages.  But the form must be completely filled in to the extent applicable. If you attach additional pages, be sure to identify which section of the complaint is being continued and number all pages.

E. Request for Relief (Cont'd from Page 6)

(2) defendant BOP, its officers, servants, staff, employees, and all persons acting in concert or participation with them are enjoined and restrained from threatening plaintiff with punishment, penalty, or other reprisals, harrassing plaintiff, or imposing punishment, penalty, or other reprisals because of plaintiff's exercise of her rights under the First Amendment or her pursuit of legal remedies or her political beliefs or her media attention;

(3) that the injunction remain effective until Oct. 5, 2026;

4. Award all costs and fees of this action for plaintiff to be taxed against defendants.

5. Award $25,000,000 against the United States on the FTCA portion of Claim IV.

Supporting Facts:

1. The plaintiff is an inmate confined to the custody of the Federal Bureau of Prisons, hereinafter "BOP", and during the pendency of this federal lawsuit has been confined to institutions in Tucson, AZ and Allenwood, PA. (Note: The plaintiff was briefly housed at a facility in Oklahoma City, in transit from AZ to PA).

2. Plaintiff if a transgender (female) and is diagnosed with Gender Dysphoria.

3. Gender Dysphoria is a serious medical condition characterized by "mental distress stemming from strong feelings of incongruity between one's anatomy and one's gender identity." Iglesias v. Fed. Bureau of Prisons, No. 19-cv-415-NJR (S.D.Ill. Dec. 27, 2021)(quoting Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 451 (5th ed. 2013)).

4. The World Professional Association for Transgender Health (hereinafter "WPATH") is a professional association dedicated to understanding and treating gender dysphoria. WPATH has established standards of Care for the Health of Transsexual, Transgender & Gender Nonconforming People 1 (7th ed. 2011).

5. BOP "uses WPATH standards as a guide, but does not follow them in entirety, and that's because they were'nt developed specifically for correctional settings." (Iglesias, citing BOP filing);

6. The American Psychological Ass'n, American Psychiatric Ass'n, World Health Organization, American Academy of Family Physicians, American Public Health Ass'n, National Association of Social Wrokers, the American College of Obstetrics and Gynecology, and American Society of Plastic Surgeons endorse all protocols in accordance with WPATH's Standards of Care. The Ninth Circuit Court of Appeals has noted that "most courts agree" that the WPATH Standards of Care are the internationally accepted standard of care for the treatment of gender dysphoria.

7. Treatment options for gender dysphoria include social role transition, cross-sex hormone therapy, psychotherapy, and Gender Confirmation Surgery (hereinafter "GCS").

8. For GCS, current WPATH Standards of Care require the individual to live for "12 continuous months in a gender role that is congruent with gender identity" An individual also needs a medical clearance by a primary care provider and two referrals from mental health professionals. Finally, a surgeon still has discretion to decide whether surgery is appropriate for the individual.

9. Before 2010, only BOP inmates who received hormone therapy prior to incarceration were eligible to receive hormones while in BOP custody. See: Stipulation for Compromise Settlement and Release Ex. A, Adams v. Fed. Bureau of Prisons, No 09-10272-JLT (D.Mass., Sept. 29, 2011)

10. After BOP was sued in Adams, it ended this policy and provided more clarification for the evaluation and treatment of inmates with what was then called "Gender Identity Disorder" or "GID".

11. Following Adams, BOP changed its Program Statement 6031.03 to say: "if a diagnosis of GID is reached, a proposed treatment plan will be developed which promotes the physical and mental stability of the patient."; and "The development of the treatment plan is not solely dependent on services provided or the inmate's life experiences prior to incarceration."; and "Each treatment plan or denial of treatment must be reviewed by the Medical Director or BOP Chief Psychiatrist."

12. In 2016, BOP developed clinical guidance for medical management of transgender inmates which "provides recommendations for the medical management and treatment of transgender federal inmates, referred to in these guidelines as individual(s) or person(s)." See Federal Bur. of Prisons, Medical Management of Transgender Inmates, Clinical Guidance (Dec. 2016) (available at www.bop.gov/resources/pdfs/ trans_guide_dec_2016.pdf). (hereinafter "MMTI").

13. The BOP criteria in the MMTI included:
    "In addition to the eligibility and readiness criteria for hormone therapy, general criteria for consideration of surgery include at least 12 months of successful use of hormone therapy, participation in psychotherapy as clinically indicated, full-time real life experience in their preferred gender, and consolidation of gender identity. The inmate must request consideration for and demonstrate via informed consent a practical understanding of [GCS] including, but not limited to, permanence, potential complications, and short and long-term treatment plans" (MMTI at Pg. 22).

14. BOP defined "real-life experience" as "when individuals live as the gender with which they identify." (MMTI at Pg. 5).

15. At that time, "requests for surgery [were] submitted to the BOP TCCT for initial review and recommendation to the Medical Director, who is the approving authority." (MMTI at Pg. 22). The TCCT was the Transgdender Clinical Care Team.

16. By 2018, BOP developed the Transgender Offender Manual (hereinafter "Manual"). The Manual listed the following assessments the Transgender Executive Council should make when considering transfer of a transgender woman inmate to a female facility:
    -- The TEC will use biological sex as the initial determination for designation;
    -- The TEC will consider the health and safety of the transgender inmate exploring appropriate options available to assist with mitigating risk to the transgender offender, to include but not be limited to cell and/or unit assignments, application of management variables, programming missions of the facility, etc;
    -- The TEC will consider factors specific to the transgender inmate such as behavioral history, overall demeanor, and likely interactions with other inmates; and
    -- The TEC will consider whether placement would threaten the management and security of the institution and/or pose a risk to other inmates in the institution. "The designation to a facility of the inmate's identified gender would be appropriate only in rare cases after consideration of all of the above factors and where there has been significant progress towards transition as demonstrated by medical and mental health history."

17. In the Iglesias lawsuit, members of the TEC testified at a preliminary injunction hearing and in its briefing that unwritten policies also existed requiring transgender women to live in a female facility for 12 continuous months, and to be transferred to a female facility BOP required transgender women to achieve target hormone levels and to be at a low security level facility for an unspecified period of time.

18. Policies and procedures regarding an inmate's security level are found in BOP's Program Statement 5100.08, which defined "Maximum Custody" as:
     "The highest custody level assigned to an inmate requiring the highest level of security and staff supervision. This classification is for individuals who, by their behavior, have been identified as assaultive, predacious, riotous, serious escape risks, or seriously disruptive to the orderly running of an institution. Accordingly, quarters and work assignments are assigned to ensure maximum control and supervision."
     (P.S. 5100.08, "Definitions" Section).

19. P.S. 5100.08 further states: "It should be clearly understood that the Custody Classification Form only recommends an inmate's custody. The Unit Team and.or Warden is the final review authority."

20. Only, a Warden within BOP may remove a "Maximum Custody" classification once it is assigned. By custom and practice, this may only occur in rare cases, but not before an inmate has demonstrated at least 10-years of receiving no "incident reports" for prohibited acts as defined by 28 C.F.R. 541.3(a), Table 1.

21. By custom and practice, only "male" BOP inmates are assigned the classification of "Maximum Custody".

22. After the Iglesias injunction issued, BOP rescinded the 2018 version of its Transgender Manual, and implemented a version which removed the 2018 Manual's requirement that the TEC use biological sex as its initial determination for designation or transfer. (hereinafter "2022 Manual").

23. In making housing determinations, the 2022 Manual directs that a transgender person's "own views with respect to his/her own safety be given serious consideration."

24. Unlike the prior versions of the Manual, the 2022 Manual also contains a provision specific to "situations where the transfer request is related to progressing the individual inmate's transition." The TEC is to consider such cases after the Warden of the individual's current facility submits documentation to the TEC showing the person has "met the minimum standards of compliance with programs, medications and mental health treatment and is meeting hormone goal levels".

25. The Bureau of Justice Statistics and Niational Institute of Corrections have each noted publicly that transgender inmates are particularly vulnerable to assault and sexual abuse while incarcerated, particularly in male facilities. (See, e.g. Bureau of Justice Statistics, Sexual Victimization in Prisons and Jails, 2011-12 (May 2013)).

26. Plaintiff filed lawsuits in the District of Arizona in 2019 and 2020 relating to her sexual/physical abuse in BOP custody.

27. In June 2022, Warden Damon Colbert agreed to plaintiff's transfer from USP#2 Coleman in Florida, back to USP Tucson. Plaintiff was assigned to Unit A-1.

28. Soon after her arrival, BOP's TEC decided to create an electronic "Request to Staff" option within BOP's Trust Fund Limited Inmate Communications System (hereinafter "TRULINCS") to allow BOP inmates to communicate their concerns directly with the TEC.

29. In June 2022, plaintiff submitted a PREA Complaint against inmate Tyrone Brown who was attempting to use threats and intimidation to coerce plaintiff into joining a prostitution ring he ran within USP Tucson, primarily to obtain drugs from Jose Armendariz an influential drug dealer within USP Tucson.

30. Warden Colbert ordered Brown kept in the USP Tucson Special Housing Unit pending an SIS Investigation pursuant to 28 CFR 115.62 to keep plaintiff safe from Brown.

31. At some point in June 2022, Warden Colbert transitioned out of USP Tucson as Warden, and Mark Gutierrez of USP Victorville became the USP Tucson Warden and FCC Tucson Complex Warden.

32. As Warden, Gutierrez was the final decisionmaker in all areas of local policies and operations as USP Tucson with the authority to follow or override all decisions by other USP Tucson staff. Upon his departure, this included the decisions of Warden Colbert.

33. Because of an influx of voluminous requests for investigation of the complaints submitted to the TEC by USP Tucson's transgender inmates, Warden Gutierrez called a meeting of all transgender inmates in USP Tucson by using the Bureau's SENTRY system to identify and schedule all USP Tucson inmates with a "Transgender" CMA Asignment to a joint meeting in the USP Tucson Chapel.

34. Also attending the meeting, of the transgender population were other Unit Managers, Associate Wardens and Psychology staff. More than 100 inmates attended the meeting.

35. One associate Warden, made a number of transphobic, stereotypical, outrageous and scandalous remarks about the transgender inmates who present. After repeating for a third time, comments regarding being prostitutes, plaintiff raised her hand to be recognized and Warden Gutierrez acknowledged her so that she could speak. The plaintiff stood and addressing the Associate Warden stated that she was not aware of why the Associate Warden was addressing the entire transgender population of USP Tucson as actively engaged in prostitution but that the plaintiff did not appreciate being sterotyped as such, and stated that it was the right of every transgender inmate to email the TEC and the Executive Staff were wrong to call them to such a meeting to threaten and verbally abuse them for doing so.

36. Plaintiff's remarks upset Warden Gutierrez who, in front of the entire transgender population stated "you wont be here much longer."

37. Warden Gutierrez, within days of the meeting in the Chapel of the

Page 10

USP Tucson transgender population, and another discussion with the plaintiff regarding complaints about Health Services staff, suddenly ordered Tyrone Brown released from SHU to General Population.

38. Upon his release from SHU, Brown began immediately threatening to rape and kill plaintiff, and several other inmates, prompting her, Albert Singer, Ernesto Zaragosa-Solis III, Rickie Rarey, Jessica Gulisano to email PREA complaints against Brown to the OIG, which were immediately rerouted to Warden Gutierrez for action.

39. Gutierrez took no action, to protect anyone from Brown. Instead he allowed Lt. Christensen to call Brown to the Lieutenant's Office where he was informed that several inmates were filing PREA complaints against him and released to general population.

40. Gutierrez and Christensen, did not follow 28 CFR 115.62 in their handling of Brown, and the next morning as plaintiff and several others were walking through the dining hall during the AM meal, they were attacked by Brown with a weapon causing serious physical, mental and emotional injuries.

41. The inmates involved in the attack by Brown on 9-14-22 were all put in SHU for an SIS investigation.

42. On Sept. 29, 2022 Judge Rosemary Marquez decided the Motion for Summary Judgment in Case No 19-cv-00422-RM, by denying it. This set the case on track for a bench trial. The next day, Beth Schwartzapfel of The Marshall Project indicated a desire to cover the trial for an investigative journalism piece.

43. The Marshall Project is a nonpartisan, nonprofit news organization that seeks to create and sustain a sense of national urgency about the U.S. criminal justice system. (https://www.themarshallproject.org/about?via=navright (visited Sept. 20, 2023).

44. One central issue in Case No. 19-cv-00422-RM was whether BOP staff had failed to follow a PREA regulation, in failing to protect the plaintiff from another sexual predator who tried to rape her and had severely assaulted her.

45. The Marshall Project, and Schwartzapfel's interest in Case No. 19-cv-00422-RM coincided with the 20th anniversary of the Prison Rape Elimination Act of 2003. (34 U.S.C. 30301 et seq.). In particular, whether BOP's implementation of PREA regulations and policies had helped reduce sexual abuse and misconduct in BOP facilities.

46. The plaintiff was openly critical of BOP's implementation of PREA both in Case No 19-cv-00422-RM and in her communications with the reporter - Schwartzapfel.

47. On or about Oct. 5, 2022 Gutierrez and Christensen interviewed the plaintiff and several other inmates involved in the Sept. 14, 2022 attack by Brown. All were told that if they did not drop or stop participating in civil actions, both pending and proposed, against BOP and USP Tucson staff in particular they would remain in SHU on a long term basis and be transferred to a worse prison.

48. The plaintiff declined to drop any of her civil claims.

49. Gutierrez and Christensen first began their retaliation against the plaintiff and Ernesto Zaragosa-Solis III (the other inmate they had threatened on Oct. 5, 2022 during the interviews) by releasing from SHU all the inmates who had agreed to drop any civil claims but who were part of the investigation with the exception of Brown who was the assailant against the on Sept. 14, 2022.

50. At the same time Pinson and Zaragosa-Solis III were being held in SHU a second SIS investigation was opened against them by Gutierrez and SIS for an unrelated incident involving Daniel McNeal and Jose Armendariz.

51. Armendariz, an influential drug dealer within USP Tucson and SIS informant, had threatened McNeal over a drug debt. McNeal, fearing reprisal from inmates part of Armendariz institutional drug ring had sought protective custody the day of Brown's release from SHU.

52. The only true connection between Armendariz/McNeal and Pinson/Zaragosa-Solis was that Armendariz had been named in the PREA complaints filed against Brown on Sept. 13, 2022 as a potential target for assault by Brown.

53. Next, Christensen and Gutierrez directed a subordinate - Karen Moran - who worked in the SIS department to charge Plaintiff in an incident report with violatin BOP Prohibited Act Code 203 which prohibits Threatenin Any Person with Bodily Harm, on the basis of her refusal on Oct. 5, 2022 to drop her civil claims and telling Gutierrez and Christensen that she was going to hold staff accountable in her civil lawsuit that they were demanding she drop: No 19-cv-00422-RM.

54. The Unit Discipline Committee (pursuant to PS 5270.09) and Staff Psychologist Samantha Licata (pursuant to 28 CFR 541.6) both opined, without even speaking to plaintiff, that she was guilty of the incident report as charged by Moran, at the direction of Christensen and Gutierrez.

55. At a hearing before Discipline Hearing Officer Antoinetta Estrada pursuant to 28 CFR 541.8, plaintiff was acquitted of the charges that had been filed against her by Gutierrez, Christensen and Moran.

56. Following the acquittal, Gutierrez still refused to release plaintiff from the SHU back to general population. Instead, he directed her Unit Team to prepare a request that she be transferred to a "more restrictive environment" which was typed and presented to Gutierrez for his signature by Case Manager Felix who signed the document in his own name and for Unit Manager M. Palmer and then routed it to Case Manager Coordinator Snodgrass and Assistant Warden Zantout prior to its arrival at Gutierrez who signed the request on Dec. 2, 2022.

57. The transfer request was directed at BOP Senior Deputy Assistant Director Linda Geter and contained a number of false statements and allegations that had been generated by Christensen and Gutierrez. However, knowing that the TEC had just transferred plaintiff to USP Tucson in June 2022 Gutierrez and Christensen knew that a compelling case would be required to secure plaintiff's transfer again in such a short period of time. However, Gutierrez and Christensen also knew that their averments of fact in the transfer request would not be subject

to an independent review process to determine their veracity by Geter or the other designation officials involved.

58. Among the false allegations by Gutierrez, Felix and Christensen were (1) that plaintiff was involved in the introduction of drugs to USP Tucson with Armendariz, (2) that plaintiff was involved in an effort to "pimp" or sex traffick other transgender inmates, (3) that the plaintiff's actions had caused Brown to seriously assault Jessica Gulisano on 9-14-22, (4) that plaintiff was refusing to take programs at USP Tucson and engaging in disruptive behavior, (4) that the plaintiff was recruiting inmates to make false allegations against USP Tucson staff regarding the treatment of transgender inmates at USP Tucson, and then tied these false statements to information already in the TEC's possession from her period of incarceration between 2007 and 2016 which included negative behaviors.

59. Gutierrez did not inform the TEC or Geter, that, insofar as he was accusing plaintiff of involvement with Armendariz, an SIS investigation had produced no credible evidence that plaintiff was involved in the behavior of Armendariz and that as a result Armendariz had been charged and convicted at a DHO Hearing pursuant to 28 CFR 541.8 of Prohibited Act Code Code 111 for Introduction of Narcotics. Plaintiff was not charged because there was no evidence of her involvement to support a charge.

60. Gutierrez did not inform the TEC or Geter, that, insofar as he was accusing plaintiff of involvement in "pimp[ing]" or sex trafficking transgender inmates, the evidence was that plaintiff was a victim of attempted sex trafficking by Brown who had himself been working for Armendariz and received compensation in narcotics.

61. Gutierrez did not inform the TEC, or Geter, that insofar as he was accusing plaintiff of involvement in the assault of Gulisano on 9-14-22, the plaintiff had been assaulted with a weapon in that incident and had helped Gulisano sit upon the ground after Brown had caused a deep laceration to her face. Plaintiff was a victim, not otherwise involved.

62. Gutierrez did not inform the TEC, or Geter, that insofar as he was accusing plaintiff of refusing to take programs or engaging in disruptive behavior, he was referring to the Code 203 Moran had charged her with and with which she had been acquitted, and plaintiff took all the programs available to her including a Trauma Resilience class through the Psychology department and multiple Adult Continuing Education classes through the Education Department, and had manipulated her "Male Custody Classification" score to reflect the worst point score available by violating PS 5100.08 in multiple ways to achieve the score.

63. Gutierrez did not inform the TEC, or Geter, that insofar as he was accusing plaintiff of "recruitng" inmates to "make false allegations" against staff regarding the treatment of transgender inmates, he was referring to her list of witnesses that she was seeking to call at the bench trial before Judge Marquez in Case No. 19-cv-00422-RM which she refused to dismiss under threat of retaliation on Oct. 5, 2022 days after Judge Marquez denied summary judgment in that case.

64. Gutierrez knowingly and intentionally made these misrepresentations and

false statements because he had threatened to do so during the Oct. 5, 2022 interview.

65. In the transfer request of inmate Zaragosa-Solis he outlined multiple prohibited acts, but failed to inform the designation officials that Mr. Zaragosa-Solis had served all sanctions for those prohibited acts while Warden Colbert had been the USP Tucson Warden and that Colbert had released Zaragosa-Solis pursuant to 28 CFR 541.33(b) to USP Tucson general population and was not in SHU for any other reason than he had been the victim of an assault by Brown on 9-14-22.

66. Plaintiff and Zaragosa-Solis, the only 2 inmates who refused to drop any pending or proposed civil actions against USP Tucson, the BOP, and USP Tucson staff, were the only 2 inmates that Gutierrez and his sub-ordinates went to such lengths to secure their transfers by completely manipulating the transfer request process with misrepresentations, misleading and false statements.

67. BOP policy, at the time of Gutierrez, Christensen, Moran, Felix and Zantout's actions against plaintiff and Zaragosa-Solis, in Program Statement 1210.24 and 3420.11 required all BOP staff to report to the Office of Inspector General and Office of Internal Affairs "any violation or alleged violations of the Standards of Employee Conduct" and that the most serious cases, which are identified in PS 1210.24 as "Classification 1 and 2 cases" had mandatory requirement that they "must be reported to OIA immediately".

68. Prior to the incidents involved in this case, USA Today reporter Kevin Johnson had filed a story in that newspaper in 2019 titled "Congress: US Prison Misconduct Regularly Covered Up" citing a 9-Page Report of an investigation conducted by the U.S. House Government Oversight and Reform Committee" which had concluded "serious misconduct by senior federal prison officials [was] largely tolerated or ignored altogether under a culture in which some were shielded from discipline" and that the Bureau of Prison had a serious, chronic problem with retaliation.

69. The reporter, Beth Schwartzapfel, and a second reporter for the Arizona Republic - Jimmy Jenkins - both began following the case (No.19-cv-00422-RM) for their respective media organizations and requested to interview plaintiff by submitting a request to Gutierrez for authorization to conduct an interview as required by 28 CFR 540.63, which Gutierrez then assigned to Amanda Stangl - his Executive Assistant for handling.

70. Stangl, who had worked as a unit team staff member for years at USP Tucson prior to her elevation to the position of Executive Assistant to Warden Gutierrez and was familiar with operations in the Special Housing Unit, knowingly and intentionally lied to Schwartzapfel stating plaintiff had telephone and email access in the SHU to attempt to mislead the reporter into believing the plaintiff was not cooperating with the news reporters who were seeking in-person interviews of plaintiff and when Schwartzapfel flew from Massacusetts to Tucson for the interview she was denied entry by Gutierrez, in part because of and relying upon the false representations of Stangl who claimed plaintiff could email or call Schwartzapfel whenever she wanted in SHU which was not true.

71. Plaintiff's allegations of non-compliance with PREA regulations, 28 CFR 115 et seq., in Case No. 19-cv-00422-RM were not unique. As she pointed out to Schwartzapfel and Jenkins, they had also been made in other lawsuits brought by federal prisoners, including:

Herrera v. United Staes, No. 20-cv-10206 (SDNY)
M.R. v. United States, No. 22-cv-05137 (NDCAL)
Gabbidon v. Wilson, No. 19-cv-00828 (SDWVa)
Delarosa v. United States, No. 22-cv-116 (EDKy)
Rudd v. United States, No. 22-cv-201 (EDKy)
S.B. v. Wilson, 19-cv-00773 (SDWVa)
C.L. v. Wilson, No. 19-cv-00792 (SDWVa)
Beaubrun, et al. v. United States, No. 19-cv-00615 (MDFla)
Thomas v. Carmichael, No. 21-cv-160 (SDInd)
Shorter v. United States, No. 19-cv-16627 (D.N.J.)
Cardenas v. United States, No. 23-cv-00745 (NDTex)
Kalu v. Spaulding, No. 19-cv-01621 (MDPa)

but not limited to those cases.

72. The plaintiff also pointed to the victim impact statements of female staff at USP Tucson, made in United States v. Jemine, No. 21-cr-374 (N. D.Ill. 2021) that stated in a filing:

"The female victims in the four incident submitted victim impact statements for the Court's consideration...the victim in Count One reported suffering from post-traumatic stress disorder afterward, and that the event affected her home life and her intimate relationship with her husband. The incident has taken a toll on her mental health and her sense of safety at [USP Tucson] where she confronts an ongoing fear of being raped. The victim in Count Two related that the event was dehumanizing and caused her to have to take time off from work. She reports being angry about the event, and about how 'nothin ever seems to happen' to prisoners who expose themselves to staff. The victim in Count Three also reported feelings of anger and helplessness, and she also reported being more cautious in her daily work routines. The victim in Count Four said she avoids the USP Tucson Special Housing Unit and had lastin feelings of anger."

73. Plaintiff, as a victim of Brown, had rights pursuant to the Crime Victim Rights Act, 18 U.S.C. 3771. However, due to the false statements and misrepresentations of fact in the documents prepared by Gutierrez, Felix, Christensen, Moran, and others involved in the aftermath of Brown's assault upon plaintiff with a deadly weapon, and efforts to deny any liability on the part of BOP staff at USP Tucson, these individuals thwarted any meaningful investigation by the Federal Bureau of Investigation and Tucson U.S. Attorneys Office into the incident for possible prosecution of Brown, which in turn denied plaintiff any of the rights she was due under 18 U.S.C. 3771.

74. All BOP staff, and attorneys, had responsibilities under federal law (i.e 5 USC 404, 413) and DOJ regulations (28 CFR 45.10, 45.11, 45.12) to act upon receipt of allegations of wrongdoing as described herein, yet failed to fulfill these duties regarding staff wrongdoing at USP Tucson.

75. Because of the failure to report, or investigate, the allegations made repeatedly by plaintiff, and others, regarding Gutierrez, Christensen, and other USP Tucson staff as described herein, designation officials

proceeded with the request for plaintiff's transfer to a "more restrictive environment" refusing to give any consideration to the allegations described herein.

76. Designation officials in the Bureau's Psychology Services Branch of its Central Office and the TEC, selected for plaintiff the Secure Administrative Unit or "SAU" at USP Allenwood.

77. In general population at USP Tucson, prior to Gutierrez's actions, the plaintiffs conditions included:

-- 16 hours daily out of cell time for programs and activities;
-- 520 minutes per month telephone access;
-- unlimited email access
-- drug rehabilitation and psychology programs
-- a cellmate
-- educational programs
-- 8 hours per day outdoor recreation (weather permitting)
-- contact visits weekly
-- paid employment within multiple departments (i.e. recreation, commissary, chapel, etc.)

78. The plaintiff's conditions in the SAU are starkly different:

-- 1 hour out of cell time every other day, alone, in secure cages;
-- solitary housing (no cellmate allowed)
-- no outdoor recreation
-- no employment opportunity
-- email access every other day for no more than 30 minutes
-- ineligible for drug rehabilitation programs
-- currently no psychology or education classes available

79. Plaintiff received no written notice, no hearing, no impartial decision-maker, no opportunity to present witnesses or documentary evidence, no opportunity to appeal prior to her placement in the SAU.

80. In prior litigation, the Bureau of Prisons in response to a lawsuit the plaintiff brought in 2012, sought dismissal on grounds of mootness. That case, No. 12-cv-01872-RC (D.D.C.) was dismissed on grounds of mootness in 2021 because BOP - by and through its attorneys - convinced the D.C. District Court that the likelihood of her being returned to solitary confinement in retaliation for her lawsuits or media engagements was so unlikely as to be unreasonable, and cited to updated and amended BOP policies regarding housing the mentally ill in solitary confinement.

81. Plaintiff informed Dr. Ashley Noble, Coordinator of the Women and Special Populations Branch of Central Office, and the members of the Transgender Executive Council in both in-person discussions and electronic messages of misconduct by Gutierrez as described herein and regarding other matters, and none of these individuals followed their mandatory reporting duties by failing to report the matters to the OIG or OIA.

82. Other attorneys representing the BOP and USP Tucson Staff, including but not limited to Clay Cook, AUSA Denise Ann Faulk, and Melissa Marcus Kroeger in the Tucson, US Attorneys Office, knew of but failed to report any of the allegations received from plaintiff or other sources to the OIG, OIA, or OPR.

Claim/Count IV, Supporting Facts:

1. Supreme Court Justice Sonia Sotomayor wrote in Apodaca v. Raemisch, No. 17-1284, 202 L.Ed.2d 251 (Oct. 9, 2018): "A punishment need not leave physical scars to be cruel and unusual. See Trop v. Dulles, 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958). As far back as 1890, this Court expressed concerns about the mental anguish caused by solitary confinement."

2. Apodaca described the inmate Petitioners' conditions as:

   "In administrative segregation at the CSP, each offender is housed in a single cell approximately 90 square feet in size...The cell contains a metal bed, desk, toilet and three shelves. There is [a] small vertical glass window that admits light but which, because of its placement in relation to the bed, desk, and shelving, is difficult to access to look out. A light in the cell is left on 24 hours a day. The inmates' daily existence is one of extreme isolation. They remain in their cells at least 23 hours a day. The cells were designed in a manner that discourages and largely restricts vocal communication between cells. [One prisoner could] hear other people yelling and screaming but not conversations. All meals are passed through a slot in the cell door to the inmate. The inmates have little human contact except with prison staff and limited oppor-tunities for visitors..."

3. Plaintiff is housed in the Secure Administrative Unit, or "SAU", and her conditions are:

   Pinson is housed in the SAU, where each offender is housed in a single cell approximately 10 feet long and 8 feet wide. The cells contain a metal bed, desk, toilet, and no shelves for their property so all belongings are kept in a single mesh bag on the floor. Each cell has 2 light fixtures, each housing 3 long fluorescent light bulbs, and is so bright that the plaintiff regularly gets headaches from the illumination which is continuous 24 hours per day. Her daily existence is one of extreme isolation. She remains in her cell 24 hours per day unless removed for a staff-scheduled appointment with a staff member, but otherwise has no human contact with other inmates at any time. The cells were designed to discourage vocal communica-tion between cells, and staff keep inmates in the SAU separated by a distance of between 20 feet to 100 feet with as few as 5 or as many as 15 cells between inmates which at the time of this complaint are kept empty. While plaintiff can hear an inmate regularly screaming at staff, she has not had an opportunity to speak to another inmate since February 2024. Plaintiff has a single 1-hour interaction with a staff psychologist once every 7 days, and no other human contact except by telephone or email.

4. Plaintiff, at sentencing, was recommended by the district court for designation to a medical facility in Butner, NC on the basis of an expert opinion offered by Dr. Melvin Gerald Preisz who testified:

   "Although I certainly don't condone any of what [she's] done and certainly [am] not trying to rationalize the way--- the very scary letters that [she's] written in the past and a very scary history that couls have been so much more worse, because the

damage that was done to [her] is beyond most people's compre-
hension. And they would never realize that the kind of depri-
vation [she] had in childhood was so severe that even I find it
hard to believe and Ive had 40 years of experience and Ive seen
cases that are extremely severe and extremely dangerous, and very
violent...but [her] early maternal grandfather, who beat [her] in
ways and treated [her] in ways that even you dont see in movies"

however, due to a clerical error, the district court's recommendation
did not specify which facility at FCC Butner it sought her designation
to.

5. The Bureau of Prisons, declined to place plaintiff at any of its
facilities in Butner, NC.

6. In 2014, the Tenth Circuit Court of Appeals approved a limited
correction to the Judgement to clarify that the district court at
sentencing "received extensive evidence of [her] mental health needs
and intended to recommend incarceration in FMC Butner - the federal
medical center located in Butner, North Carolina- so [she] could
receive the psychiatric treatment [she] needed" pursuant to 18 U.S.C.
3553(a)(2)(D). United States v. Pinson, 594 Fed. Appx. 517 (10th Cir.
2014).

7. Upon receipt of the corrected Judgment from the sentencing court in
Oklahoma, the Bureau of Prisons again declined to place plaintiff at
any of its facilities in Butner, NC.

8. By 2016, the plaintiff's mental health had deteriorated in segregation
to such a degree that the Bureau of Prisons itself raised her Mental
Health Care Level to Level-4 and housed her at its medical facilities
first in Springfield, MO and later in Rochester, MN. Psychiatrists
and Psychologists at both facilities urged administrative staff to
(1) house plaintiff in an open-population setting, and (2) house her
at all times with another inmate due to her suicide risk.

9. Since 2014, plaintiff has been subject to a "Psych Alert" pursuant to
Program Statement 5324.07 which policy describes as:
"PURPOSE AND SCOPE: Some inmates with substantial mental health
concerns require extra care when their housing is changed or they
are transferred. For this group of inmates that pose management
concerns, a special protocol has been developed for staff. It is an
enhanced tracking and monitoring system to ensure that when a dec-
ision to move the inmate occurs: any special psychological needs of
the inmate are reviewed and considered by Psychology Services staff"

10. Plaintiff's Psych Alert status warns all staff to (1) notify an on
duty psychologist immediately if plaintiff is to be placed into a
segregated housing unit, and (2) do not house plaintiff alone at any
time in segregation due to her suicide risk/self-harm risk.

11. Pursuant to Program Statement 5310.16 plaintiff is also classified
as "ADX/SMU Exempt" due to "The Bureau strives to avoid prolonged
placement of inmates with serious mental illness in settings such
as Special Housing Units (SHU) and the Special Management Unit (SMU)"
and the classification is meant to alert designators that an inmate with

an "ADX/SMU Exempt" CMA Assignment has serious mental illnesses and should not be designated to a solitary confinement facility or unit.

12. "ADX/SMU Exempt" status was assigned to plaintiff after she was a party to the class-action lawsuit Cunningham et al. v. Federal Bureau of Prisons, No. 12-cv-01570 (D.Colo.), and as a result of an evaluation by 2 non-Bureau Psychiatrists and Dr. Ashley Noble (a Bureau Psychologist) was deemed mentally unfit for solitary confinement and removed from ADX in 2014.

13. By 2023, Dr. Noble was promoted to the position in Central Office National Policy and Program Coordinator in the Women and Special Populations Branch. Dr. Noble spoke to plaintiff in-person and by electronic messages on TRULINCS, as part of the decisionmaking process to send plaintiff to the SAU.

14. Dr. Noble discussed plaintiff's case with her treating psychologist Dr. James Hayden who expressed grave concerns that plaintiff would commit suicide or engage in serious self-harm if housed in solitary confinement and recommended her release to general population immed- iately.

15. Despite his historical involvement in her removal from ADX, assign- ment as "ADX/SMU Exempt", and both his discussions with plaintiff and her treating clinician Dr. Hayden, Dr. Noble urged the TEC to house the plaintiff in the SAU in solitary confinement despite the heightened risk she would commit suicide or harm herself.

16. Furthermore, the public record is littered with evidence of the very serious harm involved with solitary confinement. In Apodaca at fn. 8, Justice Sotomayor noted:

" See, e.g., Davis v. Ayala, 576 U.S.____, ____, 135 S.Ct. 2187, 192 L.Ed.2d 323 (2015)(Kennedy, J., concurring)(detailing psycho- logical effects and citing story of 16-year old who was held in pretrial solitary confinement for 3 years and committed suicide two years after his release); Grissom v. Roberts, 2018 WL 4102891, *9-11 (10th Cir., Aug. 29, 2018)(Lucero, J., concurring); See also B. Stevenson, Just Mercy 153 (2014)(recounting story of juvenile pris- oner whose "mental health unraveled" in solitary, yielding self-harm and multiple suicide attempts). See generally Bennion, Banning the Bing: Why Extreme Solitary Confinement is Cruel and Far Too Usual Punishment, 90 Ind. L. J. 741, 753-763 (2015); Betts, Only Once I Thought About Suicide, 125 Yale L. J. Forum 222 (2016); Grassian, Psychiatric Effects of Solitary Confinement, 22 Wash. U. J. L. & Policy 325 (2006); Smith, The Effects of Solitary Confinement on Prison Inmates: A Brief History and Review of the Literature, 34 Crime & Justice 441 (2006); Calambokidis, Note, Beyond Cruel and Unusual: Solitary Confinement and Dignitary Interests, 68 Ala. L. Rev. 1117, 1150-1155 (2017)"

17. The Bureau of Prisons designated plaintiff to solitary confinement at the SAU on 11-29-2023 and began her transfer there on Dec. 14, 2023.

18. In the first 90-days of her designation to the SAU, plaintiff was

subject to more Suicide Risk Assessments by BOP psychologists, than she had been in the prior 2 years combined.

19. Plaintiff experiences significant clinical distress in solitary confinement in the SAU including but not limited to: depression, anxiety, panic attacks, suicidal ideation and urges, insomnia, irritability, paranoia, increasing unfamiliarity and uncomfortability with social interaction, withdrawal, stomach cramps, headaches, feelings of helplessness and hopelessness.

20. The scientific evidence of the harmful effects of solitary confinement are voluminous. See e.g.:

A. Diana Arias & Christian Otto, NASA, Defining the Scope of Sensory Deprivation for Long Duration Space Missions, 43 (2011) &
B. Craig Haney, Mental Health Issues in Long-Term Solitary & "Supermax" Confinement, 49 Crime & Delinq. 124, 130-31 (2003);
C. Thomas B. Benjamin & Kenneth Lux, Solitary Confinement as Psychological Punishment, 13 Cal. W. L. Rev. 265, 277 (1977);
D. Terry A. Kupers, Isolated Confinement: Effective Method for Behavior Change or Punishment for Punishment's Sake?, The Routledge Handbook for Int'l Crime & Just. Stud., 213, 215-16 (Bruce A Arigo & Heather Y. Bersot, eds., 2014);
E. Jeffrey L. Metzner & Jaime Fellner, Solitary Confinement & Mental Illness in U.S. Prisons: A Challenge for Medical Ethics, 38 J. Am. Acad. Psychiatry & L. 104 (2010).

21. On March 5, 2024 the BOP Director released a revision to the Program Statement for Special Housing Units (PS 5270.12) stating: "Generally, an inmate who has been identified by Psychology or Psychiatry Services as a Care3-MH, Care4-MH, Psychology Alert, or identified on the monthly SHU advisory should not be placed in Special Housing unless they present an immediate and/or serious danger to self, employees, or the orderly running of a Bureau facility...An inmate is considered to be housed in 'extended placement' when continuously housed in SHU for six months or longer. Inmates with serious mental illness must be removed from SHU before they have been housed for six months, unless they have extraordinary security needs."

22. When plaintiff asked SAU staff how they squared the Director's own statements with plaintiff's housing (1) in segregation since Sept. 14, 2022 and (2) in solitary confinement, one supervisory official stated "we get around the Director by how we write up the paperwork, we can pretty much do whatever we want with you" and others noted the plaintiff's treatment was at the direction of the TEC.

23. In a document titled "NE Regional Single-Cell Review Form" the USP Allenwood Warden, Captain, Unit Manager, and Lieutenant wrote and signed in a section titled "Reason for Single Cell" that the reason plaintiff was housed in isolation was "other cellmate trans[gender]".

24. When Plaintiff asked the acting Warden on 4-4-24 what "other cellmate trans" on the "NE Regional Single-Cell Review Form" meant, he stated "you can't live with noone who isn't transgender, we dont want you crying rape or nothing".

25. Razors, in the USP Tucson SHU, have been prohibited object for the inmate population since 2018. Plaintiff had an ongoing lawsuit involving self-harm in the USP Tucson SHU with razors at the time of her housing in SHU between Sept. 14, 2022 and Dec. 14, 2023.

26. While housed in the USP Tucson SHU, plaintiff's treating psychologist Dr. James Hayden would attend weekly "SHU Meetings" at which the defendants Gutierrez, Zantout, Marlow and Williams were present for weekly briefings on the status and conditions for each inmate in SHU including the plaintiff.

27. For more than a year, Dr. Hayden advised defendants Gutierrez, Zantout, Marlow, and Williams that inmates, including Plaintiff, were mentally suffering in the segregation conditions and advocated for their release from segregated housing on the grounds that the segregation and isolation was detrimental to the mental health of all Care-3MH Level inmates in particular (including plaintiff) and was exacerbating their struggle with self-harm and suicidal acts and/or ideation.

28. On 7 separate occasions between Sept. 14, 2022 and Dec. 13, 2023 plaintiff verbally told defendants Zantout, Marlow, Gutierrez and Williams that she was "feeling suicidal" and was in possession of a razor. Each defendant took no action to have the plaintiff taken from her cell to be searched for the razor to prevent her from harming herself or to be evaluated by a psychologist or other mental health provider such as a psychiatrist.

29. Within 4 to 6 hours of each incident when plaintiff informed the defendants Gutierrez, Williams, Zantout and Marlow that she was "feeling suicidal" and in possession of a razor, plaintiff then used the razor to cut her body causing serious and superficial injuries. On one of the occasions she showed the defendants Williams, that she had cut herself 7 times on her arm and he simply laughed before shaking his head and walking away from her cell.

30. Gutierrez, Zantout and Marlow upon seeing plaintiff's injuries after each incident of self-harm would tell staff members in SHU "no paper" or some variation of the same indicating to the SHU staff members to not document the injuries.

31. On one occasion where the SHU staff were told "no paper" by Gutierrez (with which they complied) plaintiff was also assessed by Dr. Hayden who declined to follow Gutierrez's instructions and documented in his notes observing lacerations to the plaintiff's arm and hand. The other SHU staff, followed Gutierrez's instructions and omitted from all other documentation that plaintiff has injured herself in direct violation of multiple mandatory BOP policies requiring documentation of inmate acts of self-mutilation.

32. Gutierrez, Zantout, Marlow and Williams also instructed staff to "no paper" other suicide attempts and acts of self-mutilation by inmates Elmer Moreno, Ernesto Zaragosa-Solis, Mikeal Stine, David Holland and others, which plaintiff reported during her meeting with Dr. Ashley Noble who was required to report the allegations he received from plaintiff, including her visible lacerations to her neck but failed to report her injuries at all. He too took no action.